**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| **In Re SUPERIOR OFFSHORE** ) | **CIVIL ACTION NO. 08-cv-** |
| **INTERNATIONAL, INC. SECURITIES** ) | **00687** |
| **LITIGATION** ) | |
| ) | **JUDGE NANCY F. ATLAS** |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**OPPOSITION TO THE INDIVIDUAL AND UNDERWRITER
DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

I.   PRELIMINARY STATEMENT ..................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................... 1

III. LEGAL STANDARDS .................................................................................. 8

   A.  Motion to Dismiss ................................................................................. 8

   B.  Rule 8 Notice Pleading Applies ........................................................... 10

IV.  ARGUMENT ............................................................................................... 14

   A.  As a Preliminary Matter, Knowledge is Not an Element of Plaintiffs' Claims
       14

   B.  The Complaint Alleges Materially Untrue and Misleading Statements in
       Violation of Section 11 ......................................................................... 15

      1.  Defendants' Omissions Regarding the Torch Bankruptcy and Declining
          Gulf Work Were Material ................................................................... 15

      2.  The Complaint Adequately Alleges Defendants' Material GAAP Violations
          And Violations Under Federal Tax Laws ........................................... 18

      3.  Defendants Failed to Disclose Business Transactions Among Insiders That
          Were a Detriment to the Company ..................................................... 19

      4.  Plaintiffs Have Adequately Pleaded Statements That Were Materially
          Untrue and/or Misleading When Made and the Inevitable Failures that
          Occurred Thereafter Serve to Further Bolster Plaintiffs' Allegations ............... 20

   C.  Defendants' Additional Materiality Arguments Fail ........................................ 22

      1.  The Bespeaks Caution Doctrine Is Inapplicable to Section 11 Cases .......... 22

      2.  Defendants' Risk Factors Were Insufficient To Warn Investors of the
          Conditions Present at the Time of the IPO ....................................... 24

      3.  Defendants' Misstatements Are Not Puffery ..................................... 26

   D.  Defendants' Mismanagement Argument is a Red Herring ............................ 27

**E.   The Complaint Adequately Alleges the Individual Defendants Are Liable Under Section 15 as Control Persons** .................................................................... **30**

**V.      CONCLUSION** ......................................................................................... **31**

# TABLE OF AUTHORITIES

## Cases

*ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336 (5th Cir. 2002). .............. 13, 17

*Basic Inc. v. Levinson*, 485 U.S. 224 (U.S. 1988) ............................................................ 21

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007)........................................................ 8, 9

*Brumbaugh v. Wave Sys. Corp*., 416 F. Supp. 2d 239 (D. Mass. 2006) ............................ 2

*Brumbaugh v. Wave Systems Corp.*, 416 F.Supp. 2d 239 (D. Mass. 2006) ...................... 27

Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d
      1125, 1132 (9th Cir. 2004)........................................................................................... 23

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) .................................................. 23

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) .............................................. 27

*Hill York Corp. v. American Int'l. Franchises, Inc*., 448 F.2d 680 (5th Cir. 1971) .......... 16

*Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981) .................................. 25

*In re Donna Karan Int'l. Sec. Litig.*, No. 97-CV-2011, 1998 U.S. Dist. LEXIS 22435
      (E.D.N.Y. Aug. 14, 1998)............................................................................................. 30

*In re Dura Pharms, Inc. Sec. Litig.,* 452 F. Supp. 2d 1005 (S.D. Cal. 2006) .................. 23

*In re Dynegy, Inc.*, 339 F. Supp. 2d 804 (S.D. Tex. 2004)............................................... 10

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 540 F. Supp. 2d 800 (S.D. Tex. 2007)... 13

*In re Fleming Cos. Sec. & Deriv. Litig.*, No. 5-03-md-1530, 2004 U.S. Dist. LEXIS
      26488 (E.D. Tex. June 10, 2004) .................................................................................. 10

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008)........................................... 13

*In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...................... 30

*In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472 (N.D. Ga. 1997) ................................. 27

In *Vess v. Ciba-Geigy Corp., USA,* 317 F.3d 1097 (9th Cir. 2003) .................................. 12

*Kane Enterprises v. MacGREGOR (USA) Inc*., 322 F.3d 371 (5th Cir. 2003).................. 8

*Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004) ................................. 8, 10, 16

*Krim v. pcOrder.com, Inc.*, No. A 00 CA 776 SS, 2002 U.S. Dist. LEXIS 6648 (W.D. Tex. Apr. 12, 2002) .................................................................................................... 28

*Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001) ............... 12

*Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994) .................................................................. 10

*Nathenson v. Zonagen, Inc.*, 267 F.3d 400 (5th Cir. 2001) ................................................ 19

*Santa Fe Indus. Inc. v. Green*, 430 U.S. 462 (1977) .......................................................... 29

*Scritchfield v. Paolo*, 274 F.Supp. 2d 163 (D.R.I. 2003) ................................................... 27

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) .............................................. 11

*Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705 (N.D. Tex. 2008) ........... 29

*Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995) ........................................................ 26

## Statutes

15 U.S.C. § 77o ...................................................................................................................... 30

15 U.S.C. § 77z-2(b)(2)(D) .................................................................................................. 23

## Rules

Fed. R. Civ. P. 8                                                                                                                    10

Fed. R. Civ. P. 9(b)                                                                                                               10

## I.    **PRELIMINARY STATEMENT**

The Complaint alleges that, in violation of Section 11 of the Securities Act of 1933, Defendants[1] made materially misleading and/or untrue misstatements and omissions in Superior Offshore Inc.'s ("Superior" or the "Company") Registration Statement and Prospectus (collectively the "Prospectus") regarding the availability of work in Superior's core market in the Gulf of Mexico, the pace at which Superior would enter new international and deepwater markets, the Company's ability to attain work and succeed in international and deepwater markets, the background and experience of Company management and employees, transactions with companies and individuals with undisclosed ties to Superior, and the Company's compliance with Generally Accepted Accounting Principles ("GAAP") and Federal Tax Laws.

Nothing more is required to state a Section 11 claim. Indeed, "Section 11's liability provisions are expansive – creating 'virtually absolute' liability for corporate issuers for even innocent material misstatements." *Krim v. PCOrder.com*, 402 F.3d 489, 495 (5th Cir. 2005) (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390, (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case…."). To survive a motion to dismiss a Section 11 claim, a plaintiff need only allege

---

[1] Defendants include the Company (against whom this action is currently stayed), its Chairman of the Board Louis Schaefer, its President and CEO James Mermis, its CFO Roger Burks, its Senior Vice President and General Counsel Joshua Koch (collectively, the "Individual Defendants"), and the lead underwriters of the offering, Merrill Lynch, Pierce, Fenner & Smith Inc. and J.P. Morgan Securities Inc. (the "Underwriter Defendants"). In addition to Section 11, the Complaint also states a claim for Section 15 control person liability.

a material misstatement or omission in the Prospectus, 15 U.S.C. § 77(k), and Plaintiffs have done so here.

