# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| **In re SUPERIOR OFFSHORE INTERNATIONAL, INC. SECURITIES LITIGATION** | **CIVIL ACTION NO. 08-cv-00687**<br><br>**JUDGE NANCY F. ATLAS** |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  ARGUMENT .......................................................................................... 7

    A.  Applicable Legal Standards ........................................................... 7

    B.  Plaintiff Has Demonstrated the Requirements of Predominance and
        Superiority ..................................................................................... 8

        1.  Plaintiff Has Shown That Common Questions of Law and Fact
            Predominate ..............................................................................8

        2.  Defendants' Misguided Attacks Concerning Widespread
            Knowledge Do Not Undermine the Predominance of Common
            Questions ................................................................................10

        3.  Plaintiff's Allegations and Record Evidence Further Show The
            Predominance of Common Questions of Law and Fact ...........17

        4.  The Class Action Is Superior to Other Available Methods For the
            Fair and Efficient Adjudication of This Action ......................23

    C.  Lead Plaintiff Mr. Ognar Is a Passionate Advocate for the Class and
        Readily Meets the Requirements To Be Certified as a Class Representative
        ................................................................................................. 26

        1.  Mr. Ognar Is Knowledgeable About this Action ....................30

        2.  Mr. Ognar Vigorously Represents the Interests of the Class ................33

        3.  Mr. Ognar Is Diligently Overseeing His Counsel ....................36

III. CONCLUSION ..................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009) ........................... 14

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................... 16

*APA Excelsior III L.P. v. Premiere Technologies, Inc.* 476 F.3d 1261 (11th Cir. 2007) .............. 4

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330 (5th Cir. 2010) ........................................................................................................... 9

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................... 21

*Beach v. Healthways, Inc*., No. 3:08-0569, 2010 WL 1408791 (M.D. Tenn. April 2, 2010) ........ 3

*Bell Atl. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) .................................................. 8

*Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005)....................................... 9

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001)................. 6, 26, 27, 28, 29, 39

*Berger v. Compaq Computer Corp.*, 279 F.3d 313 (5th Cir. 2002).............................. 28

*Brown v. E.F. Hutton Group*, 991 F.2d 1020 (2d Cir. 1993)........................................ 12

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2009) ................................... 40

*Eisen v. Carlisle and Jacquelin*, 391 F.2d 555 (2d Cir. 1968) ...................................... 25

*Eisen v. Carlisle and Jacquelin*, 41 F.R.D. 147 (S.D.N.Y. 1966) ................................ 25

*Feit v. Leasco Data Processing Equipment Corp.* 332 F.Supp. 544 (E.D.N.Y. 1971) ................ 3

*Fener v. Operating Engineers Const. Indus.,* 579 F.3d 401 (5th Cir. 2009) ................................ 9

*Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th Cir. 2008).................................. 10

*Green v. Wolf Corp*, 406 F.2d 291 (2d Cir. 1968) ....................................................... 16

*Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298 (S.D. Tex. 2000)................................... 29, 39

*Hanon* v. *Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ...................................... 27

*Herman & MacLean v. Huddleston,* 459 U.S. 375 (1983) ........................................... 9

*In re Avon Sec. Litig.,* No. 91 CIV. 2287, 1998 WL 834366 (S.D.N.Y. Nov. 30, 1998) .............. 5

*In re Com. Oil/Tesoro Petroleum Sec. Litig.*, 484 F.Supp. 253 (W.D. Tex. 1979) .................. 3, 16

*In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009) ........................................... 1, 3, 10

*In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263 (S.D. Tex. 2005) .................................................. 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147 (S.D.N.Y. 2007) ......................... 5

*In re Gap Stores Sec. Litig.*, 79 F.R.D. 283 (N.D. Cal. 1978) ....................................................... 3

*In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ...................................... 11, 12

*In re LifeUSA Holding Inc.*, 242 F.3d 136 (3d Cir. 2001) ........................................................... 24

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ....................... 15

*In re Metropolitan Sec. Litig.*, No. CV-04-25-FVS, 2008 WL 5102303 (E.D. Wash. Nov. 25, 2009) ........................................................................................................................................... 14

*In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004) .............................................. 15, 16

*In re Reliant Energy ERISA Litig.*, No. Civ.A. H-02-2051, 2005 WL 2000707 (S.D. Tex. August 18, 2005) ........................................................................................................................................ 29

*In re Reliant Sec. Litig.*, No. H-02-1810, 2005 U.S. Dist. LEXIS 9716 (S.D. Tex. Feb. 18, 2005) ................................................................................................................................................. 8, 23

*Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646 (S.D.N.Y. 1986) ................................... 11, 12

*Krim v. PCOrder.com*, 402 F.3d 489 (5th Cir. 2005) ..................................................................... 9

*Levine v. Atricure, Inc.*, 508 F. Supp. 2d 268 (S.D.N.Y. 2007) ................................................... 13

*Lynch v. Baxley*, 651 F.2d 387 (5th Cir. 1981) ........................................................................... 40

*Mullaney v. Anderson*, 342 U.S. 415 (1952) ............................................................................... 40

*Mullen v. Treasure Chest Casino, L.L.C*, 186 F.3d 620 (5th Cir. 1999) ..................................... 24

*n re Am. Int'l Group, Inc. Sec. Litig.*, No. 04 Civ. 8141, 2010 WL 646720 (S.D.N.Y. Feb. 22, 2010 ...................................................................................................................................... 11, 15

*Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000) ....................................................................... 16

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007) ............ 8, 9

*Regents of Univ. of Cal. v. Credit Suisse First Boston*, 482 F.3d, 372 (5th Cir. 2007) ................ 9

*Shockley v. Adams Golf, Inc.*, No. Civ. A. 99-371, 2005 WL 3654346 (D. Del. June 27, 2005) 11, 12

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966) ................................................................. 28

*Umsted v. Intelect Commc'ns Inc.*, No. Civ.A. 3:99-CV-2604, 2003 WL 79750 (N.D. Tex. Jan. 7, 2003) ................................................................................................................................ 40

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ............................................................. 8, 9

*United Klans of Am. v. McGovern,* 621 F.2d 152 (5th Cir. 1980) ................................................. 15

*Williams v. Sinclair,* 529 F.2d 1383 (9th Cir. 1975) ..................................................................... 14

*Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986) ....................................................................... 12

## Statutes

15 U.S.C. § 77k ............................................................................................................................... 1

## Other Authorities

William O. Douglas & George E. Bates, *The Federal Securities Act of 1933,* 43 Yale L.J. 171 (1933) .......................................................................................................................................... 4

## Rules

Fed. R. Civ. P. 23 .................................................................................................. 7, 23, 26, 41

Lead Plaintiff Charles Ognar, by his undersigned attorneys, respectfully submits this memorandum of law in further support of his motion for class certification.

## I.   <u>PRELIMINARY STATEMENT</u>

Defendants' Motion in Opposition to Plaintiff's Motion for Class Certification ("Opposition" or "Opp.") fails to acknowledge the fundamental difference between the case at bar – a negligence-based case brought under Section 11 of the Securities Act of 1933 – and the vast majority of Defendants' supporting authority – fraud-based cases brought under Section 10(b) of the Securities Exchange Act of 1934.

Unlike a securities fraud case, Section 11 cases like this one involve no requirement that plaintiffs demonstrate plaintiffs' reliance, loss causation, or defendants' intent. Even damages are calculated based on statutory formula and can only be rebutted if defendants are able to affirmatively prove that the depreciation in share value was caused by something other than the misstatements and omissions in the registration statement. 15 U.S.C. § 77k(e). "Thus, the elements of a § 11 claim 'stand in stark contrast' to those of a claim under the Exchange Act (such as a § 10(b) claim)." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009) (citation omitted).

Despite these fundamental differences, Defendants cite a myriad of inapplicable 10(b) cases and even repeatedly refer to this § 11 case as one of securities "fraud." Opp. at 14 ("only 'certain' cases alleging 'securities fraud' are appropriate for class certification."), 24 n. 15 ("'securities laws' do not impose 'potentially expansive liabilities for events later alleged to be frauds'"), 26 ("'a class action is not the superior procedure'" for 'securities fraud lawsuit[s]' like this one"). These arguments ignore the

straightforward nature of Section 11, which has narrow elements that can and should be proven on a class-wide basis.

First, while making no dispute regarding the existence of commonality, Defendants argue that class members' purported "individualized knowledge" precludes a finding of predominance or superiority. Rather than argue that Plaintiff or certain members of the Class are privy to inside information or unique knowledge that could create individualized issues, Defendants assert that "widespread reporting of information relating to matters that plaintiffs alleged was [sic] misrepresented or withheld in the Prospectus resulted in individual claimants having knowledge that bars their section 11 claims." Opp. at 25. They go on to argue that such knowledge is "not susceptible to class-wide proof" and thus "class adjudication encompassing individual inquiries into each investor's knowledge would be hopelessly unmanageable." Opp. at 25-26.