Faced with this straight-forward pleading that readily meets the applicable standards, Defendants have filed motions to dismiss that attempt to miscast this case as a "fraud" when the Complaint sounds in strict liability and negligence. Indeed, without regard to the fact that their arguments are wildly misplaced in light of the allegations, Defendants nevertheless attempt to impose a heightened Rule 9(b) pleading standard to the Complaint when Rule 8 notice plainly pleading applies; suggest that Plaintiffs must plead the element of "knowledge" when knowledge is not an element of a Section 11 claim at all; and, using a kitchen sink mentality, throw in a number of red herrings -- *e.g.*, that the Complaint that clearly states a claim for untrue and misleading statements and omissions is somehow merely inactionable "mismanagement," or that the statements are mere "puffery" when the statements are in fact specific and detailed the so-called puffery defense has "gone the way of the dodo." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250, n.11 (D. Mass. 2006)(citing 69A Am. Jur. 2d Securities Regulation-Federal § 1118 (2005)). Finally, Defendants attempt to muddy the waters by making a vast array of premature and convoluted factual arguments that are both confusing and contradictory.

For example, Defendants argue that they had no way of knowing that work in the Gulf of Mexico would decline (ignoring that knowledge is *not* an element of Section 11), and yet also claim that the decline was publicly available information. Defendants further argue that they had no duty to disclose transactions with "friends" but disregard

that these alleged undisclosed transactions were made to the detriment to Superior – including the purchase of goods and services from companies owned by executives and their friends at vastly overpriced rates, the use of Company facilities for Defendant Mermis's son's business, and the use of Company funds to purchase gas for the CEO Mermis's personal fishing boat. Defendants also suggest that the Court should believe that Superior 's so-called "risk" factors – which purported to warn against circumstances that *may* occur in the future – "proved prophetic," rather than accept Plaintiffs' allegations (supported by multiple well-placed sources) that those conditions *already existed* at the time of the IPO.

Defendants argue that their statements about experienced workforce was mere "corporate optimism" and that post-IPO events -- which materialized as a consequence of the undisclosed conditions present at the time of the IPO -- somehow amount to fraud by hindsight. As discussed in detail below, each and every argument made by Defendants fails. Plaintiffs have met their *prima facie* burden of alleging a materially untrue and/or misleading statement or omission and as such, Defendants' motions should be denied.

## II.    FACTUAL BACKGROUND

On April 20, 2007, Superior conducted the IPO of almost 10.2 million shares for gross proceeds of $152 million. ¶1. In connection with that IPO, Superior issued a Prospectus which contained allegedly materially untrue and misleading statements regarding

At the time of the IPO, Superior's "core" business was its work in the Gulf of Mexico. The Prospectus represented that it had a successful track record that allowed it

to "develop a strong and loyal customer base" and "capitalize on the increased demand" in the Gulf market. ¶40. Defendants repeatedly stated in the Prospectus that there was "currently" "significant demand" in the Gulf of Mexico that the Company "intend[ed] to continue capitalizing on" and that work was expected "for the next several years." ¶40-41, 50. In line with these goals to continue substantial work in the Gulf, the Prospectus disclosed the Company's intention to "selectively pursue growth opportunities" into deepwater and international projects. ¶¶50. At the time of the IPO, the Company had only one vessel with the appropriate government and regulatory approvals and licenses for international work, but Defendants represented that, after refurbishment and upgrades, two vessels, the *Superior Achiever* and *Superior Endeavor*, would "enable [the Company] to provide services in water depths up to 10,000 feet" and "operate in a broad range of regions and expand the breadth of services." ¶¶56-57. Though the Company acknowledged it had limited experience in deepwater, it quickly reinforced investors' faith by reiterating that it had hired experienced personnel. ¶92.

Although the Company warned that demand for its services was driven by hurricane-related work and that "*current* activity levels *may* decrease," (¶90) confidential witnesses confirmed that hurricane-related work in the Gulf had *already* slowed by the time of the IPO. ¶46. In addition to this decline, Superior abandoned callout work (the last minute short-term jobs that had been the "bread and butter" for the Company) and overbid on projects. ¶¶48-49. As a result of Superior's lack of work in the Gulf, rather than "selectively pursue" deepwater and international markets, the Company intended to

use the funds from the IPO to "transform" Superior and move completely away from Gulf work. ¶52.

Defendants failed to disclose in the Prospectus, however, that the Company utterly lacked the assets, experience, and financial liquidity to make this transition. ¶¶53-67 (discussing the Company's difficulty with vessel refurbishment, problems with international projects, tax issues, and internal conflict). At the time of the IPO, Superior already lacked the available cash to refurbish and employ the *Endeavor* and *Achiever*. ¶57. In fact, the refurbishment of the *Superior Endeavor* was overshot by $15-20 million. ¶58. The *Superior Achiever* had to be sold before it could even be delivered to the Company for use. ¶58.

The Prospectus also touted management's experience including the employment of executives at several other offshore companies in high-level roles and decades of experience in the industry, "extensive experience in accounting, finance, and mergers," and "legal practice . . . in the areas of energy, admiralty and commercial litigation." ¶33. Specifically, Defendants represented that certain of the Company's executives (Defendant James Mermis, President and CEO; Patrick Chemin, COO; and Eric Smith) had many years experience in the industry, including as high level employees of "Torch Offshore, Inc., an offshore energy services company" ¶¶26-33

In truth, the Complaint alleges that Torch Offshore, Inc. was driven into bankruptcy as a result of its failed attempt to enter into the deepwater market. ¶28. This bankruptcy, and the disastrous attempt to enter the deepwater market which was spearheaded by Defendant Mermis, Chemin, and Smith, was undisclosed to investors.

¶¶28, 31-32.  In fact, multiple confidential witnesses reported an evident lack of experience or skill, disorganization, poor communication, and incompetence among management.  ¶¶34-39.

Defendants also conducted numerous undisclosed transactions with friends, family members, and companies with competing interests.  Many of these transactions were conducted to the detriment of Superior.  These transactions included, for example: the use of future-COO Chemin's contracting company to charter ships, outsourcing IT work to a company owned by the friend of the Chief Information officer, the hiring of VP Danny Schwartz' friends for subcontracting at overpriced rates, the use of Company facilities to fabricate equipment for Defendant Schaefer's son's business, Defendant Mermis's attainment of a major project in Venuzuala for a competing company he eventually joined, and the chartering of boats from VP Weinhoffer at inflated rates ¶¶68, 70, 72-73.