As an initial matter, investors' knowledge is largely irrelevant in a Section 11 case and will never create individualized issues. The Third Circuit, in affirming the district court's grant of class certification in a strictly Section 11 case, has addressed an argument that is substantially similar to Defendants' and has made clear:

> [B]ecause reliance is not an element under § 11, **'the conduct of the defendants, not the knowledge of the plaintiffs**, is determinative' of materiality. The crucial questions are: '[W]as there a misrepresentation? And, if so, was it objectively material?' Since reliance is irrelevant in a § 11 case, <u>a § 11 case will never demand individualized proof as to an investor's reliance or knowledge</u> . . . Further, because a misrepresentation is material if a reasonable investor would have considered a fact important, the effect of a material misrepresentation is felt uniformly across the class of investors, regardless of whether the market is efficient. Since this is an objective standard, materiality is not determined . . . by the 'mix of information' available to each individual plaintiff.

*Constar*, 585 F.3d at 783 (citations omitted) (emphasis added).

Furthermore, Defendants' "individualized knowledge" argument collapses under the weight of Defendants' own admission that such information was "widespread" and "public." Opp. at 24-26. At trial, proof of this alleged "widespread knowledge" would be common to the class, as "[a]ll class members are charged with knowledge of the information in the public domain." *In re Com. Oil/Tesoro Petroleum Sec. Litig.*, 484 F.Supp. 253, 258 (W.D. Tex. 1979); *see also Beach v. Healthways, Inc*., No. 3:08-0569, 2010 WL 1408791, at *3 (M.D. Tenn. April 2, 2010) ("**Any defense that the truth was available in the market is a class-wide question of fact.** Even if Defendants' claim is true, however, given Defendants' admissions, such knowledge had to come from public information, available to all class members."); *See, also In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 302 (N.D. Cal. 1978) ("The central issue in this cause of action is whether or not the registration statement contained a material misrepresentation. **Other common questions of fact include whether the plaintiffs purchased with knowledge of any material misrepresentation** … Therefore, the commonality requirement of subsection (a)(2) of Rule 23 is satisfied by the proposed class.") (emphasis added); *Feit v. Leasco Data Processing Equipment Corp.* 332 F.Supp. 544, 575 (E.D.N.Y. 1971) (Noting, in finding the issuer and individual defendants liable following the trial of a Section 11 class action, that "**[p]roof that any particular member of the class had [] knowledge may be presented at the next stage of the litigation on the issue of whether that individual is entitled to his share of damages.**") (emphasis added).

Just as plaintiffs are presumed to have been harmed by the registration statement, regardless of whether they actually read it, plaintiffs are presumed to have relied on all public information when they made their purchase. *See APA Excelsior III L.P. v. Premiere Technologies, Inc.* 476 F.3d 1261, 1274 -1275 (11th Cir. 2007) ("At that time the registration statement will be an important conditioner of the market. Plaintiff may be wholly ignorant of anything in the statement. But if he buys in the open market at the time he may be as much affected by the concealed untruths or the omissions as if he had read and understood the registration statement." (quoting William O. Douglas & George E. Bates, *The Federal Securities Act of 1933,* 43 Yale L.J. 171, 176 (1933)); ("[W]hen the Section 11 plaintiffs [in *WorldCom*] purchased their stock they were presumed to have relied 'on all public information about WorldCom's financial condition insofar as it was reflected in the market price of the WorldCom securities'" (quoting *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 294 (S.D.N.Y. 2003)).

Because investors are presumed to have relied on all information that was meaningfully disclosed to the market, and such information is presumed to be absorbed by the market and factored into the share price of the stock at issue, individualized issues of knowledge are irrelevant and cannot predominate over class-wide inquiries regarding when the truth entered the market.

Even to the extent that such public disclosures create varying issues of damages (*e.g.,* that damages vary based on the timing of investors' purchases as they relate to the public dissemination of truth), such issues are *not* based on individuals' knowledge and will *not* create individualized issues. *See e.g. In re Flag Telecom Holdings, Ltd. Sec.*

4

*Litig.*, 245 F.R.D. 147 (S.D.N.Y. 2007) (*aff'd* in part at 547 F.3d 29 (2d. Cir 2009)) ("[I]t is well-established that **'[t]he fact that the interests of some members of [the class] may ultimately diverge when it comes time to allocate damages does not warrant the denial of class certification. . . .'"** (quoting *In re Avon Sec. Litig.,* No. 91 CIV. 2287, 1998 WL 834366, at *11 (S.D.N.Y. Nov. 30, 1998)). Thus, Defendants' arguments that issues of investors' knowledge would predominate over common issues must be rejected.

Second, Defendants argue that the Class Period must end on October 25, 2007, because unregistered shares entered the market on that date and demonstrating traceability would be difficult, if not impossible. Opp. at 28-31. Plaintiff agrees that the Class should consist of all purchasers of Superior's stock from April 20, 2007, the date of the IPO, through October 25, 2007, and abandons any claim based on the remaining Class Period (*i.e.*, the period from October 26, 2007, through April 25, 2008).

Third, regarding adequacy, Defendants argue that the class should not be certified because Mr. Ognar is not a suitable class representative. Nothing could be further from the truth. As discussed in detail below at Section C, Mr. Ognar's deposition testimony, along with his written discovery responses and unparalleled level of regular communications with counsel whom he oversees, amply demonstrate that he meets the adequacy requirements of Rule 23.

Lacking any meaningful basis in law to attack Mr. Ognar's adequacy, Defendants seek to impose an impossible standard of knowledge that has no basis in law and that defense counsel themselves fail to meet.

A putative class representative need not "possess[] a certain level of experience, expertise, wealth or intellect, or a level of knowledge and understanding of the issues, beyond that required by our long-established standards for rule 23 adequacy of class representatives." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) ("*Berger I*"). Rather, he need only "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Berger*, 257 F.3d at 482 -483. Mr. Ognar's knowledge and understanding of this case far exceed the Fifth Circuit's requirements.

Defense counsel themselves could not even meet the impossibly high and legally baseless standards they have set for Mr. Ognar here. For example, in the deposition of Mr. Ognar, the lead attorney for Defendants Mermis and Burks misstated the IPO date as having occurred in the year 2000 – some seven years before the IPO actually occurred. Ognar Dep. 73:3-6. Similarly, in the deposition of Mr. Glance, the same lead defense attorney misstated the Class Period and had to be corrected by Lead Counsel (Glance Dep. 78:17-23, Mar. 17, 2010). Defense counsel also repeatedly referenced multiple "lead plaintiffs," at one point asking Mr. Glance who the "other lead plaintiffs in this case" are, when in fact, there has only ever been one Lead Plaintiff – Mr. Ognar. *See* Order dated May 20, 2008. *Id.* at 76:10-17, 80:8-13.

Defendants do not dispute that Plaintiff has met the numerosity or typicality requirements of Rule 23(a). Plaintiff estimates that there are thousands of class members, and thus joinder of all members is impracticable. *See* Memorandum of Law in Support of Plaintiff's Motion for Class Certification ("Mtn.") at 11. The Company issued over 10

million shares in its Initial Public Offering (IPO) and the stock's daily trading volume averaged in the hundreds of thousands of shares during the Class Period. Furthermore, Lead Plaintiff's claims are typical of the class in that he seeks to recover damages stemming from the same materially untrue and misleading statements and omissions in the Prospectus and, like all other class members, suffered economic losses when the truth regarding those misstatements and omissions were revealed. Mtn. at 13-14.

For these and other reasons discussed herein, Lead Plaintiff has demonstrated that this action meets the requirements for class certification pursuant to Fed. R. Civ. P. 23, and that he should be appointed Class representative pursuant to Fed. R. Civ. P. 23(a) and that Lead Counsel, Kahn Swick & Foti, LLC ("KSF") should be appointed Class Counsel pursuant to Fed. R. Civ. P. 23(g).

## II.   ARGUMENT

### A.   Applicable Legal Standards

To qualify for class certification under Rule 23(b)(3), Plaintiff must show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition, a class action may only be maintained if the Court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Unger v. Amedisys Inc.*, 401 F.3d 316

(5th Cir. 2005). In making these determinations, a district court gives "independent weight to each Rule 23 requirement, regardless of whether that requirement overlaps with the merits." *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007).

**B.  Plaintiff Has Demonstrated the Requirements of Predominance and Superiority**

**1.  Plaintiff Has Shown That Common Questions of Law and Fact Predominate**

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiff must show that "issues are common to all members of the proposed class and predominate over any individual issues that have been plausibly shown to be present." *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 U.S. Dist. LEXIS 9716, *35 (S.D. Tex. Feb. 18, 2005). While Defendants correctly recognize that the predominance requirement directs courts to "consider how a trial on the merits would be conducted if a class were certified," *see* Opp. at 2, 13 (quoting *Bell Atl. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)), Defendants omit the next sentence of the Fifth Circuit's opinion in *Bell Atl.*, which defines what this consideration entails: "identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id*. at 302 (internal quotations omitted).

Because Section 11 cases involve violations of federal law based on uniform misrepresentations in a single offering document, the predominance requirement is easily met. *See Reliant*, 2005 U.S. Dist. LEXIS 9716, at *20-21 ("[T]he major issues in this

case, as in most Section 11 cases, include whether material misrepresentations and/or omissions were made in the registration statement, whether the market price for Reliant Resources' stock was artificially inflated, and whether Defendants are liable for violations of Section 11 and Section 15."). In fact, Plaintiff can *only* establish the elements of a valid Section 11 claim through common means of proof. *See Krim v. PCOrder.com*, 402 F.3d 489, 495 (5th Cir. 2005) (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390, (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case….").