Defendants claimed they had experienced revenue growth, were focused on the improvement of internal controls and financial systems.  ¶¶77-78.   In truth, the Company's internal controls were grossly inadequate or non-existent.  ¶80.  Confidential witnesses reported that the Company received daily calls throughout the relevant period from vendors seeking payment for unpaid bills.  ¶¶81-82.  The Company lacked checks and balances and accounting standards and, as a result, significantly overpaid on everything from dive supplies to food for employees and expended Company money on personal items such as fuel for Schaefer's personal 50-foot fishing boat.  ¶¶83-84

Defendants touted their adherence to GAAP.  ¶94. GAAP requires that the financial effects of transactions, events, and circumstances be accounted for in the period

in which they occur.  ¶97.  Defendants, however, eventually were forced to disclose that they neglected to withhold an aggregate of $980,000 in taxes *as required by law* for 2004 and 2005 relative to charter payments made to a foreign vessel owner. ¶98.  Defendants thus failed to accrue prior year taxes.  Not only did this violate federal tax laws, but it contravened GAAP, rendering the financial statements for 2004, 2005, 2006, and Q1:07 materially untrue and misleading.  ¶99.  In addition, as a result of Defendants' other material nondisclosures regarding the Company's lack of Gulf work and abandonment of the small projects that were responsible for its pre-hurricane success (¶¶101-102, 104, 207) Defendants violated SEC disclosure rules, including the regulations governing Management's Discussion and Analysis of Financial Condition and Results of Operations.  ¶¶100, 105.

Finally, four months after the IPO, Defendants acknowledged Superior's plan to "transform" the Company.   On August 14, 2007, the Company announced its second quarter and year-to-date earnings for the first six months of 2007, including a loss of $4.6 million for the first six months of the year (compared to income of $24 million for the same period of the previous year).  This period began *more than four months* prior to the IPO, and the losses were a direct result of the conditions present at the time of the IPO. Superior also disclosed Defendant Schaefer's sudden retirement in November (¶117), announced in December that it would be forced to sell the *Achiever* even though it had not yet been delivered to the Company ¶120, announced Defendant Mermis's unscheduled resignation in January, and in April, just one year following the IPO, announced its inability to timely file financial results, changes in senior management,

extremely limited liquidity, and eventual bankruptcy. ¶¶124-136. Before the true condition of the Company was announced, Defendants Burks, Koch, Mermis, and Schaefer managed to sell millions of privately-held Company stock – including more than $45 million in sales by Defendant Schaefer alone. ¶137. When the truth was finally revealed, Superior's stock plummeted, losing 99% of its value from its IPO price of $15 per share to just $.15 per share on April 29, 2008. ¶137.

### III.    LEGAL STANDARDS

#### A    Motion to Dismiss

On a motion to dismiss, all factual allegations and reasonable inferences drawn therefrom must be construed "in the light most favorable to the plaintiffs." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004)(citations omitted). "A motion to dismiss must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citing *Kane Enterprises v. MacGREGOR (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).

As the Supreme Court has stated, a complaint need not provide "detailed factual allegations" but, rather, only "enough factual matter (taken as true)." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). "[E]nough fact to raise a reasonable expectation that discovery will reveal evidence [is all that is required] even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 1965 (citation omitted). "[A] plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* at 1969 (citation omitted).

Section 11 renders any signer, director of the issuer, or underwriter liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k (a). The securities laws recognize that the issuers' disclosure of material information is "crucial in the context of a public offering, where investors typically must rely . . . on an offering price determined by the issuer and/or the underwriters of the offering[.]" *Shaw*, 82 F.3d at 1208 (1st Cir. 1996).[2]  Section 11 does not require pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made, thus, liability against the issuer of a security is "**virtually absolute**, even for innocent misstatements." *Herman & MacLean*, 459 U.S. 375, 382 (1983) (emphasis added) (noting also that a Section 11 action can be brought against the issuer, its directors or partners, underwriters, and accountants).

Section 11 imposes only a "'**relatively minimal burden on a plaintiff**,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab*, 103 F. Supp. 2d at 201 (quoting *Herman & MacLean*, 459 U.S. at 381-82). Applying these standards to the Complaint, Defendants' motions to dismiss should be denied.

---

[2] Defendants are held to a heightened duty to disclose with respect to a public offering. *See, e.g.*, *Ernst & Ernst*, 425 U.S. at 195.  Indeed, "the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures called for in the company's annual Form 10-K or quarterly Form 10-Q filings . . . ." *Shaw*, 82 F.3d at 1208.

## B    Rule 8 Notice Pleading Applies

Notice pleading applies to Plaintiff's Section 11 claims. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004) ("Section 11 only requires notice pleading under Fed. R. Civ. P. 8 rather than the detailed pleading mandated by Fed. R. Civ. P. 9(b) or the Private Securities Litigation Reform Act[.]"); *In re Dynegy, Inc.*, 339 F. Supp. 2d 804, 827 (S.D. Tex. 2004) ("Because Lead Plaintiff has alleged that the §11 claims asserted in this action sound only in strict liability and negligence, they are only subject to the notice pleading standard of Rule 8(a)[.]"); *In re Fleming Cos. Sec. & Deriv. Litig.*, No. 5-03-md-1530, 2004 U.S. Dist. LEXIS 26488, at *140 (E.D. Tex. June 10, 2004) ("Notice pleading under Rule 8 is all that is required to properly state 1933 Act claims."). The Complaint here alleges only strict liability and negligence claims. Defendants contend, erroneously, that the heightened pleading standards of Rule 9(b) apply. Indiv. Br. at Section III.C. In *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994), relied upon by Defendants, the Fifth Circuit concluded that Rule 9(b) applied because of the "wholesale adoption of the allegations under the securities fraud claims for purposes of the Securities Act claims."[3]  That is not an issue here; the Complaint alleges *only*

---

[3] Defendants also rely on *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996), which is inapplicable. The complaint in that case, as in *Melder*, 27 F.3d at 1099, asserted both Section 10(b) and Section 11 claims. Plaintiffs in *Stac* alleged that the company went public and misled investors by failing to disclose information in its possession regarding a competitor's plan to include data compression into its newest operating system, which would take away the company's market. *Stac*, 89 F.3d at 1402-03. The complaint alleged "falsified" financial statements, *id.*, at 1403, "sham" agreements, *id.*, at 1405, channel "stuffing," *id.*, at 1407, and "inevitable" pending decline. *Id.*, at 1403. Importantly, the gravamen of the complaint sounded in fraud as it involved a central theory of a fraudulent scheme involving all defendants. There was no distinct, negligence-based theory upon which to base a Section 11 claim; that claim, like in *Melder*, was dependent entirely upon the 10(b) allegations.

Securities Act claims.   There are no claims brought for securities fraud under the Exchange Act.  Indeed, Defendants have conceded that the Complaint does not even use the word "fraud."  Indiv. Br. at Section III.C.