Thus, it is no surprise that *every* case cited by Defendants as evidencing the Fifth Circuit's repeated refusal to certify "securities fraud class actions" on the basis of predominance involved Section 10(b) class actions where common means were not available to show *reliance. See* Opp. at 14 (citing cases).[1] However, because reliance is not an element of a valid Section 11 claim, and because these cited cases also required

---

[1] *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 344 (5th Cir. 2010) (affirming district court denial of certification in 10(b) case, where fraud on the market presumption unavailable to show reliance); *Fener v. Operating Engineers Const. Indus.*, 579 F.3d 401, 407-10 (5th Cir. 2009) (same); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 316 (5th Cir. 2005) (same); *accord Regents of Univ. of Cal. v. Credit Suisse First Boston*, 482 F.3d, 372, 394 (5th Cir. 2007) (noting that "[b]ecause no class may be certified in a § 10(b) case without a classwide presumption of reliance, our analysis of reliance disposes of this appeal."); *Unger*, 401 F.3d at 320 (vacating grant of class certification and remanding for further consideration in Section 10(b) case where "district court erroneously applied too lax a standard of proof to the plaintiffs' fraud-on-the-market allegations"); *Oscar*, 487 F.3d at 267 (vacating grant of certification in Section 10(b) case "[b]ecause plaintiffs have failed to trigger the presumption of reliance provided by the fraud-on-the-market theory.").

plaintiffs to establish a material misstatement or omission (the only requirements of a valid Section 11 claim), the fact that certification was denied in these cases solely on *reliance* grounds actually supports Plaintiff's position that common questions of law and fact predominate and that the certification of Plaintiff's Section 11 claims is proper.

## 2. Defendants' Misguided Attacks Concerning Widespread Knowledge Do Not Undermine the Predominance of Common Questions

"[B]ecause reliance is not an element under § 11, the conduct of the defendants, not the knowledge of the plaintiffs, is determinative . . . . [A] § 11 case will never demand individualized proof as to an investor's reliance or knowledge[.]" *Constar*, 585 F.3d at 784 (internal quotation omitted). Nevertheless, Defendants baldly assert on the basis of an undefined widespread knowledge affirmative defense that Plaintiff has somehow failed to show predominance. However, a closer look at Defendants' supporting authority and the means by which they would prove their affirmative defense show that common questions of law and fact do in fact predominate over any individualized issues.

Defendants cannot point to a *single* case within the Fifth Circuit in support of their individualized knowledge argument. *See* Opp. at 15-17.[2] Instead, Defendants misleadingly extract quotes from two extremely narrow areas – both plainly inapplicable

---

[2] Defendants' only Fifth Circuit authority cited in support of their "individualized knowledge" argument, *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008), *see* Opp. at 15, supports the contention that "[a]n affirmative defense is not *per se* irrelevant to the predominance inquiry." However, where, as here, there is "a viable theory employing generalized proof" to establish the affirmative defense, that defense does not create individualized issues. *See id.* at 328-29.

here – where courts in other jurisdictions have found that individualized knowledge, in its most general sense, can be relevant to a Section 11 claim: (1) cases in which lead plaintiffs purchase their shares after defendants' fraud is disclosed to the public;[3] and (2) cases in which plaintiffs pled on the face of the complaint that there was widespread *but non-public* knowledge of defendants' fraud.

For example, Defendants cite *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006), for the proposition that there is an affirmative duty that plaintiffs "prove lack of knowledge in order to recover." Opp. at 15-16. The Second Circuit did *not* establish a requirement that Section 11 plaintiffs prove lack of knowledge. Rather, the plaintiffs in *In re IPO* were required to affirmatively show lack of knowledge because they alleged on the face of their complaint that thousands of investors had certain knowledge of the alleged scheme. *See id.* at 43. *In re IPO* involved claims under Section

---

[3] *See* Opp. at 15-16 (citing *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 652 (S.D.N.Y. 1986) (finding that the named plaintiff was not typical because he possessed additional information regarding the alleged undisclosed information in the prospectus at the time of his purchase); *Shockley v. Adams Golf, Inc.*, No. Civ. A. 99-371, 2005 WL 3654346 (D. Del. June 27, 2005) (citing *Klein* in concluding that "typicality will be lacking in the class" after the point at which information was revealed that was "expressly directed to the risk that plaintiffs claim was wholly undisclosed in the prospectus"); *In re Am. Int'l Group, Inc. Sec. Litig.*, No. 04 Civ. 8141, 2010 WL 646720, at *7-*9 (S.D.N.Y. Feb. 22, 2010) ("the Lead Plaintiffs here knew that some or many of the statements contained in the Registration Statement were false" when they made their purchases);and *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001) (dismissing claims where the complaint alleged that the purchasers "were aware prior to purchasing . . . that [the] registration statement and prospectus contained material misstatements," as the complaint specifically alleged that they relied on the issuer's public statements which included disclosure of "serious irregularities in the Company's financial records," the need to restate its financial results, the restatement itself, and the company's filing for bankruptcy, when making their purchases.).

10(b) and Section 11 for a widespread market manipulation scheme against 55 underwriters and 310 issuers. *Id.* at 27-28. The underwriters in *IPO* had engaged certain investors in the alleged scheme by charging them various forms of undisclosed compensation and requiring them to purchase in the aftermarket. The Court noted that "the initial IPO allocants. . . were fully aware of the obligation that is alleged to have artificially inflated share prices. Those receiving or seeking allocations [as a part of improper trading arrangements] number in the thousands." *Id.* at 43. The Second Circuit even noted that the District Court had categorized certain investors as those who "exhibit the hallmarks of *full participation in the alleged scheme*," which failed to account for those who participated in the scheme in part, among others. *Id.* at 44.

Unfortunately for Defendants, these situations are not before the Court. In fact, at least half of the Section 11 cases cited by Defendants, from these narrow contexts and noncontrolling jurisdictions, to show that individualized knowledge precludes class treatment *actually certified* a Section 11 class. *See Klein*, 109 F.R.D. 646; *Adams Golf, Inc.*, 2005 WL 3654346. The remainder of Defendants' authority is comprised of cases finding the predominance of individualized issues based on plaintiffs' obligation to prove reliance in the context of Section 10(b), which is irrelevant as reliance not an element for Plaintiff here.[4]

---

[4] *See* Opp. at 16 (citing *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) and *Brown v. E.F. Hutton Group*, 991 F.2d 1020, 1032 (2d Cir. 1993)). Unlike Plaintiff's Section 11 claims, the violations at issue in *Zimmerman* required plaintiffs to show individualized reliance to establish that the alleged omission was material. *See Zimmerman,* 800 F.2d at 390. Defendants' quotation of *Zimmerman* (Opp. at 16)—which specifically omits the words "reliance" and "material"—is misleading. For Section 11 claims, the question of

Unlike the factual circumstances in Defendants' cited authority, Defendants do not argue that Lead Plaintiff or other investors had inside information or that Lead Plaintiff purchased his stock after the full truth was revealed. Nor do they argue that any potential instances of inside information would be so widespread as to create individual issues that would outweigh common interests. Rather, Defendants argue that there will somehow be individualized issues regarding knowledge because "there were many public disclosures concerning the matters allegedly misstated or withheld." Opp. at 17-18. Tellingly, Defendants categorize the information that purportedly creates individualized issues of knowledge as: "public statements," "many disclosures," "public announcements," "widespread release of these and other announcements," "public knowledge," a "plethora of public announcements," and "widespread reporting of information." *Id.*

Public announcements such as these analyst reports, press releases, and public filings do not create individualized issues, but instead concern the timing of the entry of truth into the marketplace as a whole an issue that pertains to damages, not knowledge. *See Levine v. Atricure*, *Inc.*, 508 F. Supp. 2d 268, 274 (S.D.N.Y. 2007) (discussing defendants' negative causation defense under §11 (e) and noting "[i]t is defendant's burden . . . to show when information first entered the marketplace."). Establishing such a defense will not require any individualized inquiry into knowledge of investors. *See*

---

materiality is judged with reference to an objective standard—the reasonable investor—and is therefore common to all members of the Class. In addition, Defendants' citation to *Brown*, 991 F.2d 1020, is directly excerpted from a discussion of 10(b)'s reliance requirement, which again is not an element of Plaintiff's Section 11 claims. *See id.* at 1032.

*Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir. 2009); *In re Metropolitan Sec. Litig.*, No. CV-04-25-FVS, 2008 WL 5102303, at *3 (E.D. Wash. Nov. 25, 2009) (citing *Williams v. Sinclair,* 529 F.2d 1383, 1388 (9th Cir. 1975)) ("Generally speaking, disputes concerning the damages suffered by individual class members do not preclude a finding of predominance. . . . [D]espite the existence of the defendants' loss causation defense, common issues predominate…. Put somewhat differently, the existence of a loss causation defense is not, by itself, sufficient to preclude certification. . . . in a Section 11 action.") .