Defendants contend that the insider trading allegations are sufficient to transform the Complaint into one for fraud.  Indiv. Br. at 14.  Defendants have cited no cases holding that the presence of an insider trading allegation in a Section 11 complaint is sufficient to transform it to a complaint grounded in fraud.  *Cf., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202-4 (1st Cir. 1996) (reviewing insider trading allegation in the context of a Section 11 claim).  In fact, to paint such a broad brush rule would excuse future defendants from their disclosure duties under Section 11.  That is, if Defendants here are allowed to use insider trading as a shield against liability for Section 11 violations by successfully arguing that insider trading *ipso facto* transforms a Section 11 complaint into one for fraud, future defendants could escape Section 11 liability by engaging in insider trading.  The express language and policy goals of Section 11 militate against such a finding.

Defendants also cite no cases holding that allegations of an "undisclosed scheme,"[4] a phrase created out of whole cloth by Defendants and a phrase never used in

---

[4] It is striking that Defendants feel the need to conjure up this phrase, along with "artificially high prices," in an attempt to manufacture a fraud claim, color the language of the Complaint, and skew what is actually alleged.  *Melder*, 27 F.3d at 1100 (looking to the actual statements instead of a party's selective distortions to create an inference of fraud).  Defendants also choose to lodge their objection to a mere four words of the entire Complaint, "undisclosed plan" and "radically transform."  These words do not a fraud make.  Indeed, the failure to disclose material facts in the Registration Statement, of course, forms the basis of a traditional Section 11 claim under the express language of the statute.  Liability attaches under Section 11, "[i]n case any part

the Complaint, is a "classic allegation of fraud (albeit one with woefully insufficient particularity)."  While the Complaint contains an allegation of an "undisclosed plan," this does not transform the Complaint into one for fraud.  In *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003), for instance, a case citing to the Fifth Circuit's *Lone Star*, 238 F.3d at 368, and *Melder*, 27 F.3d at 1100 n.6, decisions, the Ninth Circuit held that Rule 8's liberal notice pleading standard applied to allegations of a drug company's *failure to disclose* the limited effectiveness of its product and its *failure to disclose* that the clinical literature on attention deficit disorder referred to in the diagnostic manual was of poor quality.

In the alternative, even if this Court were to hold that the Complaint contains one or more fraud allegations, the proper course is to disregard them.  *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001).  "[T]he rule has emerged that Plaintiff's claim must be dismissed if 'the inadequate fraud averment is *so intertwined* with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the inadequate fraud averment while leaving behind a viable negligent misrepresentation claim.'"  *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 540 F. Supp. 2d 800, 808 (S.D. Tex. 2007) (citation omitted) (emphasis added).[5]

---

of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]"  15 U.S.C. § 77k(a).

[5] More recent pronouncements on this issue have emanated from the Ninth Circuit, and at least two cases have held that the asserted fraudulent claims must be "necessarily" grounded in fraud. *Safron Capital Corp. v. Leadis Tech., Inc.*, No. 06-15623, 2008 U.S. App. LEXIS 8699, at **5 (9th Cir. Apr. 18, 2008); *In re Merix Corp. Sec. Litig.*, No. 06-35894, 2008 U.S. App. LEXIS 9073, at **3 (9th Cir. Apr. 22, 2008).  When viewed together with the "so intertwined"

Alternatively, even if Rule 9(b)'s particularity standard were applied to this case, the Complaint would survive Defendants' motions to dismiss. Particularity under Rule 9(b) is comprised of "the who, what, when, where, and how" of the events at issue. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir. 2002). A party need only "state with particularity the circumstances constituting fraud" such that the defendant "can prepare an adequate answer from the allegations." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. 2008). Where the "complaint offers sufficient detail to give defendants ample notice" of plaintiff's theory and "give[s] [the court] some assurance that the theory has a basis in fact," the allegations have been sufficiently pleaded under both Rule 8 and Rule 9. *Id.* (citations omitted). The Complaint here was pled with particularity and bolstered by statements from former employees and the Company's own belated disclosures. Plaintiffs have alleged several categories of untrue statements in the Company's Registration Statement, including untrue statements of material fact and omissions of material fact necessary to make not misleading statements regarding the qualifications and background of management, ¶¶26-39, the Company's Gulf of Mexico work and growth prospects, ¶¶40-49, the plan and ability to expand into international and deep sea work, ¶¶50-67, transactions with related parties, ¶¶68-73, conflicts of interest, ¶¶74-76, expenditures and operating expenses (as well as internal controls), ¶¶77-89, risk factors, ¶¶90-93, and compliance with GAAP, ¶¶94-107. In short, Plaintiffs have alleged with specificity not only the falsity of Defendants'

---

requirement in the Fifth Circuit, it is clear that there is an extraordinarily high bar to transform a Rule 8 pleading into one for fraud.

statements, but who made them (Defendants), where and how they were made (in the Registration Statement/Prospectus), when they were made (upon issuance), and why they were materially untrue and misleading when made (discussed below). Whether analyzed under the rubric of Rules 8 or 9(b), the Complaint withstands Defendants' attacks and their motions to dismiss should be denied.

## IV.    ARGUMENT

### A.  As a Preliminary Matter, Knowledge is Not an Element of Plaintiffs' Claims

Despite the fact that Section 11 contains no scienter or state of mind requirement, Defendants argue that Plaintiffs failed to allege that Superior *knew* at the time of the IPO that it would experience delays and cost overruns with the refurbishment of the *Endeavor* or knew that the *Achiever* would need to be sold prior to the Company even receiving the vessel. Indiv. Br. 19-20. (emphasis added). Defendants further argue that they could not have known that the Trinidad project, scheduled to take place in Fall of 2007, would go poorly. Indiv. Br. 20-21. To the extent certain of the Company's projects failed *after* the IPO, these failures were a result of the undisclosed conditions present *at the time of the IPO*.

Contrary to Defendants' implication, Plaintiffs did not need to allege "how or why Superior could have *known* at the time of the IPO that these events would occur." UW. Br. at 19, *See also* Indiv. Br. at 19 ("Plaintiffs do not allege that at the time of the IPO the Company knew it would have to sell the *Achiever* to raise funds."); 20 ("Plaintiffs do not allege facts suggesting Superior knew at the time of the IPO that it would experience

delays and cost overruns with the refurbishment of the *Endeavour*."); 30-31 ("plaintiffs do not contend that the alleged decline in hurricane-related work prior to the IPO was known or knowable). Section 11 does not require that plaintiffs allege knowledge or *any* state of mind (scienter).[6]  *Herman & MacLean*, 459 U.S. 375, 382 (1983).