The issue of when true facts entered the market can (and must) be determined on a class-wide basis at trial and clearly predominates over individual issues. For example, *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 283 (S.D. Tex. 2005), defendants argued "that if a class including aftermarket purchasers is certified, it should end on [the date the truth began to be disclosed], because § 11 is only available to purchasers without knowledge of purported misstatements, and inclusion of aftermarket purchasers following this date would raise individualized issues regarding knowledge that would preclude a finding of superiority and predominance." The court rejected this argument, noting that it was akin to a negative causation defense, and stating that: "Defendants have not cited and the court has not found any case that has relied on the negative causation defense to limit a putative class at the class certification stage of litigation. Moreover, district courts have been directed not to reach the merits of the action at the class certification stage of the litigation." *Id.* at 283.

In addition, Defendants have done nothing to support their assertion that the mere

potential for a widespread knowledge affirmative defense mandates the predominance of individual issues because "no shortcut to individualized inquiry into each individual claimant's knowledge is available at trial." Opp. at 17. In fact, the suitability of this potential defense to common means of proof on a theory of constructive notice further evidences the predominance of common issues. Defendants are not required to prove actual knowledge in support of their affirmative defense. *See In re Am. Int'l Group, Inc. Sec. Litig.*, 2010 WL 646720, at *8 ("defendants need not demonstrate plaintiffs' actual knowledge of the truth.") (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001)). Rather, courts in this Circuit have found that, "[w]here events receive 'widespread publicity, plaintiffs may be charged with knowledge of their occurrence.'" *In re Monumental Life Ins. Co.*, 365 F.3d 408, 421 (5th Cir. 2004) (quoting *United Klans of Am. v. McGovern,* 621 F.2d 152, 154 (5th Cir. 1980)).

For example, the Fifth Circuit found in *In re Monumental Life Ins. Co.* that defendants' statute of limitations defense, which depended upon when *each* prospective plaintiff should have learned of defendants' practices, was appropriate for class-wide treatment. 365 F.3d at 420-21. In discussing constructive knowledge for purposes of analyzing the statute of limitations in a securities case at the class certification stage, the court in *In re Com. Oil/Tesoro Petroleum Securities Litigation* rejected the contention that public information could create individualized issues. The court stated, in part:

> Defendants [] argue that the constructive knowledge of each class member must be scrutinized separately and thus that individual questions predominate over common ones. Defendants' argument has two flaws. . . . **[First,] the same standard of due diligence applies to all class members. Second, the defendants' argument assumes that different information was available to the**

**various class members.** Several cases on which [Defendants rely]…. are cases in which the information available to the class members was not uniform. In this case, however, there is no claim of selective disclosure to some but not to all class members. **All class members are charged with knowledge of the information in the public domain. The question of whether [Defendants'] various announcements were sufficient to put a reasonably prudent investor on inquiry notice is common to the class.** Similarly, if [Plaintiff] had had access to certain specialized information, defendants could challenge the adequacy of his representation or the typicality of his claim.

484 F.Supp. at 258 (emphasis added).

Even where "individual questions may arise as to whether, for example, a particular class member exercised due diligence. . . .**Courts have found that the possible existence of these relatively uncomplicated and infrequent individual issues does not preclude class certification. '**To hold that (such) individual issues . . . necessarily prohibit class treatment in a securities case would do violence to the remedial nature of the securities acts.'" *Id.* (quoting *Green v. Wolf Corp*, 406 F.2d 291 (2d Cir. 1968)) (emphasis added.). The susceptibility of Defendants' widespread knowledge defense to class-wide proof strongly shows the predominance of common questions of law and fact sufficient to warrant class certification. *See Monumental Life*, 365 F.3d at 421 ("Whether the media reports were sufficiently publicized so as to provide constructive notice is an issue reserved for the merits. Our analysis is limited to whether this issue is determinable on a classwide basis.").[5]

---

[5] In addition, Defendants' representation that "Federal law also forbids allowing a class action to proceed if manageable class adjudication would require shortcuts at trial that limit a defendant's ability to defend against each class member's individual claims" is unsupported. *See* Opp. at 14 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 466 (2000); and *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)). The cited provisions of *Amchem* discuss the

### 3. Plaintiff's Allegations and Record Evidence Further Show The Predominance of Common Questions of Law and Fact

In applying the facts of this case to their disingenuous legal argument regarding investors' knowledge, Defendants manipulate Plaintiff's allegations and refer to information that is either public and widespread (and thus creates no individual issues) and/or is too attenuated, outdated, or distorted to have provided any meaningful information to investors.

***Company's Transformed Strategy***

Regarding Superior's undisclosed "'transformed' strategy," Defendants state that a "plethora of public announcements" alerted investors to the omitted truth. Opp. at 18. Public announcements, which are available to all class members equally and—if stated fully and meaningfully and are not contradicted by other public statements, are absorbed into the Company's stock price—do not create individualized issues.

Even still, Defendants' arguments manipulate Plaintiff's allegations. In arguing that the truth regarding the "company's 'transformed' strategy" was widely and publicly available, Defendants cite public statements referring to Superior's "strategic growth plan," "next logical extension" into international and deepwater work, "pursu[it]" of deepwater growth, and an *analyst's* expectation that the company was "in

---

requirements for class actions generally under Rule 23(b)(1). *See Amchem*, 521 U.S. at 614. The quoted provision of *Nelson*, that "the 'opportunity to respond' to claims is 'the fundamental requisite of due process,'" concerned a defendant's ability to file an answer following a pleading amendment under Rule 15. *See Nelson*, 529 U.S. at 466. The excerpted provisions of *Lindsey* speak to the need to preserve available defense when determining the applicable choice of law. *See Lindsey*, 405 U.S. at 66.

transformation" as well as Mr. Ognar's "understanding" that "the company was *going to* provide services for deepwater oil exploration" or Mr. Glance's "thought" that Superior was in international and deepwater markets "to begin with." Opp. at 20.

Superior Offshore's desire to expand globally and intention to move into international and deepwater work were no secret. ¶¶50-51. The Complaint alleges that that the Company disclosed its intention to "transition" to and "pursue" international and deepwater work, but that, undisclosed to investors, Superior was *forced* to immediately *transform* into a deepwater and international company because it secretly *lacked Gulf of Mexico work* and *abandoned* smaller callout projects *prior to the IPO*, and also that Superior lacked the *financial strength and managerial experience* to successfully move into the international and deepwater markets at the time it was being forced to do so. ¶¶52-54, 61, 104. Indeed, discovery has borne out evidence that the Company's vessel utilization rate for the shallow water Gulf of Mexico fleet had declined in the four months leading up to the IPO and, by the time of the IPO, call-out work had dramatically declined or was non-existent. *See* D. Miller (Sales Manager) 4/23/07 email, attached hereto as Exhibit A; B. Mothersbaugh Dep. at 11:11-17, attached hereto as Exhibit B; C. Zamora Dep. at 36:1-37:6, attached hereto as Exhibit C. None of the "public reports" that Defendants cite comes close to disclosing Superior's dire need to move into international work despite the Company's inability to do so. Opp. at 22.

### Declining Business in the Gulf

Regarding declining business in the Gulf, Defendants again exaggerate the impact and significance of these public announcements. Defendants' cited disclosures concern

"*future* revenue" from non-hurricane related projects, state that "anticipated demand…*may* moderate," note that "revenue generation from Hurricane repairs is clearly trending down," and note an "*expectation* of softer than expected pricing and utilization of US Gulf surface diving equipment and services." Opp. at 22 (emphasis added). These post-IPO expectations of potential, "anticipated" declines in Gulf work in no way reveal the truth that the Superior itself saw declining Gulf of Mexico work *prior to the IPO* that negatively impacted the quarter that was *already underway* at the time of the Offering. Nor do they disclose that Superior's representations that it had in hand "several years" of Gulf work (¶101) were materially untrue. Notably, Defendants' last "example" of a Class Period public announcement creating an individualized issue of knowledge is the very announcement Plaintiff's cite in the Complaint as partially revealing the truth that was omitted from Superior's registration statement. As discovery has revealed, prior to the IPO, Superior attempted to obtain a buyer for the Company in a potential merger and acquisition process. Through this process, there were strong concerns expressed to Superior and its Underwriters by industry insiders regarding the declining Gulf of Mexico market. *See,* E. Fornell 12/15/06 email, attached hereto as Exhibit D; *See* L. Bloom 8/29/06 email, attached hereto as Exhibit E; *See* R. Pacha 8/31/06 email, attached hereto as Exhibit F; *See* M. Gurwit 1/19/07 email, attached hereto as Exhibit G; *See* C. Jimenez Dep. (rough version) at 38:17-40:3, attached hereto as Exhibit H (recounting that Defendant Mermis commented on a presentation comparing Superior Offshore's quotes for work and win/lose ratio from first quarter 2006 to first quarter 2007, specifically, that Defendant Mermis stated: "these numbers don't look good. We need to make these

19

numbers look good." ).

***Torch Offshore's Bankruptcy***

Defendants argue that Torch Offshore's bankruptcy "was a matter of public knowledge well before Superior Offshore went public." If Defendants meet their burden to demonstrate that their assertion is actually true, *i.e.*, that Torch Offshore bankruptcy court filings and press releases issued years before the Superior IPO were "public knowledge" for Superior Offshore investors in 2007, then, at best, they will have demonstrated only that the Torch Offshore bankruptcy was widely disseminated, making no impact on any contention that there are individualized issues of knowledge.