### B.  The Complaint Alleges Materially Untrue and Misleading Statements in Violation of Section 11

#### 1.  Defendants' Omissions Regarding the Torch Bankruptcy and Declining Gulf Work Were Material

Defendants question the materiality of the alleged nondisclosures regarding Superior's lack of work in the Gulf of Mexico and the undisclosed bankruptcy of Torch Offshore, Inc., the company nearly identical to Superior that was guided by Defendant Mermis, Smith, and Chemin and was driven into bankruptcy.  Indiv. Br. at 32-33. According to Defendants, these undisclosed facts were publicly available:  "[T]he status of the hurricane damages and repair work in the Gulf of Mexico was reported on by those tracking hurricane weather patterns and as an industry-wide trend for the whole of the offshore petroleum industry" and "the Torch bankruptcy was available in public court filings and in Torch's own public filings."  Indiv. Br. at 32-33.

Companies are subject to heightened and rigorous disclosure requirements when conducting an IPO. *See, e.g., Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996).  The

---

[6] Defendants' contentions that Plaintiffs have failed to allege knowledge are particularly puzzling given that they allege the Complaint is grounded in fraud *because* the Complaint alleged knowledge.  Nevertheless, Defendants contentions are baseless in every regard.  Even in fraud cases, plaintiffs need not allege actual knowledge.  Further, in Section 11 cases grounded in fraud, plaintiffs need not allege any state of mind as it is not an element of the claim.

Prospectus must include all material information and investors are not expected to do extensive outside research into the background. *Hill York Corp. v. American Int'l. Franchises, Inc*., 448 F.2d 680, 696 (5th Cir. 1971) ("Defendants' argument concerning the availability of information to the plaintiffs is equally unavailing here. The plaintiffs do not have to prove that they could not have discovered the falsity upon reasonable investigation. To put it simply, the availability of information elsewhere does not excuse misleading or incomplete statements."). Without the information that Torch Offshore was driven into bankruptcy due to the incompetence of Torch Offshore, the statements touting Mermis, Smith, and Chemin's experience running a very similar Company are materially untrue and misleading.

The Fifth Circuit (interestingly, in a case against Torch Offshore) made clear that Defendants may not make material misrepresentations or omit information simply because it is publicly available elsewhere if investors search hard enough. *Kapps v. Torch Offshore, Inc*., 379 F.3d 207, 213 (5th Cir. La. 2004) ("It appears that the district court granted the motions to dismiss on the ground that the price of natural gas is publicly available information, and therefore, the defendants could not have been in violation of Section 11. If this is the interpretation intended by the district court, it is incorrect… Specifically, we hold that the definition of 'material' under Section 11 is not strictly limited to information that is firm-specific and non-public."). Information is material if it would affect a shareholder's investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 983, 985, 99 L. Ed. 2d 194 (1988). "Omitted information is immaterial if it is adequately set forth in the prospectus, not simply

because the information was not firm-specific or was publicly available. *Kapps*, 379 F.3d at 214 (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993)). The Firth Circuit also noted that "the SEC requires an issuer to disclose certain "trends" that could affect its business, and in appropriate circumstances this requirement may extend to certain trends that are not firm-specific or are publicly available." *Id.*

Materiality is a mixed question of law and fact reserved for the trier of fact. *TSC*, 426 U.S. at 450. Only "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [is it] appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Krim*, 989 F.2d at 1446. That Torch Offshore was driven into bankruptcy by certain Superior executives is undoubtedly material to investors.

Defendants' contention that the decline in Gulf work was publicly available contradicts the Plaintiffs' allegations, which must be accepted as true. Defendants argue that "the status of the hurricane damage and repair work in the Gulf of Mexico was reported on both by those tracking hurricane weather patterns and as an industry-wide trend for the whole of the offshore petroleum industry." Br. at 32-33. The implication that investors are expected to familiarize themselves with reports from hurricane trackers or industry-wide trends which *directly contradict* the representations in the Company's Prospectus is absurd. The Prospectus made representations regarding the "increased demand" for its service in the Gulf (¶40), stated that there was "significant demand" in the Gulf and that "currently, demand for [Superior's] services

17

in the U.S. Gulf of Mexico is at a high" (¶41). Defendants noted that the Company "intend[ed] to continue capitalizing on the strong demand for [Superior's] services . . . in the U.S. gulf of Mexico. ¶50. Superior even noted that it "anticipate[d] that hurricane-related repair projects will continue **for the next several years"** (¶ 41) and would "provide significant work" for the industry in that time (¶50). Plaintiffs also allege that *Superior* lost out on contracts to other companies who had saturated the market. ¶42. To contend now that there was publicly available information regarding a decline in Gulf work that materially affected Superior only exhibits Defendants' negligence in allowing these alleged misstatements to be published.

### 2. The Complaint Adequately Alleges Defendants' Material GAAP Violations And Violations Under Federal Tax Laws

The Complaint adequately alleges material omissions regarding Defendants' abject failures to comply with GAAP as well their violations of the U.S. Tax Laws. Defendants actually have the audacity to dispute that their conceded failure to withhold $980,000 in taxes in violation of federal law is immaterial as a matter of law. Indiv. Br. at Section X; UW Br. at 18-19.

As alleged in the Complaint, "[t]he Company is *required by law* to withhold taxes with respect to payments made to the vessel owner [*i.e.*, in the amount that should have been withheld of $980,000]." ¶98 (emphasis added). It is clearly material to a shareholder that the company has *violated the tax laws*.[7] When coupled with the

---

[7]    Defendants dramatically mischaracterize this as an "expenses" violation. Indiv. Br. at 36. In reality, this is not only a GAAP violation, but a U.S. tax code violation implicating Defendants' practices and capabilities that goes to the heart of whether Defendants can properly

allegations regarding the quality of personnel hired by the Company, or the lack on internal controls, the failure to account properly for the tax collection was part and parcel of the ***practices*** at the Company. Furthermore, the fact that the stock price dropped one day after the disclosures relating *inter alia* to the $980,000 charge, ¶113, strongly militates in favor of finding that the statement was material. *See, e.g., Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 413-15 (5th Cir. 2001). The misperception of the claim (as relying solely on the amount charged as cost of revenues) renders the cases cited by Defendants in support inapplicable.[8]

### 3. Defendants Failed to Disclose Business Transactions Among Insiders That Were a Detriment to the Company

Defendants claim they did not have a duty to disclose business transactions between Superior and Superior executives' family and friends; "side companies" with competing interests owned by Superior executives, transactions where Company resources were expended to benefit Superior executives' family, or instances where the Company grossly overpaid for goods and services because that vendor or service provider had a personal relationship with Superior and/or its executives. Indiv. Br. at 33-36; UW Br. at 23-25. According to Defendants, these undisclosed connections were immaterial

---

comply with federal law. This is unquestionably material to an investor. "A *fact* is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision." *Kapps*, 379 F.3d at 213-14 (citations omitted).