Even if Defendants succeed in persuading the jury to make such an illogical leap, the dissemination of information regarding the Torch Offshore bankruptcy does not shield Defendants from class certification in this case. The fact that Torch Offshore went bankrupt, even if known to investors, did not explain or in any way disclose to investors: that Torch Offshore went bankrupt attempting a nearly *identical* international and deepwater transformation to what Defendants were attempting with Superior Offshore; Defendant Mermis's, Mr. Chemin's, or Mr. Smith's key roles in this failed deepwater attempt with Torch Offshore; or the actual timing that Mr. Chemin was with Torch Offshore[6] (the Prospectus stated that Mr. Chemin left Torch Offshore in 2000, but he

---

[6] Defendants claim Chemin's return to Torch Offshore in 2003 "was a matter of public record." Opp. at 23 n. 14. In support, Defendants cite a September 2003 news article pertaining to Torch Offshore. The implication that potential investors can rely on prospectuses to the extent that they are willing to investigate every person and company named in the prospectus by researching for articles and information that pre-date the IPO by four years is absurd.

actually returned in 2003—as Vice President of *International* Business Development, no less—and remained until just a few months before Torch Offshore was forced to declare bankruptcy).[7] Quite tellingly, in a July 31, 2006 email, attached hereto as Exhibit I, Lackland Bloom, a Vice-President of Investment Banking at J.P. Morgan and involved in the Superior IPO, categorized the Torch Offshore debacle as an: "Over-ambitious attempt to transition business to deepwater services focus involved aggressive capital spending on new deepwater vessels. Limited track record in deepwater ended up being a big issue."

### The Endeavour

In discussing news regarding the *Endeavour*, Defendants again seek to recast a negative causation argument as an issue of individualized knowledge. It is not. Defendants argue that the Company's statement in its 10-Q that Superior "expected the *Endeavour* to return by 'mid- to late- June 2007" somehow caused claimants to "likely" know the truth regarding Defendants' problems with the *Endeavor* as of the date of that

---

[7] Defendants make the alternative argument that these outdated filings render the alleged omissions as to Torch Offshore "immaterial as a matter of law and therefore not actionable under section 11," Opp. at 24 n.15, claiming in support that Mr. Glance testified that "nothing having to do with [Torch Offshore made] any difference to [him] in connection with [his] purchase or sale decisions with respect to Superior." Opp. at 24 n. 15. A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision in that it would have "significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (citation omitted). First, Defendants' citation to the deposition testimony of Mr. Glance, who has withdrawn as a proposed class representative, is moot. Second, regardless of whether the limited, misleading information in the Prospectus regarding executives' roles with Torch Offshore affected Mr. Glance's investment decision, had he known the omitted material information regarding Torch Offshore, his decision, and that of the reasonable investor, would likely have been affected.

10-Q—May 17—because this timing "was 45 days later than JPMorgan's analyst had anticipated." (Interestingly, the JPMorgan analyst report that Defendants cite for this proposition was not issued until May 30. Defendants apparently expect that Plaintiff should have some intuitive ability to know, two weeks before the JPMorgan report was filed, that the Company's May 17 announcement was not in line with JPMorgan's expectations). Defendants also cite one other analyst that reported "additional shipyard time" for the *Endeavour*.

Plaintiff's allegations go far beyond the timing of when the *Endeavour* would be "back at sea." Plaintiff's allegations include that the Company lacked the financial ability, internal controls, cash, experience, or influx of revenue to support the refurbishment of the *Endeavour* and that Superior was on track, by the time of the IPO, to overshoot its budget to the extent that the Endeavour could not be finished without financially contributing to the financial downfall of Superior. ¶¶11(g), 58. A Company memorandum based on an internal audit of the Superior Endeavor project pointedly recounts the fact that the refurbishment of the vessel had gone over budget well before the IPO (by $4.2 million as of December 31, 2006), and exceeded the actual budget by $19.0 million. *See* 3/26/08 Memorandum, attached hereto as Exhibit J (noting also that "[i]nadequate due diligence was performed prior to the acquisition of the vessel in order to determine the 'true' condition of the vessel…"). Thus, by the time of the IPO, it was apparent that the *Endeavour* would not allow Superior to pursue deepwater work and that the extensive pre-IPO problems and delays associated with the refurbishment of that vessel would negatively impact Superior's revenue.

22

**4.  The Class Action Is Superior to Other Available Methods For the Fair and Efficient Adjudication of This Action**

Superior Offshore's shareholders were harmed by a common set of facts relating to statements in Superior Offshore's Prospectus; class certification allows the claims of these many shareholders to be efficiently resolved at one time. Indeed, "in the absence of a class wide adjudication of certain securities fraud claims, the claims would never be heard." *See Reliant*, 2005 U.S. Dist. LEXIS 9716, at *37 (applying this principle in a strictly Section 11 case) (quoting *WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) ("Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail.")). Defendants' assertion that this case is not a "negative value suit" solely on the basis of Lead Plaintiff Ognar's losses is misplaced. *See* Opp. at 27. The proposed class unquestionably consists of numerous members for whom individual prosecution would be cost prohibitive. Fed. R. Civ. P. 23(b)(3)(A) requires the consideration of "the interest of members of the class in individually controlling the prosecution or defense of separate actions." Defendants' desire to limit this inquiry to a single Plaintiff—in direct contravention of the statutory text of Rule 23(b)(3)(A)—is telling.

Defendants do not dispute the desirability of concentrating this litigation in a single forum or the corresponding efficiencies for the witnesses, parties, and judiciary. *See* Fed. R. Civ. P. 23(b)(3)(C). Nor do Defendants allege that individual prosecutions are already underway. *See* Fed. R. Civ. P. 23(b)(3)(C). These facts strongly favor finding

that the class action mechanism is the superior means by which to resolve this dispute. *See Id.* Instead, Defendants attempt to rely on their amorphous widespread knowledge affirmative defense to assert that the class action is not maintainable. *See* Opp. at 26. However, as noted above, Defendants' unsupported assertion that this defense cannot be maintained through common means of proof cannot be sustained in the face of contrary controlling precedent.

In apparent recognition of this fact, Defendants persist in misleadingly injecting quotations without regard to context in further attempting to undermine the clear superiority of the class action for resolving the issues in *this* litigation. For instance, Defendants represent that "a class trial would be 'inordinately time consuming and difficult' and not superior to individual suits" on the basis of *In re LifeUSA Holding Inc.*, 242 F.3d 136, 148 (3d Cir. 2001). *See* Opp. at 27. However, *In re LifeUSA Holding Inc.,* involved claims for fraudulent nondisclosures and misrepresentations, negligent misrepresentation, breach of duty of good faith and fair dealing, negligence, and unjust enrichment—where the proposed class did not even satisfy the *commonality* requirement,[8] let alone predominance. 242 F.3d at 145-46 ("Here the plaintiffs assert claims arising not out of one single event or misrepresentation, but claims allegedly made to over 280,000 purchasers by over 30,000 independent agents where the District Court found that the sales presentations (hence the alleged misrepresentations) were neither

---

[8] "The test for commonality is **not demanding** and is met where there is **at least one issue**, the resolution of which will affect all or a significant number of the putative class members." *Mullen v. Treasure Chest Casino, L.L.C*, 186 F.3d 620, 625 (5th Cir. 1999) (internal quotation omitted) (emphasis added).

uniform nor scripted."). In contrast, Plaintiff has alleged singular violations of federal law based on uniform misrepresentations in a single offering document for which Defendants have failed to even muster a commonality challenge. Notwithstanding Defendants' unsupported assertions, *In re LifeUSA Holding Inc.* does not undermine Plaintiff's strong showing that the class action is the superior mechanism for resolving *this* litigation.

Similarly, Defendants flatly assert that certification of the proposed class would create a "Frankenstein monster" akin to *Eisen*. Opp. at 27. Defendants fail to note that this quip actually comes from the *dissent* in the Second Circuit's *Eisen II* (*Eisen v. Carlisle and Jacquelin*, 391 F.2d 555 (2d Cir. 1968)). However, impediments to class manageability and notice, which evoked Judge Lumbard's Frankenstein-monster comment, will not arise in this case. Unlike this case, *Eisen* did not involve a claim for violation of Section 11 but instead violations of Sherman Act and the Securities Exchange Act of 1934 brought by a putative class of millions of unidentifiable (to the extent the could not be receive notice of the class action) buyers and sellers across the world, by a plaintiff with only $70 in damages, seeking damages and injunctive relief against the two major odd-lot dealers on the New York Stock Exchange. *Eisen v. Carlisle and Jacquelin*, 41 F.R.D. 147, 148-152 (S.D.N.Y. 1966); *Eisen II*, 391 F.2d at 570 (C.J. Lumbard, dissenting) ("[T]he potential claimants have no direct business dealings with the parties which plaintiff seeks to hold liable, and therefore defendants are in no position to identify from their own records the potential claimants, let alone calculate the amounts of any refund that they may be found entitled to receive . . . . Class actions were not meant to cover situations where almost everybody is a potential member of the class. Nor

25

were they ever intended to compel any court to entertain an alleged controversy with so many potential parties, or to compel any court to entrust the interests of numerous plaintiffs to representation by one plaintiff whose interest is all of $70.). Defendants do not even assert such issues are present for Plaintiff and thus, Defendants have done nothing to erode the superiority of the class action for fairly and efficiently resolve *this* litigation. A putative class action rarely gets more straightforward than that a § 11 case arising out of an initial public offering.