[8]    Defendants' premature, factually-intensive alternative argument -- that the Complaint fails to allege that the Company should have taken the $980,000 reserve at the time of the IPO (Indiv. Br. at 37) -- is directly contradicted by Defendants' own admissions and the Complaint. The Complaint alleges that "GAAP requires that the financial effects of transactions, events and circumstances be accounted for in the period in which they occur." ¶97. Defendants themselves have already conceded in their Form NT 10-Q that taxes should have been withheld "as payments were made in 2004 and 2005." ¶98.

and SEC regulations require only the disclosure of certain tractions between certain related persons, (officers, directors, or family) and not "friends." Indiv. Br. at 33.

The materiality of these undisclosed transactions does not lie solely in a single SEC disclosure provision. Defendants are required to disclose *all* material that would be relevant to investment decisions and any material facts necessary to make the statements included in the Prospectus not misleading. 15 U.S.C. §§ 77k.

Each of these alleged transactions was conducted for the benefit of a person or company with a personal connection to a Superior executive and to the detriment to the Company. The Complaint alleges, for example, that VP Danny Schwartz's friends were hired for subcontracting (over Superior's usual vendors) and would have benefited greatly from overpriced goods and services purchased by Superior (¶70(c)) and that Superior charted boats from Executive VP Weinhoffer's companies at "rates that were dramatically higher than other charter companies." ¶73. The Complaint also alleges that multiple confidential witnesses reported that there were undisclosed dealings "which would dramatically contribute to the Company's inability to succeed" including Defendant Mermis, while the CEO of Superior, working to attain a project out of Venezuela for a competing company, and later joining that company. ¶71. These omissions are material. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (U.S. 1988).

4. **Plaintiffs Have Adequately Pleaded Statements That Were Materially Untrue and/or Misleading When Made and the Inevitable Failures that Occurred Thereafter Serve to Further Bolster Plaintiffs' Allegations**

Superior's post-IPO failures are provided to evidence the undisclosed conditions present at the time of the IPO which form the basis for this case, and the consequences as those conditions came to light.[9]  In particular, the Complaint alleges that confidential witness confirmed that the Trinidad projected presented difficulties that Defendants "lacked the experience and strategy to overcome;" that the Company lacked "cost accounting" and the "proper checks and balances for spending" causing it to sink money into the project,   the Company's inexperience caused it to "set the dive" improperly, and materials – like glow sticks and Sodasorb – were purchased from vendors at incredibly inflated prices.   ¶¶65, 83.   These issues further bolster Plaintiff's allegations that Defendants at the time of the IPO suffered from undisclosed adverse conditions including lack of experience, necessary resources, and internal controls present within the Company.

With regard to the *Endeavor* and *Achiever*, the Complaint alleges that Defendants should have disclosed that, at the time of the IPO, the Company lacked the requisite experience, cash, influx of revenue (because it was abandoning the Gulf and had yet to attain adequate international and/or deepwater work), and internal controls to carry out refurbishment.  As a result of these conditions, the Company overshot its budget and the

---

[9] The Underwriter Defendants contend that the allegations regarding those post-IPO occurrences amount to "fraud by hindsight" and include "no allegations explaining how or why Superior could have known at the time of the IPO that these events would occur."  Br. at 19.  Of course, Plaintiffs have not alleged a fraud claim.  As such, as noted above, allegations of knowledge are not required and "fraud by hindsight" is an inapplicable defense.  Further, Plaintiffs have adequately alleged that the post-IPO events were cause *because* of the undisclosed conditions *present at the time of the* IPO.

vessels were forced into drydock and costly refurbishment from which the Company would never had the opportunity to benefit.

Defendants' factually-intensive contentions that they could not have known that work in the Gulf of Mexico was declining at the time of the IPO are particularly puzzling in light of their contradictory argument that this Gulf decline was publicly available information. The Complaint alleges that even though Defendants made statements that "current activity levels" (those purportedly present at the time of the IPO) "*may* decrease," the undisclosed truth was that the work was *already* declining for Superior at the time of the IPO because *other* competitors were thriving in the Gulf and had saturated a market. As a result, Defendants had *already* prematurely embarked on an alternate business strategy which the IPO was used to fund.

### C. Defendants' Additional Materiality Arguments Fail

#### 1. The Bespeaks Caution Doctrine Is Inapplicable to Section 11 Cases

Defendants argue that the Prospectus "bespoke caution," *i.e.*, that Defendants issued sufficient cautionary statements such that their forward looking statements are not misleading. (UW Br. at 12-19, I Br. at 24-32). The "bespeaks caution" doctrine, a judicial construct, was codified by the PSLRA as the "safe harbor" provision. 15 U.S.C. § 77z-2(b)(2)(D); *In re Dura Pharms, Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (noting that the PSLRA codified the bespeaks caution doctrine) (citing *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004)).

22

"In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* (citations omitted).  There is thus no doubt that Congress has directly and expressly spoken as to whether an underwriter or issuer can seek shelter for cautionary language (whether under the judicially constructed "bespeaks caution" doctrine or the later codified statutory "safe harbor" provision) as to statements made in connection with an IPO.  The plain wording of the PSLRA is abundantly clear:  Congress was well aware of the law at the time of the enactment of the PSLRA and expressly chose to exclude IPOs.  Congress is presumed to know the present state of the law when it enacts legislation. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988).   The "safe harbor" provision is expressly applicable only to 10(b) cases, and therefore renders the bespeaks caution defense inapplicable to statements made in connection with IPOs.

Nevertheless, the misstatements alleged here were *not* forward looking and, as noted below, the Company's "warnings" and so-called risk factors were inadequate.  The alleged untrue and/or misleading statements include, for example, that the Company's "track record has allowed [it] to develop a strong and loyal customer base and to capitalize on the increased demand . . . in [its] core market," that "*Currently*, demand for our services in the U.S. Gulf of Mexico is at a high level" and that "we have one of the largest, most highly trained and experienced workforces of diving personnel.  ¶¶40, 41, 85.  These statements, regarding the Company's current condition, are alleged to be materially untrue and misleading when made.

23

### 2.  Defendants' Risk Factors Were Insufficient To Warn Investors of the Conditions Present at the Time of the IPO

Superior's risk disclosures were inadequate, boilerplate, and failed to warn of the true facts and conditions present at the time of the IPO.  ¶¶90-93.  Defendants assert that Superior's risk factors proved "prophetic" and "prescient" and "warned investors of precisely what eventually came to pass" – implying that it is more likely that their risk factors psychically forecasted the future rather than misleadingly warned against conditions *already present* at the time of the offering.  Indiv. Br. at 25-26. The Prospectus warned that "Demand for our services currently is driven primarily by the need to repair hurricane-related damage … and is not indicative of our historical business…. Current activity levels may decrease as hurricane-related repair and construction work is completed."  *Id.*  Defendants argue that the Company's intention to "expand [its] deepwater capabilities" and to "pursue international growth opportunities" was made clear in the Prospectus.  Br. at 22-24.  The Complaint cites the Prospectus's disclosures regarding these intentions in detail (¶¶50-53) and alleges that they were inadequate.