**C.** **Lead Plaintiff Mr. Ognar Is a Passionate Advocate for the Class and Readily Meets the Requirements To Be Certified as a Class Representative**

To demonstrate adequacy, the proposed class representative must be capable of understanding and controlling the litigation, be sufficiently interested in the outcome to ensure rigorous advocacy, have no conflicts of interest with other class members, and choose counsel that is competent and able to conduct the litigation vigorously. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80, 482 (5th Cir. 2001) ("*Berger I*"). Indeed, "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Id.* at 479.

Defendants do not take issue with the adequacy of counsel or Plaintiff's interest in the outcome of this litigation.[9] Rather, Defendants seek to attack Lead Plaintiff Ognar on

---

[9] Defendants do not challenge the adequacy of Lead Counsel to serve as Class Counsel pursuant to Fed. R. Civ. P. 23(g), which was demonstrated in Plaintiff's motion for class certification. *See* Mtn. at 22; KSF firm resume at Exhibit 1 to Mtn. Further, Defendants' misplaced attempts to undermine Plaintiff's superiority showing by reference to Mr. Ognar's very large losses confirm that he is sufficiently interested in the outcome of this litigation to ensure rigorous advocacy. *See* Opp. at 27.

the untenable grounds that he is somehow unable to understand and control this litigation—despite his career as a retail stockbroker and municipal bond salesman registered with the NASD and New York Stock Exchange (Ognar Dep. Pp. 8-17) and his impressive and vigorous advocacy for the class at his deposition. Defendants also appear to suggest that Mr. Ognar has not been involved in the active management of this litigation (Opp. at 39) —despite his large financial interest, with losses of over $750,000 as a result of Defendants' conduct, and despite spending at least 400 to 500 hours communicating with, strategizing with, and overseeing counsel in this case and poring over documents and information related thereto (Ognar Dep. p 24). Defendants distort, among other things,[10] the adequacy requirements announced by the Fifth Circuit in *Berger I*.

Contrary to Defendants' representations, *see* Opp. at 33 ("the Fifth Circuit squarely held in *Berger [I]* that the district court committed legal error by certifying a class in which representatives were unable to manage the litigation"), the Fifth Circuit in *Berger I* made no finding on the adequacy of the proposed representatives. *See Berger I*, 257 F.3d at 480-81 ("Although we do not know whether the named plaintiffs could meet the adequacy standard, we do know that the district court erred in two respects.").

---

[10] Defendants' representation to the Court that, "[f]irst, plaintiffs' motion offers nothing of substance to establish the adequacy of Glance, Ognar, or Britain. On this basis alone, class certification should be denied," is false with respect to Lead Plaintiff Ognar. Opp. at 34 (citing *Hanon* v. *Dataproducts Corp.*, 976 F.2d 497, 508-09 (9th Cir. 1992)). Further, the case Defendants cite, *Hanon,* affirmed a denial of class certification on the basis of typicality, finding the prospective plaintiff subject to unique defenses, but made no comment on the sufficiency of plaintiff's proffer. *See id.* at 509. Plaintiff is at a loss as to how Defendants distilled the stated proposition from any reading of this case.

Instead, the *Berger I* Court merely found that the district court improperly required defendants to rebut a presumption of adequacy and applied an impermissibly lax standard. *Id.*

Importantly, in the follow-up decision on petition for rehearing *en banc* in *Berger v. Compaq Computer Corp.*, 279 F.3d 313 (5th Cir. 2002) ("*Berger II*"), the Fifth Circuit made clear that:

> We have not, however, created an additional requirement under rule 23(a)(4) that, after completing the process of selecting the lead plaintiff and lead counsel, a court may grant class certification only if the putative class representative possesses a certain level of experience, expertise, wealth or intellect, or a level of knowledge and understanding of the issues, beyond that required by our long-established standards for rule 23 adequacy of class representatives.

*Id.,* at 313-14 (emphasis added). Those long-established standards are referenced in *Berger I*, and include the Supreme Court's landmark decision in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966), holding that Rule 23 did not allow summary dismissal of derivative case where plaintiff, a Polish immigrant who spoke very little English, had no knowledge of contents of suit, and relied on her son-in-law to provide an explanation of complaint prior to her verifying it despite lacking personal knowledge. Rather, class representatives need only "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Berger II*, 257 F.3d at 482-83. As set forth in detail below, Plaintiff Ognar has demonstrated his adequacy.

The Fifth Circuit requires that "putative class representatives [be] willing and able to take an active role in and control the litigation and to protect the interests of

absentees." *Berger I*, 257 F.3d at 479; *accord Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301-02 (S.D. Tex. 2000). Able class representatives are those who "are informed and can demonstrate that they are directing the litigation." *Id.* at 483.

Lead Plaintiff and proposed class representative Mr. Ognar is a vigorous advocate and has a passionate desire to obtain the best possible result on behalf of the Class.[11] In this Action, it is clear that Mr. Ognar has fulfilled his fiduciary duties to the Class. For example, Mr. Ognar questioned counsel about their experience and expertise in class action litigation before retaining them (Ognar Dep. 205:16-1:206); discussed and understood attorneys' fees and read the written retainer agreement (Ognar Dep. 150:11-12, 15, 152:11-12); read the operative complaint and other documents filed on his behalf (Ognar Dep. 24:3-9, 138:11-12); discussed the case with his attorneys on many, many occasions (Ognar Dep. 23:16-19, 104:9, 19-24); understands the core allegations of the case (*e.g.*, Ognar Dep. 54:21-24); and has been very actively involved in the prosecution of this Action (*e.g.*, Ognar Dep. 22:24-1:23). *See, e.g., In re Reliant Energy ERISA Litig.*, No. Civ.A. H-02-2051, 2005 WL 2000707 (S.D. Tex. August 18, 2005) (appointing as Class Representatives plaintiffs who understood the allegations, discussed attorneys fees, read the complaints filed on their behalf, questioned counsel about their expertise, and were

---

[11] The motion to withdraw Mssrs. Glance and Britain as proposed class representatives was granted by Order of this Court dated April 7, 2010. As noted in the motion to withdraw, Mr. Glance's current serious health issues prevent him from continuing to fulfill his fiduciary duties to the Class. The reasons for Mr. Britain's failure to appear at his deposition are addressed in Mr. Britain's Declaration in Support of Plaintiff's Motion to Withdraw James Britain and Calvin Glance as Proposed Class representatives, submitted on March 29, 2010, and incorporated herein by reference.

otherwise actively involved in the litigation).

### 1.  Mr. Ognar Is Knowledgeable About this Action

As demonstrated by his deposition testimony, Mr. Ognar has a thorough understanding of the case, including the allegations alleged in the Complaint, the basis of the claims asserted, and the course of the litigation. Mr. Ognar reviewed the operative Complaint prior to its filing;[12] he knows who the Defendants are;[13] he knows to within three days when the Company's IPO occurred;[14] he understands the basis of the lawsuit;[15] and he understands that the suit is founded on violations of the federal securities laws.[16]

Despite Mr. Ognar's thorough understanding of the action, Defendants nevertheless claim that Mr. Ognar "does not understand the claims in this lawsuit" on the meaningless grounds that he failed to identify who had highlighted certain portions of a Prospectus that defense counsel presented to him without explanation at his deposition.

---

[12] Ognar Dep. 134:10-15.

[13] "[C]umulatively I'm suing the management and the brokerage firms who did not do due diligence," Ognar Dep. 31:17-18.

[14] "Q. Do you know when Superior had its initial public offering? A. Don't sue me now, if I'm wrong. Is it April 17, '07? Q. …it was April 20th of 2007. A. Okay, April 20." Ognar Dep. 38:19-1:39.

[15] "Q. You understand that… you've sued my clients for making false and misleading statements in the prospectus, correct? . . . A. Yes." Ognar Dep. 54:20-24.

[16] Mr. Ognar contacted and retained counsel because he "thought they [defendants] violated the Securities Act of 1933 and '34." Ognar Dep. 142:3-5; "…Merrill Lynch and JPMorgan did not do due diligence and they violated the Securities Act of 1933." Ognar Dep. 147:8-10.

Opp. 35-36. In a move amounting to pure gamesmanship, Defendants presented Mr. Ognar with the highlighted prospectus, which had been an exhibit to one of his many interrogatory responses, and asked Mr. Ognar to explain what it was without disclosing it was actually a subset of a larger document and did not resemble its original form, with which Mr. Ognar was familiar.[17]

Defendants also argue that Mr. Ognar testified "that many of the alleged misstatements and omissions that make up the core allegations in this lawsuit were *not* false and misleading." Opp. at 36. This is a serious distortion of Mr. Ognar's testimony. Defense counsel engaged in a lengthy series of exchanges pressing Mr. Ognar to recall, despite having no context, precisely whether the Complaint alleged any of a large number of statements or "risk" disclosures were materially false or misleading. Ognar Dep. 48-98. In addition to stating that he could not answer about statements taken out of context,[18] and that certain statements, while literally true, were misleading in context,[19] Mr. Ognar

---

[17] *See, e.g.,* Ognar Dep. 29:11, 55:22-56:8, 98:21-23, 106:22-24, 118:1-2, 127:6-8, 129:8, 130:1, 132:18, 134:7-9 and 24, 135:2-3, 148:1-2, 159:9, 186:11-12.