The Complaint alleges that Superior's true plans were not to carefully "expand into" and "selectively pursue" new opportunities, but were instead to "transform" the Company – an undertaking for which Superior was ill prepared. ¶52.  Further, it was undisclosed that Superior was *forced* into this complete transformation by the undisclosed depletion of Gulf work that the Company faced at the time of the IPO.  ¶146. Defendants' boilerplate warnings about conditions that *may* occur were totally inadequate

and insufficient to alert investors of the true fact that the Company was *already* without work in the Gulf coast and yet lacked the cash and experience to transform the Company.

Although Defendants suggest that the internal control allegations relate only to post-IPO matters, Indiv. Br. at Section V.B; UW Br. at 18-19, they are quite mistaken.[10] The so-called adequate disclosures, however, are so vague and boilerplate as to be meaningless, failing to refer in any way to the inability to process or timely pay bills and expenses or accurately account for their non-payment, complete lack of fiscal oversight regarding expenditures, inadequate management oversight regarding contracts and deals with the largest clients, and inadequate IT system.  ¶¶80-84.  Furthermore, "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981).  The fact that the deficiencies existed prior to the IPO, as alleged in the Complaint at ¶80, is sufficient in and of itself to rebut Defendants' argument.[11]

Defendants cite *Zucker v. Quasha*, 891 F. Supp. 1010, 1017-18 (D.N.J. 1995), for the proposition that SEC filings after the offering did not support allegations the company

---

[10]  It is odd for Defendants to suggest that it is "self-flagellation" for them to fulfill their disclosure obligation by revealing the inadequacy or non-existence of their internal controls when, as Defendants contend, they did adequately disclose such frailties.  Indiv. Br. at 23 of 41. Perhaps, Defendants believe that the obligation to fully disclose all material facts, which they failed to do, is meant to be some sort of punishment, a view which should not be harbored under the securities laws.

[11]  The Prospectus also stated that "future growth" depended on the ability to "improve [] operating and financial systems and controls."  This spoke to present capabilities, *i.e.*, the actual existence of such systems and controls (otherwise there would be nothing to "improve").  Defendants suggest that they adequately warned that there were no such controls, an assertion clearly belied by the language of the Prospectus.  Indiv. Br. at 21-22; UW Br. at 18.

was in a precarious financial position at the time of the offering. Indiv. Br. at 19. The court found that "[w]ithout being connected to some prediction or evaluation of the risk associated with these investments, the statements reporting BPC and Aegis' purely historical revenue performance were not rendered misleading. . . ." *Id.* In contrast, Defendants here touted their ability to capitalize on the strong market conditions and demand in the Gulf while "selectively pursu[ing] international growth opportunities" but drastically *understated* the risk associated with their undisclosed transformation of the Company. Defendant's disclosures revealed that "***over the past few months*, we have been transforming Superior Offshore.**" ¶108. Even though the IPO had occurred less than four months prior to this disclosure, two thirds of its business was outside of its "core" Gulf market. ¶108. Further, Plaintiffs here provided numerous confidential witnesses who confirmed that the undisclosed conditions alleged were present at the time of the IPO.

### 3. **Defendants' Misstatements Are Not Puffery**

Defendants interpose a puffery defense, UW Br. at 23, which is tantamount to conceding that the statement at issue (*i.e.*, "one of the largest, most highly trained and experienced workforces") is inaccurate.[12] *Scritchfield v. Paolo*, 274 F.Supp. 2d 163, 172 n.13 (D.R.I. 2003). In *Scritchfield*, the court found actionable statements that reflected the company was a "premier provider" of DSL services and "dominant" in the field

---

[12]    Although Defendants refer to "other similar allegations," they neither cite nor refer to any other paragraphs or actual text. Statements of corporate optimism, however, are now viewed with disfavor and the "recent trend is to consider expressions of corporate optimism carefully." *See Brumbaugh v. Wave Systems Corp.*, 416 F.Supp. 2d 239, 250 (D. Mass. 2006) (noting that the puffing concept has "gone the way of the dodo").

because these statements reflected present status and capabilities, and connoted comparative superiority to other companies.  *Id.*, at 175; *accord, e.g.*, *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1477-78 (N.D. Ga. 1997) (statement that airline's safety record was "certifiably among the very best in the airline industry" was material and actionable).  That is precisely what the statement "one of the largest, most highly trained and experienced workforces" connotes.  Defendants assert that the Company has a particular advantage over other companies by virtue of its workforce.[13]  This is an actionable statement, as it is objectively verifiable, *i.e.*, it can be proven true or false.  *Cf., Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("Puffery" means statements of "corporate optimism" that "are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification.").[14]

### D. Defendants' Mismanagement Argument is a Red Herring

---

[13]    Defendants' claim that they disclosed the limits of their experience in the deepwater and international markets is factually wrong.  The offending statement expressly refers to the abilities of the workforce as the "largest" and "most highly trained."  The statement regarding the Company having limited experience speaks nothing to the qualities of its workers.  This is plainly recognized when the Company notes: "We have hired personnel who have experience operating in the deepwater; however, as a company, we have limited experience in operating in water depths in excess of 1,000 feet."

[14]    Defendants' reliance on *In re Azurix Corp. Sec, Litig.*, 198 F. Supp. 2d 862, 886 (S.D. Tex. 2002), is not instructive.  The language in that case held to be immaterial puffing consisted of the following, which has no applicability or bearing here: the second quarter of 1999 had been "a period of significant accomplishment for Azurix"; the Buenos Aires acquisition "established the company as a major participant in the Argentine water market"; that the IPO was "very successful"; and, that the IPO "provided Azurix with access to additional financial resources to fund the many growth opportunities that will distinguish the company as a leading player in the global water industry." *Id.*

The gravamen of the Complaint speaks to the Company's strict liability and the Individual and Underwriter Defendants' negligence in allowing the inclusion of materially untrue and/or misleading statements and omissions in the Prospectus. Nonetheless, Defendants attempt to cast aside their disclosure duties by claiming that Plaintiffs only allege inactionable statements falling within the purview of mismanagement or breaches of state law fiduciary duties.[15] Indiv. Br. at 15-18; UW Br. at 21-23.[16] It is clear that the Complaint sufficiently alleges materially untrue and misleading statements or omissions to survive the motions to dismiss.[17]

In *Krim v. pcOrder.com, Inc.*, No. A 00 CA 776 SS, 2002 U.S. Dist. LEXIS 6648, at *17 (W.D. Tex. Apr. 12, 2002), a Section 11 case, the court denied a motion to dismiss and rebuffed defendants' mismanagement argument: "A plain reading of the complaint, however, indicates that plaintiffs plead more than mere corporate mismanagement; rather, there are clear allegations of false statements [] and material omissions in the registration statements and prospectuses." In *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 478-79

---

[15] Defendants assert that the "vast majority" of the allegations in the Complaint are "garden-variety mismanagement claims." Indiv. Br. at Section IV. To say the least, Defendants have gilded the lily. They identify in the aggregate only 30 paragraphs of a 171-paragraph pleading as allegations somehow constituting mismanagement or breach of fiduciary duty.