[18] *E.g.,* Ognar Dep. 53:6-18 "A. And -- and, you know, I don't like the line of questioning that -- that refers to one specific sentence or one specific paragraph out of context. There is an inference here, sir, as to an ongoing business and its past relationships to conduct future business because it says stuff like, "loyal customer base." It doesn't get specific as to time and place, about shallow or deep; it goes on further in the context about deep, and so you have to read that paragraph highlighted with the subsequent paragraph highlighted, et cetera….. ; Ognar Dep. 44:11-12 "You know, so many of these questions are relative to time and place. I don't mean to be evasive, sir, but, you know, are you talking prospectus? Are you taking four, six months later"?; *See also* 60:19-21; 61:8, 62:21-24, 64:11-13, 65:10-15.

[19] Ognar Dep. 52:11-52:22 ("Q. What, if anything, is false or misleading about that first paragraph that starts, "Our track record"? A. As I said, sir, does "Our track record" -- if it

replied that he was "represented by counsel that makes those judgments, and I can't answer you specifically… That's why I have hired or that I am represented by legal counsel, because you're asking specifics… I don't know whether this specific paragraph is included specifically." Ognar Dep. 55:18-56:16. Notwithstanding these concerns, Mr. Ognar made clear at his deposition that he has a thorough understanding of the allegations of this case.[20]

---

only refers to the past -- but the notion of this whole prospectus is an ongoing business, which is the current and the future. So if you're asking me if this paragraph describes the past, I would probably say correct, but if it implies the -- the present or the future, I would probably say that it's misleading, it's devious.")

[20] *See, e.g.*, Ognar Dep. 34:12-18 ("I mean, did Mr. [Mermis] come from a company that was bankrupt? Did he ever say that? Do CFOs have the ability to account proper billings or to sign $40 million leases where ships were [incapable] of functioning as they should have?"); Ognar Dep. 43:13-4:44 ("I read the prospectus and I bought shares because I thought they were going to do deepwater drilling and . . . all the other things that go into deepwater operations, which is, you know, capping the wellhead or using submersible down there. . . These sophisticated ships were supposed to have GPS systems that, . . . because you were in deep water, you didn't have to anchor, you could maintain the position and drill and – and not only drill but help with the drilling, and if that means connecting the well to the pipelines and all that other kind of stuff, you know, it goes under generically looking for oil in deep water. . . ."); Ognar Dep. 57:13-9:58 ("A. As I told you before, sir, I'm terrible with names. Now, did you rent a boat -- did – did Superior Offshore rent a boat and then find it unseaworthy and broke a $40 million lease in arbitration or whatever, a settlement of 4.3 or 4.2 or $4 million or something and was that boat the Superior Achiever or the -- or the other one here, the Toisa Proteus? I -- boy, my Greek is terrible. But, sir, you're talking about specific boats at specific times, and, sir, I read this prospectus with the notion that Merrill Lynch and JPMorgan did due diligence in saying that this -- that this company, to quote, "track record" – that they had expertise about doing these new ventures in . . . not only . . . their previous business but that they were going into this – this deepwater and that they had expertise, that their boats were [functional], that they were operational, that they could make money in this new business."); Ognar Dep. 127:23-3:28 ("I then searched out the prospectus, and I thought that the investment banking firms lived up to their responsibility of the Securities Act of 1933 and 1934 and did due diligence.")

When he attempted to stop answering the repetitive questions to which he felt he had already adequately responded, Defense counsel threatened to file a motion to compel him to answer. Ognar Dep. 65. Mr. Ognar explained his subsequent yes-no answers: "it's easier to say 'no' to you so that we can stop the torment that you're putting me under, because I find your questions to be totally out of context. I mean, you have me read three words of one sentence and ask me if it's deceiving or not. When do you want me to say uncle?" Ognar Dep. 97:15-21. For Defendants to attempt to construe this exchange as an affirmative representation by Mr. Ognar that statements made in the Prospectus were *not* false and misleading is belied by the actual exchange, which confirms that Mr. Ognar is not merely an adequate class representative but also a passionate and vigorous advocate for the Class he seeks to represent.

### 2.  Mr. Ognar Vigorously Represents the Interests of the Class

Mr. Ognar's interest in this Litigation is significant. His financial losses amount to more than $766,000, to say nothing of the emotional suffering he has endured "because of the fiduciary responsibilities" he owes his children for the trades he made on their behalf. Ognar Dep. 115:22-116:3. Throughout the course of the litigation he has demonstrated that interest: he has been actively involved in the case and has invested considerable time and energy in vigorously fulfilling his responsibilities as Lead Plaintiff. In summing up his feelings about the suit and his role in it, he stated "I feel like I've been wronged, I feel like the class has been wronged, and if I can represent them, I will." Ognar Dep. 180:2-4. Defense counsel characterize Mr. Ognar as "passionate" about pursuing this case (Ognar Dep. 206:22-24); Mr. Ognar himself calls it "fortitude." Ognar

Dep. at 207:11. Yet Defendants have attempted to turn that passion and fortitude against Mr. Ognar. Defendants accuse Mr. Ognar of being belligerent and erratic. Opp. 3, 37. They call him "a self-described 'schizophrenic'" (*Id*. at 3) and falsely claim that he threatened Defense counsel. *Id*.

Mr. Ognar is understandably angry. He has lost a great deal of money, he has undertaken the rigors of leading a litigation which exposes him to close scrutiny, and he underwent a grueling five hour deposition during which he was badgered, condescended to, and provoked. Mr. Ognar's behavior is not merely understandable in this context; it is characteristic of a zealous class representative.

Defendants' claim that Mr. Ognar admits to suffering from schizophrenia is laughable. Defendants well know that Mr. Ognar is not a schizophrenic. Mr. Ognar used the word "schizophrenic" in the context of his purchase and sale patterns (Ognar Dep. 189:1-4) and stated that "I would buy and sell because I either owned too much or too little. You never own the right amount." *Id*. He explained "I used the word 'schizophrenia' when I meant to say that you waffle between hot and cold or bullishness and bearishness…" Ognar Dep. 207:6-9.

The so-called "threat" that Mr. Ognar "claimed he would come to Houston and 'scratch' Defense counsel" is a similarly desperate distortion. After a round of repetitive and badgering questions, Mr. Ognar said "I'm taking it personal, Mr. Mike. I'll see you in Houston." Ognar Dep. 149:11-12. When Defense counsel, a man many years younger than Mr. Ognar who routinely referred on the record to others by first name, feigned

offense at this response and stated "It's Mr. Biles,"[21] Mr. Ognar's response was, "Well, you put this guy in the corner, and he's going to scratch." Ognar Dep. 149:14-15. Defendants grossly mischaracterize this exchange.

All of Defendants' efforts to undermine Mr. Ognar are of this ilk. For example, Mr. Ognar's quip that "lower activity levels" meant "female menopause" (Ognar Dep. 87:1-2) was an obvious attempt to use a bit of levity to demonstrate the meaninglessness of words taken out of context. Indeed, the discussion preceding this comment started with a question about the meaning of three words, to which Mr. Ognar responded "We've gone from sentences in a paragraph to a sentence in the paragraph and now we're getting into three words in a paragraph or three words out of a sentence?" Ognar Dep. 86:12-15. Ironically, Defendants had to take his answer out of context to try to twist it into some form of attack on Mr. Ognar's adequacy.[22]

---

[21] Defense Counsel's attack on Mr. Ognar for referring to counsel as "Mr. Mike" (Opp. at 3, 37) smacks of elitism. The lawyers in this case, including Mr. Biles, regularly refer to each other on the record by their first names and did so in this very deposition. Mr. Biles himself repeatedly referred to Plaintiff's counsel by their first names (*e.g.*, Ognar Dep. 45:17-18, 72:20-23, 87:20-21); Lead Plaintiff's counsel referred to Mr. Ognar by his first name (*e.g.*, Ognar Dep. 114: 23-25.) To say that Mr. Ognar could not follow that example is hypocrisy.

[22] Defendants seek to make hay out of the fact that Mr. Ognar quickly left the deposition after fully and completely answering a line of questions regarding Mr. Ognar's authority to make trades on behalf of his daughter. Rather than simply presenting Mr. Ognar with a copy of the Power of Attorney for confirmation, a document which Defense counsel had ready as an exhibit, they instead took a "gotcha" approach, badgering Mr. Ognar about the precise name of the document that gave him such authority. *See* Ognar Dep. 118:1-119:19. After this line of questioning, as well as frequent drinking of juice as he testified, Mr. Ognar left the deposition for a short break due to a physical issue. *See* Ognar Dep. 120:8-12

Defendants also accuse Mr. Ognar of providing "false interrogatory responses." Opp. at 37. Again, this accusation is simply wrong. Plaintiff responded to an interrogatory requesting the he identify any communication between himself and "current or former representatives of Superior or any of the Individual or Underwriter Defendants." Defendant James Mermis's Rog. No. 10. In addition to stating general objections and certain other specific objections, Plaintiff objected that the interrogatory was vague and ambiguous with respect to the phrase "current or former representatives of Superior" and that *subject to those objections,* Mr. Ognar's answer was "none." Defendants did not follow up on this response, clarify their interrogatory, or in any way counter Plaintiff's objections. When, at his deposition, Mr. Ognar was asked: "Did you ever communicate directly with Superior Offshore in 2007?" Mr. Ognar answered affirmatively. Ognar Dep. 159:10-164:17, 166:8-20. Defendants' attempt to cast this as deceit on the part of Mr. Ognar is irresponsible given the clear objections and reservations stated in Plaintiff's truthful interrogatory response.