[16] Preliminarily, the issue of mismanagement/breach of fiduciary duty should be left to a later stage of the proceedings. *Krim,* 2002 U.S. Dist. LEXIS 6648, at *17-*18.

[17] Defendants rely on inapposite cases that deal with mismanagement/breach of fiduciary duty in the context of such allegations forming the sole basis for a fraud claim and its requisite intent requirement. *See, e.g., Panter v. Marshall Field & Indiv.*, 646 F.2d 271, 289 (7th Cir. 1981); *In re Cable & Wireless PLC Sec. Litig.*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004); *Fitzer v. Sec. Dynamics Tecs., Inc.*, 119 F. Supp. 2d 12, 31 (D. Mass 2000). These cases stand merely for the general proposition that mismanagement/breach of a fiduciary duty, standing alone, is inactionable under the securities laws. *Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527, 539 (5th Cir. 2008). More than mismanagement is alleged here, however.

(1977), a securities fraud case relied upon by Defendants, the Supreme Court postulated on whether the implied right of action for securities fraud could be premised on a state breach of fiduciary duty claim, holding that it could not.  Of course, ""*Santa Fe* merely stands for the proposition that a claim for breach of fiduciary duty cannot, absent proof of the necessary elements of a § 10(b) claim, *of itself* support an action for securities fraud....  *Santa Fe* does not [] prevent a claim simply because it involves a breach of a fiduciary duty." *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 715 (N.D. Tex. 2008).  To the extent *Santa Fe* has applicability in a non-10(b) case, the existence of any allegations relating to breaches of fiduciary duty does not undermine Plaintiff's claims stemming from materially untrue and misleading statements and omissions.

The Complaint alleges, *inter alia*, material misstatements and omissions regarding the qualifications and background of management, ¶¶26-39, the Company's Gulf of Mexico work and growth prospects, ¶¶40-49, the plan and ability to expand into international and deep sea work, ¶¶50-67, transactions with related parties, ¶¶68-73, conflicts of interest, ¶¶74-76[18], expenditures and operating expenses (as well as internal controls), ¶¶77-89, risk factors, ¶¶90-93, and compliance with GAAP, ¶¶94-107.  The Complaint specifically alleges, for example, that Defendants' actual undisclosed plan was to use the IPO funds to reorganize the Company, and to enter into new, untested markets

---

[18] Although Defendants characterize the conflict of interest allegations as mere breaches of fiduciary duty, Indiv. Br. at 16, "[f]acts of this nature [] have always been considered material, and a failure to disclose such facts states a claim under the federal securities laws.  The violation...stems from the failure to disclose a fact that puts the shareholder on notice of a potential impairment of the director's judgment." *Kas*, 796 F.2d at 513-14.

such as deepsea and international operations – areas in which Defendants had no record of success or meaningful experience and which required vastly different skills and greater expenditures than the Company's core business.  ¶¶4, 50-67.

Even if mismanagement is alleged, "the mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws *if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement*."  *In re Donna Karan Int'l. Sec. Litig.*, No. 97-CV-2011, 1998 U.S. Dist. LEXIS 22435, at *28-*29 (E.D.N.Y. Aug. 14, 1998) (collecting cases).[19]  Defendants' mismanagement argument is a red herring and should be rejected.

### E.  The Complaint Adequately Alleges the Individual Defendants Are Liable Under Section 15 as Control Persons

A claim for control person liability under Section 15 of the Securities Act, 15 U.S.C. § 77o, requires pleading of (a) a primary violation by a controlled person and (b) control by defendant of the primary violator.  *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007).  The Complaint adequately alleges an underlying violation of Section 11 by each of the Individual Defendants, *Kapps*, 379 F.3d at 221, contrary to Defendants' assertion.  Defendants do not dispute their alleged control over the Company, and merely argue that Plaintiffs have not pled a Section 11 violation.

---

[19]    *See also Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2002 U.S. Dist. LEXIS 9814, at *36 (N.D. Ill. May 30, 2002) (stating that market pricing was not a mere claim of mismanagement but "a misrepresentation as to the practices actually being applied").

## V.   CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that Defendants' motions to dismiss be denied in full.[20]

Dated: November 24, 2008                                       /s/ Art Sadin

                                                    Art Sadin (Texas Bar No. 17508450)
                                                    **THE SADIN FIRM**
                                                    121 Magnolia, Suite 102
                                                    Friendswood, Texas 77546
                                                    Telephone: (281) 648-7711
                                                    Facsimile: (281) 648-7799
                                                    asadin@sadinlawfirm.com

                                                    **Local Counsel for Lead Plaintiff,
                                                    Additional Plaintiffs, and the Class**

                                                    **KAHN GAUTHIER SWICK, LLC**
                                                    Kim E. Miller
                                                    Melissa Ryan Clark
                                                    12 East 41st Street – 12th Floor
                                                    New York, NY  10017
                                                    Telephone: (212) 696 - 3730
                                                    Facsimile:  (504) 455-1498

                                                    -and-

                                                    Lewis Kahn
                                                    650 Poydras Street - Suite 2150
                                                    New Orleans, LA  70130
                                                    Telephone: (504) 455-1400

---

[20] In the event that the Court determines that all or any portion of the Defendants' Motion to Dismiss should be granted, Plaintiffs respectfully request leave to amend in accordance with Federal Rule of Civil Procedure 15. "Leave to amend is left to the sound discretion of the court and should be freely granted under Fed. R. Civ. P. 15(a), unless the court finds denial appropriate based on a plaintiff's undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previously allowed amendments, undue prejudice to the opposing party from allowing amendment, and futility of amendment." *In re Enron Corp. Sec.*, 540 F. Supp. 2d 759, 796 (S.D. Tex. 2007)(citations omitted).

Facsimile:  (504) 455-1498

**Lead Counsel for Lead Plaintiff,
Additional Plaintiffs, and the Class**

**LAW OFFICES OF ERIC J. O'BELL**

Eric O'Bell
3500 North Hullen Street
Metairie, LA 70002
Telephone (504) 456-8677
Facsimile: (504) 456-8624

**Additional Counsel for Lead Plaintiff
and the Class**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Opposition to Defendants' Motions to Dismiss was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent via US Mail to those indicated as non-registered participants on November 24, 2008.

_____/s/ Art Sadin_____