### 3. Mr. Ognar Is Diligently Overseeing His Counsel

It is the acknowledged goal of the PSLRA to replace lawyer-driven litigation with plaintiff-controlled litigation. Indeed, one of the hallmarks of adequacy for a class representative is the ability to control and direct lead counsel. Mr. Ognar testified in his deposition that he has been "actively involved with the whole process," (Ognar Dep. 22:24), that he has spent "at least 4 or 500 hours reading documents and… discussing and e-mailing and phoning" with his counsel (Ognar Dep. 24:7-9), and that he had spoken with his counsel on the phone "numerous" – somewhere between 50 and 150 – times.

Ognar Dep. 104:7, 9. He testified that he read, signed, and understood the retention agreement whereby he retained counsel (Ognar Dep. 150:5-15); that he understood what was the maximum percentage of any potential recovery that his counsel could obtain in fees (*id.*); that he understood that his counsel could ask the Court to reimburse them for reasonable costs and expenses incurred in the course of prosecuting the litigation (Ognar Dep. 152:3-11); and that he knew that his counsel could hire and had hired other firms to assist in the prosecution of the case (Ognar Dep. 35:6-8, 15-16, 154:17-22). He testified that although he didn't know the hierarchy, which was a legal matter for which he relied on his counsel, he was aware that there were other plaintiffs in the case (Mssrs. Glance and Britain have since withdrawn). Ognar Dep. 27-28. Mr. Ognar was also actively involved in the preparations for the mediation in December 2009 and spoke multiple times to counsel during the mediation session. *See* Ognar Dep. 157:5-21.

In spite of these clear indicators of Mr. Ognar's active involvement, Defendants nevertheless claim that Mr. Ognar is some sort of absentee Lead Plaintiff: that he does not supervise lead counsel and does not participate in the litigation. Defendants state that Mr. "Ognar does not know that Glance and Britain are co-plaintiffs or that they have been deposed." Opp. at 39. Defendants' own language here is an admission that they themselves are confused – Mr. Britain was never deposed. After Defense Counsel contacted Mr. Britain's employer's outside counsel the day before the deposition was scheduled and threatened to subpoena irrelevant, confidential company materials from that Company, Mr. Britain's CEO and boss asked him to withdraw from this case. He did. *See* Rec. Doc. 177, Declaration of James Britain in Support of Plaintiffs' Motion to

Withdraw James Britain and Calvin Glance as Proposed Class Representatives.

Mr. Ognar communicates constantly with his counsel *via* e-mail and telephone; in this age of the internet, videoconferencing, Skype, and globalization, the fact that Lead Counsel did not meet face to face until it was time for Mr. Ognar's deposition is not surprising. By communicating exclusively by phone and email until Mr. Ognar's deposition mandated an in-person meeting, Lead Counsel saved the Class additional, unnecessary costs and expenditures. This attack goes hand in hand with Defendants' gross misstatement that Mr. "Ognar performed no due diligence on the selection of class counsel. He did not interview other firms and his only selection criterion was that class counsel be in New Orleans." Opp. at 38. As Mr. Ognar explained to his attorney during his deposition:

> I think the question was time sensitive, when was the first time you called – or how did I call, what leads you to call or something, and I answered that I called the firm of Kahn, et cetera because it was New Orleans-based. Now, if you're asking me about subsequent factors, you and I had numerous conversations, you explained your firm and its location and offices in New York and your expertise and I explained myself and how I felt I was injured and to what extent, and based upon those conversations, I asked you to pursue this.

Ognar Dep. 205-206. In short, Mr. Ognar selected a firm with the necessary skills and experience to prosecute this litigation. Moreover, a plaintiff may base his selection of proposed Lead Counsel on any criteria he chooses. In accordance with the mandates of the PSLRA, the Court may then accept or reject that choice of counsel in a securities class action litigation. Indeed, in his application for appointment as Lead Plaintiff and approval of his selection of choice of Lead Counsel, Mr. Ognar submitted a brief

discussing the firm's qualifications and attaching the firm's resume. The Court approved Mr. Ognar's selection of counsel by Order dated May 20, 2008.

Moreover, this case presents none of the hallmarks of lawyer-driven litigation at play in the cases cited by Defendants. In *Berger I*, the Fifth Circuit took issue with the district court's appointment of a group of 39 lead plaintiffs to oversee and monitor the litigation. *See id.* at 478 n. 2. In moving for class certification, the prospective class representatives were "whittled to seven, only four of whom appeared at depositions." *Id.* at 478. This wholesale evisceration of the lead plaintiff group—some 32 individuals purportedly in charge of supervising and monitoring the case—strongly evidenced that the *Berger* litigation was lawyer-driven.

One of the plaintiffs in *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298 (S.D. Tex. 2000),[23] was "solicited by a friend who was also a friend of lead counsel for Plaintiff," did not receive information from counsel regarding "billings, expenses, or the progress of the case," "[did] not discuss discovery matters with lead counsel," made a profit on some of her purchases of the defendant issuer's stock, and had a "position [that was] contrary to the position which must be taken by [certain] members of the class." The other plaintiff had no understanding of the case or his role as a class representative. *Id.*

Likewise, the plaintiffs in *Umsted v. Intelect Commc'ns Inc.*, No. Civ.A. 3:99-CV-

---

[23] While the inadequate plaintiffs in *Griffin* are readily distinguishable from Mr. Ognar, *Griffin* also predates *Berger I* and the holding that plaintiffs need only "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Berger*, 257 F.3d at 482 -483, as well as *Berger II*, discussed above.

2604, 2003 WL 79750, at *2 (N.D. Tex. Jan. 7, 2003) were unaware that there had been a motion for lead plaintiff or that they had been appointed as a lead plaintiff; could not identify the claims in the complaint or any alleged misrepresentations or omissions; did not know there had been a mediation; were unaware that co-lead plaintiffs existed; knew nothing about what had happened in the litigation to date; failed to comprehend the role and responsibilities as a lead plaintiff or class representative; did not know any of the attorneys' names or qualifications; and did not know how the attorneys' fees and costs were to be paid if the litigation were successful.

In stark contrast, Mr. Ognar's deposition testimony and involvement in the litigation to date clearly shows that he is well-informed, understands the allegations and the basis of the case, chose his counsel carefully, knows when he may justifiably rely on their legal expertise, and has been an active participant in this litigation through, *inter alia*, his supervision of counsel, participation in discovery, involvement in settlement discussions. Nothing more is required to show his adequacy to serve as Class Representative.[24]

---

[24] Should the Court determine for any reason that Mr. Ognar is not adequate to serve as Class Representative in this Action, it is widely recognized that substitution of a proper plaintiff is in the interests of judicial efficiency. *See, e.g., Mullaney v. Anderson*, 342 U.S. 415, 417 (1952) (recognizing notions of judicial efficiency in allowing plaintiff without standing to substitute proper plaintiff under Rule 21 of the Federal Rules of Civil Procedure; culmination of trial with plaintiff lacking standing did not prejudice defendant, and re-filing of complaint by proper plaintiff would result in needless waste); *Lynch v. Baxley*, 651 F.2d 387, 388 (5th Cir. 1981) ("Efficient judicial administration weighs in favor of allowing an opportunity for a new and proper class representative to enter the case and litigate the interests of the subclass."); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 495 (S.D. Fla. 2009) (finding a proposed class representatives to be

### III.  **CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully request that an Order be entered: (i) certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3); (ii) appointing Charles Ognar as Class Representative; and (iii) appointing Lead Counsel KSF as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

Dated: April 23, 2010          Respectfully submitted,

                  /s/ Kim E. Miller

Kim E. Miller, *pro hac vice*
Melissa Ryan Clark, *pro hac vice*
KAHN SWICK & FOTI, LLC
500 5th Avenue, Suite 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn, *pro hac vice*
Paul S. Balanon, *pro hac vice*
Sarah Cate Boone, *pro hac vice*
KAHN SWICK & FOTI, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff and the Class*

Art Sadin (Texas Bar No. 17508450)
THE SADIN FIRM
121 Magnolia, Suite 102
Friendswood, Texas 77546
Telephone: (281) 648-7711
Facsimile: (281) 648-7799

---

atypical, certifying class, and allowing parties to file memoranda regarding substitution of atypical party).

asadin@sadinlawfirm.com

*Local Counsel for Lead Plaintiff and
the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent via U.S. Mail to those indicated as non-registered participants on April 23, 2010.

/s/ Kim E. Miller

Kim E. Miller
