# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re SUPERIOR OFFSHORE INTERNATIONAL, INC. SECURITIES LITIGATION | CIVIL ACTION NO. 08-cv-00687 <br><br> JUDGE NANCY F. ATLAS |

## MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S OMNIBUS MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AWARD OF ATTORNEY'S FEES, LEAD PLAINTIFF AWARD, AND REIMBURSEMENT OF EXPENSES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................i

INTRODUCTION ........................................................................................... 1

FACTUAL & PROCEDURAL BACKGROUND ....................................... 3

    I.    CORE ALLEGATIONS IN LEAD PLAINTIFF'S COMPLAINT........................ 4

    II.   PROCEDURAL HISTORY ................................................................ 7

ARGUMENT .............................................................................................. 14

FINAL APPROVAL OF SETTLEMENT ................................................ 14

    I.    STANDARD OF REVIEW.................................................................. 14

    II.   CONSIDERATION OF THE FIFTH CIRCUIT'S SIX-FACTOR *REED* TEST FAVORS APPROVAL OF THE SETTLEMENT ........................................ 17

THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE .... 27

AWARD OF ATTORNEY'S FEES, LEAD PLAINTIFF AWARD, AND REIMBURSEMENT OF EXPENSES ........................................................... 29

    I.    THE COURT SHOULD UTILIZE THE PERCENTAGE-OF-THE-FUND METHOD IN AWARDING ATTORNEYS' FEES ..................................... 29

    II.   OTHER RELEVANT FACTORS CONFIRM THAT THE REQUESTED FEES ARE FAIR AND REASONABLE ................................................. 32

    III.  CLASS REACTION TO THE FEE AND EXPENSE REQUEST........................ 43

    IV.  A LODESTAR CROSS-CHECK CONFIRMS THAT THE REQUESTED FEES ARE REASONABLE AND PROPER ......................................... 44

    V.   LEAD COUNSEL'S EXPENSES ARE FAIR AND REASONABLE ................. 45

    VI.  LEAD PLAINTIFF OGNAR SHOULD BE REIMBURSED FOR REASONABLE TIME, COSTS, AND EXPENSES ................................... 50

CONCLUSION ........................................................................................... 53

## TABLE OF AUTHORITIES

**Cases**

*Anixter* v. *Home-State Prod. Co.,* 77 F.3d 1215 (10th Cir. 1996) .................................... 44

*Ayers v. Thompson*, 358 F.3d 356 (5th Cir. 2004) ...................................................... 16, 21

*Blum v. Stenson*, 465 U.S. 886 (1984) ........................................................................ 33, 42

*Boeing Co.* v. *Van Gemert,* 444 U.S. 472, 478 (1980) ...................................................... 33

*Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991); ......................... 34

*Camp v. Progressive Corp.*, No. 01-2680 and No. 03-2507, 2004 WL 2149079 (E.D. La. Sept. 23, 2004) ........................................................................................................... 20, 25

*City of Detroit* v. *Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974) ........................................ 43

*Corel*, 293 F. Supp. 2d 484 (E.D. Pa. 2003) ..................................................................... 57

*Cotton* v. *Hinton,* 559 F.2d 1326 (5th Cir. 1977) ...................................................... 17, 19

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ............................ 28

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) .................................. 17, 19

*Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317 (S.D.N.Y. 2005) .................................... 56

*Faircloth v. Certified Finance, Inc.,* No. Civ. A. 99-3097, 2001 WL 527489 (E.D. La. 2001) ............................................................................................................................. 35

*Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567 (5th Cir. 1960) .................................... 15

*Goldberger* v. *Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000) ..................................... 34

*Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994) .............................................................. 34

*Henderson v. Eaton,* No. 01-0138, 2002 WL 31415728 (E.D. La. Oct. 25, 2002) ........... 21

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985) ..... 28

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...................................................................................................................................... 43

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* No. 02 Civ 5575 (SWK), 2006 U.S Dist. LEXIS 17588, at *31 (S.D.N.Y. Apr. 6, 2006) .................................................... 18

*In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002) ................................... 31

*In re Catfish Antitrust Litig.*, 939 F. Supp. 493 (N.D. Miss. 1996) ................................. 37

*In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000) .............................. 18

*In re Datatec Sys., Inc. Sec. Litig.*, No. 04-525, 2007 WL 4225828 (D.N.J. Nov. 28, 2007) ............................................................................................................................. 41

*In re Dell, Inc. Sec. Litig.*, No. 06-726, 2010 WL 2371834 (W.D. Tex. June 11, 2010). 21, 25, 26

*In re Delta Air Lines*, 310 F.3d 953 (6th Cir. 2002) .......................................................... 26

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F.Supp.2d 612 (E.D. La. 2006) ............................................................................ 23

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ..... 3

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ...................................................................................................................... 34

*In re Gilat Satellite Networks, Ltd.*, No. No. 02-1510, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ...................................................................................................................... 56

*In re Harrah's Entm't, Inc. Sec. Litig.*, No. 95-3925, 1998 WL 832574 (E.D. La. Nov. 25, 1998) ............................................................................................................................ 36

*In re Health Mgmt., Inc. Sec. Litig.*, 184 F.R.D. 40 (E.D.N.Y. 1999) .............................. 44

*In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ............................................................................................................... 24

*In re Heritage Bond Litig.*, Nos. 02-1475, 01-5752, 02-382, 02-993, 02-2745, 02-6484, 02-6841, 02-9221, 02-6512, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ................ 57

*In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403 (S.D. Tex. 1999) ...................... 36

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................................................................ 58

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733 (S.D.N.Y. 1994). ...................................................................................................................................... 55

*In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124 (S.D.N.Y. 2008) ............ 41

*In re Prohibition Against Disclosing ENE Communs. to Settlement Judges*, 494 F. Supp. 2d 1097 (N.D. Cal. 2007) ............................................................................................ 24

*In re Remoron Direct Purchase Antitrust Litig.*, No. 03-0085, 2005 WL 3008808, at *6 (D.N.J. Nov. 9, 2005) .................................................................................................. 23

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) .......................................... 49

*In re Schering-Plough/Merck Merger Litigation*, No. 09-1099, 2010 WL 1257722 (D.N.J. Mar. 26, 2010) ........................................................................................................ 20, 21

*In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) ................................................ 26

*In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570 (S.D.N.Y. 2008) .................................. 24

*In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) .............................................................................................. 34

*In re Top Tankers, Inc. Sec. Litig.,* No. 06-13761, 2008 WL 2944620 (S.D.N.Y. July 31, 2008) ...................................................................................................................... 59

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 (3d Cir.2004) ................................ 25

*In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ............................................................................................................ 24

*In re Xcel Energy, Inc.,* 364 F. Supp. 2d 980 (D. Minn. 2005) ......................................... 57

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974) ..................... 37

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156 (1999) ............................................... 28

*Lelsz v. Kavanagh,* 783 F. Supp. 286 (N.D.Tex.1991) .................................................... 19

*Maher* v. *Zapata Corp.,* 714 F.2d 436 (5th Cir. 1983) ..................................................... 17

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................... 38

*Missouri v. Jenkins,* 491 U.S. 274 (1989) ........................................................................ 42

*Newby v. Enron Corp.,* 394 F.3d 296 (5th Cir.2004) ................................................. 15, 16

*Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597 (D.Colo. 1974) ................................... 27

*Petruzzi's, Inc. v. Darling-Delaware Co., Inc.,* 880 F.Supp. 292 (M.D.Pa.1995) ........... 19

*Purdie v. Ace Cash Express, Inc.,* 2003 WL 22976611 (N.D.Tex. Dec. 11, 2003) .......... 16

*Quintanilla v. A&R Demolition, Inc.*, No. 04-1965, 2007 WL 5166849 (S.D. Tex. May 7, 2007) ............................................................................................................ 15, 16, 19

*Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513 (6th Cir. 1993) .......................... 34

*Robbins* v. *Koger Props.,* 116 F.3d 1441 (11th Cir. 1997) .............................................. 44

*San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio,* 188 F.R.D. 433 (W.D.Tex. 1999) .................................................................................................. 16, 18

*Schwartz v. TXU Corp.*, 2005 WL 3148350 (N.D. Tex. 2005) ............................ 17, 35, 54

*Shaw v. Toshiba America Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) (citation omitted) ............................................................................................................... 15, 35

*Smith v. Tower Loan of Mississippi, Inc.,* 216 F.R.D. 338 (S.D. Miss. 2003) ........ 1, 11, 30

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939) ...................................................... 33

*Strougo v. Bassini*, 258 F. Supp. 2d 254, 260-61 (S.D.N.Y. 2003) ................................ 27

*Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993) ...................................... 34

*Thornberry v. Delta Air Lines*, 676 F.2d 1240 (9th Cir. 1982) ....................................... 55

*Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277 (S.D.N.Y. 1993) ............................. 18

*Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830 (E.D. La. 2007) .................... 17, 29

iii

*United Airlines, Inc. v. McDonald*, 432 U.S. 385 (1977)...................................................16

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002); ...........................................34

*Winkler* v. *NRD Mining, Ltd.,* 198 F.R.D. 355 (E.D.N.Y. 2000)......................................44

*Yarrington v. Solvay Pharms., Inc.*, 697 F. Supp. 2d 1057 (D. Minn. 2010)...................54

## Statutes

11 U.S.C. § 362(a)(1) .................................................................................................... 3

15 U.S.C. § 77k(a) ......................................................................................................... 4

15 U.S.C. § 77k(e) ....................................................................................................... 27

15 U.S.C. § 77z-4(a)(6) ............................................................................................... 30

## Other Authorities

7 Conte & Newberg, *Newberg on Class Actions* §22.91 at 386-387 (4th ed. 2002) ........16

Manual for Complex Litigation § 21.28, at 283 (4th ed. 2004) ........................................23

## Rules

Fed. R. Civ. 8.................................................................................................................. 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 8, 9

Fed. R. Civ. P. 23(f) .....................................................................................................23

Fed. R. Civ. P. 9(b) ......................................................................................................... 8

Fed. R. Civ. P. Rule 23 ............................................................................................12, 14

# INTRODUCTION

Pursuant to Fed. R. Civ. P. 23, Lead Plaintiff Charles Ognar ("Lead Plaintiff") respectfully submits this Memorandum of Law in support of the motion for final approval of settlement, award of attorney's fees, lead plaintiff award, and reimbursement of litigation expenses.[1]

This $1.9 million all-cash settlement with Defendants[2] is an excellent result given the precarious procedural posture of the case and the immediate benefit resulting therefrom. Lead Plaintiff and Lead Counsel submit that the proposed Settlement is not only fair, reasonable, and adequate, in accordance with the Fifth Circuit's *Reed* Factors for determining final settlement approval, but also avoids the serious risks of continued litigation in these uncertain economic times.

The Settlement is the product of three years of hard-fought, intensive litigation, culminating in a settlement achieved after the Court ruled against Lead Plaintiff on a seminal class certification motion. The case had just ended the discovery phase when the Court issued its ruling. During discovery, Lead Counsel reviewed and analyzed over 1.5 million pages of documents produced by Defendants and third parties. Lead Counsel also

---

[1]     On September 22, 2008, the Court issued an Order waiving page limits for briefing. Rec. Doc. No. 79. Because of the overlap in assessing factors relevant to final approval of settlement and the award of attorney's fees, Lead Plaintiff files this omnibus Memorandum.

[2]     Louis E. Schaefer, Jr., James J. Mermis, Roger D. Burks, and R. Joshua Koch, Jr. (collectively, "Individual Defendants"); and, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and J.P. Morgan Securities, Inc. ("J.P. Morgan") (collectively, "Underwriter Defendants"). Superior Offshore Int'l, Inc. was originally named a defendant, but it filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code on April 24, 2008 in the United States Bankruptcy Court for the Southern District of Texas, Bankruptcy Petition No. 08-32590.

took or defended a total of 26 depositions, and resolved or sought Court intervention on

numerous discovery and scheduling issues.

Prior to settlement, Lead Plaintiffs had a comprehensive understanding of the

factual and legal underpinnings of this complex securities class action based upon:

- In-depth informal investigation before formal discovery commenced, which included retention and supervision of multiple highly-trained investigators who identified and interviewed former employees and other sources with knowledge;

- Research and drafting of the Amended Complaint, which included analysis of analyst reports, Securities and Exchange Commission ("SEC") filings, news articles, press releases, and announcements by and relating to the Company;

- Extensive briefing on Defendants' motions to dismiss, which the Court denied in full;

- Intensive discovery involving Lead Plaintiffs' review and analysis of close to three million pages of documents;

- Taking and/or defending 26 depositions in Texas, Louisiana, Illinois, and North Carolina;

- Working with economists, causation and damages, due diligence, forensic accounting, and construction industry consultants and experts;

- Addressing multiple discovery and scheduling disputes at numerous meet-and-confer sessions and in-Court conferences; and,

- Extensive briefing on Lead Plaintiff's motion for class certification, and Lead Plaintiff's studied consideration of a Fed. R. Civ. P. 23(f) petition for appeal.

Lead Plaintiff further moves for the award of attorney's fees of eight percent (8%)

of the $1.9 million settlement (*i.e.*, $152,000), a lead plaintiff award of $7,000 for Mr.

Ognar, and reimbursement of $698,500 in litigation expenses. In the Fifth Circuit, the

question as to whether the Court should utilize the percentage-of-recovery method or lodestar method to award fees in contingency cases has so far been left unanswered. However, "numerous district courts in this Circuit have applied the percentage method alone in awarding attorneys' fees in common fund cases under the PSLRA." *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 749 (S.D. Tex. 2008). Lead Plaintiff believes the percentage method to be reasonable in this case because Lead Plaintiff seeks an award considerably less than Lead and Liaison Counsel's combined lodestar of $2,827,474.50. Indeed, this request represents a ***negative*** multiplier of just over .05. Moreover, Lead Plaintiff satisfies the Fifth Circuit's *Johnson* factors governing the award of fees in common fund cases and, thus, the fee and expense requests are both reasonable and fair.

### FACTUAL & PROCEDURAL BACKGROUND

This case is a federal securities class action lawsuit brought on behalf of the purchasers of Superior Offshore International, Inc. ("Superior" or "Company")[3] common stock pursuant to its April 20, 2007, initial public offering ("IPO" or "Offering"). Lead Plaintiff seeks remedies pursuant to Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") in connection with Defendants' issuance of a Registration Statement, as part of the IPO, that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements

---

[3]     Superior filed a voluntary petition under Chapter 11 of the Bankruptcy Code on April 24, 2008 in the United States Bankruptcy Court for the Southern District of Texas, Bankruptcy Petition No. 08-32590. *See* 11 U.S.C. § 362(a)(1).

3

therein not misleading." 15 U.S.C. § 77k(a). Defendants sold almost 10.2 million shares, at $15 per share, to raise gross proceeds of $152 million during the Offering.

## I.  Core Allegations in Lead Plaintiff's Complaint

Superior provided subsea construction and diving services to the oil and gas industry in the Gulf of Mexico. ¶3.[4] Lead Plaintiff alleges that, in connection with the IPO, Defendants issued a Registration Statement that included material misstatements or omitted to state material facts regarding: the qualifications and background of management, ¶¶26-39; the Company's Gulf of Mexico ("GOM") work and growth prospects, ¶¶40-49; the plan and ability to expand into international and deep sea work, ¶¶50-67; transactions with related parties, ¶¶68-73; conflicts of interest, ¶¶74-76; expenditures and operating expenses (as well as internal controls), ¶¶77-89; risk factors, ¶¶90-93; and, compliance with generally accepted accounting principles ("GAAP"), ¶¶94-107.

For instance, the Registration Statement represented that the Company had a successful track record that allowed it to "develop a strong and loyal customer base" and "capitalize on the increased demand" in the GOM market. ¶40. The Registration Statement further noted that it "anticipate[d] that hurricane-related repair projects will continue **for the next several years"** (¶41) and would "provide significant work" for the industry in that time. ¶50. Although the Company warned that demand for its services was driven by hurricane-related work and that "*current* activity levels *may* decrease,"

---

[4]     All references to "¶" are to the Consolidated Amended Class Action Complaint, filed July 21, 2008. Rec. Doc. No. 71.

¶90, in truth, hurricane-related work in the Gulf had *already* slowed by the time of the IPO. ¶46.

Further, while the Registration Statement described a plan to "expand" into deepwater markets and "selectively pursue" international opportunities, ¶50, the true goal of the company's management was to radically "transform" Superior into an international and deepwater-focused company. ¶52. For all its ambition, however, Superior at the time of the IPO lacked the assets, experience, and financial liquidity to carry out an expansion into much more complicated and expensive international and deepwater market – another fact that was not disclosed in the Registration Statement. ¶53

The Registration Statement also failed to disclose the leading role of several of Superior's officers and directors in their involvement with the attempt by Torch Offshore to enter the deepwater market, or that this attempt resulted in the bankruptcy of that company in 2005. ¶¶28, 30, 32. Also omitted from the Registration Statement were details of Superior's transactions with related parties, and conflicts of interest faced by its officers. ¶¶68-76. Among other facts, Defendant Mermis (the Company's CEO) maintained a "side company" that would eventually acquire an international contract that Superior had sought, but then abandoned, while under Defendant Mermis' direction, ¶¶70-71; and Defendant Schaefer profited from Superior's failure by creating privately-owned companies to which Superior repeatedly sold assets for less than their book value. ¶76.

The Registration Statement further failed to disclose that the Company's internal controls were so poor that it could not manage basic business practices, such as the timely

payment of bills. ¶80. Nor was Superior successfully preparing its financial statements in accordance with generally accepted accounting principles, ¶¶97-99, despite an explicit statement of compliance in the Registration Statement. ¶94.

Lead Plaintiff also alleges that Defendants failed to undertake meaningful due diligence for the IPO. Had they done so, the misstatements and omissions would have become apparent. ¶4. In fact, discovery has shown that due diligence carried out by potential private equity buyers of Superior prior to the IPO *did* lead such buyers to express concerns about the stability of the Company's core market, the significance of anomalous and declining hurricane work to the Company's valuation, and the quality of its management.

Through a series of partial disclosures and materializations of risk between August 14, 2007, and the Company's eventual declaration of bankruptcy on April 24, 2008, the market learned of the truth about Superior. On August 14, 2007 (after the close of trading and after Company insiders liquidated over $49 million of personally held shares), the Company issued a release announcing dismal preliminary results for the second quarter and six months ending June 30, 2008. ¶¶108-11. It was also the first time the Company acknowledged its plan to "transform" the Company away from the Gulf of Mexico and hurricane-related work. The Company additionally announced poor results for the six months ended June 30, 2007 – the period which began almost four months prior to the IPO – including "a loss of $4.6 million, or $0.25 per share, on revenues of $96.2 million. … compare[d] with net income of $24.0 million, or $1.62 per diluted share, on revenues of $110.0 million for the first six months of 2006." Furthermore, Superior announced

abysmal revenues for the second quarter that included: "Total revenues of $41.9 million for 2Q:07, down from $60.6 million in the same quarter of the previous year." As the release also revealed, the Company attributed its loss of revenue to "the continued dry-docking and significant upgrades to the Company's dynamically positioned (DP) Superior Endeavour" and "decreased demand in the Gulf of Mexico."

Superior also disclosed Defendant Schaefer's sudden retirement in November (¶117), announced in December that it would be forced to sell the *Achiever* even though it had not yet been delivered to the Company (¶120), announced Defendant Mermis' unscheduled resignation in January, and in April, just one year following the IPO, announced its inability to timely file financial results, changes in senior management, extremely limited liquidity, and eventual bankruptcy. ¶¶124-136. When the entirety of truthful revelations finally made its way into the market, Superior's stock plummeted, losing 99% of its value from its IPO price of $15 per share to just $.15 per share on April 29, 2008. ¶137.

## II. Procedural History

The first lawsuit in this matter, *Bechtel v. Superior Offshore International, Inc., et al*, No. 08-1157, was filed on February 28, 2008, in the Eastern District of Louisiana. The following day, the case of *Brand v. Superior Offshore International, Inc., et al*, No. 08-687, was filed in this Court. On April 9, 2008, the Court issued an order consolidating the securities class actions filed or to be filed under the present caption.

On May 20, 2008, the Court appointed Charles Ognar to serve as Lead Plaintiff

and approved his selection of Kahn Swick & Foti, LLC ("KSF")[5] as Lead Counsel and
The Sadin Law Firm, P.C. as liaison counsel. Rec. Doc. No. 64.

On July 21, 2008, Lead Plaintiff filed the Consolidated Amended Class Action
Complaint, which included Calvin Glance and James Britain as additional plaintiffs. *See*
Rec. Doc. No. 71. On September 25, 2008, the Individual Defendants and the
Underwriter Defendants filed two separate sets of motions to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6).[6] *See* Rec. Doc. Nos. 80 and 81.

On November 24, 2008, Lead Plaintiff filed an opposition to Defendants' motions
to dismiss.[7] Rec. Doc. No. 83. Lead Plaintiff contended *inter alia*: that the Complaint
sounded in strict liability or negligence in accord with a Section 11 action and not subject
to the strict particularity pleading requirements of Fed. R. Civ. P. 9(b); that even if the
particularity requirements applied here, rather than those of notice-pleading under Fed. R.
Civ. 8, Lead Plaintiff met that burden here; that the Complaint sufficiently identified
numerous categories of material misstatements and omissions; that Defendants may not
make material misrepresentations or omit information simply because it is publicly

---

[5]     At the time of the approval of Lead Plaintiff's selection of Lead Counsel, KSF was
known as Kahn Gauthier Swick, LLC.

[6]     Defendants argued, among other things: that the particularity standard of Fed. R. Civ.
9(b) for pleading fraud applied; that Plaintiffs must plead the element of "knowledge" (even
though knowledge is not an element of a Section 11 claim); that the Complaint alleged only
inactionable "mismanagement" or "puffery"; that the Registration Statement contained sufficient
"risk factors" to warn investors of risks detailed in the Complaint; and that Defendants had no
duty to disclose transactions with related parties.

[7]     Individual Defendants filed an amended motion to dismiss on December 10, 2008 (to
correct formatting and typographical errors), Rec. Doc. No. 84, and Lead Plaintiff filed an
amended opposition two days later (to calibrate page number changes in the Individual
Defendants' amended motion to dismiss). Rec. Doc. No 85.

available elsewhere if investors search hard enough; the pleading of confidential witnesses not only satisfied but surpassed the standards for negligence and strict liability claims; the "bespeaks caution" doctrine was inapplicable and that the "risk factors" were insufficient; and, that Defendants had heightened duties to disclose in the context of IPOs. Defendants filed their replies on December 22, 2008. Rec. Doc. Nos. 87 and 89.

On January 12, 2009, the Court denied the motions to dismiss in full. Rec. Doc. No. 92. In its analysis the Court found that several of the numerous alleged misleading statements and omissions satisfied the pleading requirements of Fed. R. Civ. P. 12(b)(6).

Defendants filed their Answers on February 17, 2009, and asserted numerous affirmative defenses, including prior knowledge and negative causation. Rec. Doc. Nos. 117 and 119. Discovery began in earnest and the parties began discussions and started engaging on such issues as the initial conference, submission of a Joint Rule 26 Report for the January 30, 2009, case management conference, and the terms of a confidentiality/protective order. Thereafter, the parties then had extensive back-and-forth communications and telephone conferences related to electronic discovery to discuss such issues as search terms, custodians, date ranges, production formats, production protocols, and cost sharing. After several months of discovery, the parties mediated before Michael D. Young, Esq. on December 10, 2009, in Manhattan. The parties submitted mediation statements detailing their respective positions, but the mediation was unsuccessful. Regardless, the parties obtained an early assessment of the case from a neutral arbiter familiar with the federal securities laws. Discovery continued until May 6, 2010, the date established by the Amended Docket Control Order as the discovery cut-

off. Rec. Doc. No. 151.

During discovery, Defendants and third parties produced over 1.5 million pages of responsive documents. Lead Plaintiff issued third-party document subpoenas to various entities, including:

- Avenue Capital Group, LLC
- BP America, Inc.
- Deloitte & Touche, LLP
- Greenhead Rentals
- Hornbeck Offshore Services, LLC
- Johnson Rice & Company LLC
- KPMG, LLP
- Legacy Offshore, LLC
- Opportune LLP
- Riverstone Holdings, LLC
- Veolia Environmental Services North America Corp.
- William Jacob Management

As a result of the massive document production, Lead Counsel effectively and efficiently reviewed and analyzed the documents, and held internal meetings to discuss evidence, as well as production issues. Lead Counsel conferred numerous times with Defendants concerning such matters as discovery costs, discovery protocol, and electronic production problems. Lead Counsel worked closely with computer consultants on discovery database preparation, management, and review, and such issues as: file formats and method of delivery; storage and organization of produced files; customization of discovery software; maintenance of discovery databases and software; user support for document review and tagging; report generation; and document collation for analysis.

In addition, the parties took and defended 26 depositions mostly in Houston, Texas

and Lafayette, Louisiana, including those of Lead Plaintiff Ognar (in Chicago, Illinois) and additional plaintiff Calvin Glance (in Winston Salem, North Carolina), the Individual Defendants (Louis Schaefer, James Mermis, Roger Burks, and Joshua Koch), current and former employees of the Underwriter Defendants who worked on the IPO (Lackland Bloom, Stuart Pielop, and Travis Tucker), and the following former employees of Superior Offshore:

- Brad Mothersbaugh (former Operational Controller)
- Bridget Adams (former General Manager of Accounting, then General Manager of Internal Controls)
- Carlo Jimenez (former General Manager of Estimating)
- Charles Zamora (former General Manager of Diving Operations, then General Manager of Subsea Construction)
- David Watts (former General Manager-Marine)
- David Weinhoffer (former Executive Vice-President of Business Development, then Executive Vice-President of Operations)
- Eric Smith (former member of the Board of Directors)
- Evelyn Barber (former member of the Internal Audit Department)
- Graham Schaefer (Defendant Schaefer's son, former owner of Greenhead Rentals, and former employee of Superior)
- John Guarisco (former Chief Financial Officer, then Treasurer, then Chief Administrative Officer for Louisiana)
- Marisol Medellin (former Executive Assistant to Defendant Mermis)
- Patrice Chemin (former Chief Operating Officer)
- Randy Putman (former Vice-President-Controller, then Chief Accounting Officer)

Furthermore, Lead Counsel, on behalf of Lead Plaintiff, also engaged private investigators during the investigative phase of the case to interview a number of former employees of Superior, some of whom were cited in the Complaint as confidential witnesses (identified in the Complaint, and referenced hereafter, as "CW"). Defendants

11

deposed four of the eight CWs, including a former Executive Assistant to Defendant Koch, a former Accounts Payable Clerk, a former Remotely Operated Vehicle Group Supervisor, and a former Human Resources Coordinator. Lead Counsel represented three of the CWs at their depositions.

On February 8, 2010, Plaintiffs filed their motion for class certification pursuant to Fed. R. Civ. P. Rule 23, seeking to certify a class of purchasers of the common stock of Superior from April 20, 2007, through April 25, 2008. Plaintiffs also sought at that time the appointment of Lead Plaintiff Charles Ognar, and additional plaintiffs James Britain and Calvin Glance, as class representatives.[8] Rec. Doc. Nos. 172-174, 189. Defendants filed an Opposition [Rec. Doc. No. 182]; Lead Plaintiff filed a Reply and acknowledged that the end date of the class period should be October 25, 2007 [Rec. Doc. No. 189]; and Defendants filed a Sur-Reply [Rec. Doc. No. 190].

Lead Counsel also worked closely with economic and damages experts, a construction consultant, a forensics accountant, and a due diligence expert throughout the course of the litigation. Lead Plaintiff exchanged with Defendants the initial expert reports.

On June 8, 2010, however, prior to the deadline for the parties to exchange opposition expert reports, the Court denied Lead Plaintiff's motion for class certification. The parties entered into a Stipulation regarding the administrative withdrawal of the

---

[8]     Lead Plaintiff Ognar sought and received an Order on April 7, 2010, permitting the withdrawal of additional plaintiffs Calvin Glance and James Britain as putative class representatives. Rec. Doc. No. 188.

Court's June 8, 2010, Order and for a stay of the litigation [Rec. Doc. Nos. 195 and 196], which the Court so ordered on June 17, 2010. Rec. Doc. No. 197. The parties then engaged in settlement negotiations to arrive at the instant compromise.

On January 3, 2011, Lead Plaintiff filed a motion for preliminary approval of settlement. Rec. Doc. Nos. 201 and 202. One day later, on January 4, 2011, the Court preliminary approved the settlement and certified a settlement class defined as follows:

> All Persons who purchased the publicly traded common stock of Superior during the period between April 20, 2007, and April 25, 2008, inclusive, and were damaged as alleged in the Action thereby. A Person whose common stock is held by a broker Defendant as nominee will not be excluded on that basis. Excluded from the Class are Defendants, all officers, directors, partners and affiliates of Superior at all relevant times, members of Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest, and all shares of Superior stock owned or acquired, directly or indirectly, by any of them. For purposes of this Settlement, the term "controlling interest" shall include any interest of 5% or more of the stock of any entity. Also excluded from the Class are any putative Class members who exclude themselves by filing a timely request for exclusion in accordance with the requirements set forth in the Notice.

*See* Rec. Doc. No. 205. Pursuant to the Order, written objections are due April 26, 2011. Rec. Doc. No. 205 at ¶13. The Court ordered the final fairness hearing for May 10, 2011. Rec. Doc. No. 205 at ¶4.

While the preliminary approval papers noted that the Class would receive notice that Lead Counsel would move the Court for an award of fees not greater than 15% (*e.g.*, $285,000 of the $1.9 million settlement before interest) and expenses not to exceed $640,000, the actual notice was for an award of not greater than 8% (*e.g.*, $152,000 of the $1.9 million settlement before interest) and expenses not to exceed $698,500, which Lead

Counsel now seeks.[9] To date, there have been no objections to the fee request or the expenses from any Class member.[10] The Notice further advised that Lead Counsel would seek "reimbursement to Lead Plaintiff Charles Ognar for reasonable time and expenses incurred directly related to representation of the Class, in an amount up to $7,000." To date, no objections to that request have been received.

ARGUMENT

**FINAL APPROVAL OF SETTLEMENT**

## I.   STANDARD OF REVIEW

Rule 23(e) of the Federal Rule of Civil Procedure provides that before a class action may be dismissed or compromised, the compromise must be granted judicial approval and notice of the proposed dismissal or compromise must be provided to the class. The decision to approve a proposed settlement is entirely within the discretion of the Court. *Newby v. Enron Corp.,* 394 F.3d 296, 300 (5th Cir. 2004); *Quintanilla v. A&R Demolition, Inc.*, No. 04-1965, 2007 WL 5166849, at *2 (S.D. Tex. May 7, 2007).

"In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable." *Shaw v. Toshiba America Info. Sys., Inc.*, 91 F. Supp. 2d 942, 959 (E.D. Tex. 2000) (citation omitted); *Newby*, 394 F.3d at 301 (The gravamen of an approvable proposed settlement is

---

[9]    Lead Counsel's actual expenses are $712,247.79 and Liaison Counsel's expenses are $987.19, for a total of $713,234.98 in incurred expenses. However, Lead Counsel limits its request for reimbursement of expenses to the noticed amount of $698,500.

[10]   Defendants were advised of this change prior to the issuance of Notice and did not oppose it.

that it be "fair, adequate, and reasonable and is not the product of collusion between the parties.") (citation omitted). In applying this standard, the Court must determine whether, in light of the claims and defenses asserted by the parties, the proposed compromise represents a "reasonable evaluation of the risks of litigation." *Fla. Trailer & Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960).

The Fifth Circuit has identified six factors (known as the "*Reed* factors") to guide the Court in making its determination: (a) evidence that the settlement was obtained by fraud or collusion; (b) the complexity, expense, and likely duration of the litigation; (c) the stage of the litigation and available discovery; (d) the probability of plaintiffs' prevailing on the merits; (e) the range of possible recovery and certainty of damages; and, (f) the opinions of class counsel, class representatives, and absent class members. *Newby*, 394 F.3d at 301; *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004); *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983); *Quintanilla*, 2007 WL 5166849, at *2. Furthermore, "[a]lthough the court must weigh the facts and law of the case to determine the fairness of the settlement, this does not mean that the court should reach conclusions as to the ultimate merits of the claims or defenses." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 648 (N.D. Tex. 2010) (citations omitted).

"When considering [the *Reed*] factors, the court should keep in mind the strong presumption in favor of finding a settlement fair." *Purdie v. Ace Cash Express, Inc.,* No. 01-1754, 2003 WL 22976611, at *4 (N.D. Tex. Dec. 11, 2003); *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio,* 188 F.R.D. 433, 453 (W.D. Tex. 1999). Indeed, settlement of class actions is strongly favored. *See, e.g., United Airlines, Inc. v.*

15

*McDonald*, 432 U.S. 385, 401 (1977); *Maher* v. *Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983); *Cotton* v. *Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007) ("the United States Court of Appeals for the Fifth Circuit has 'admonished courts to be mindful of the "overriding public interest in favor of settlement" in class action suits.'") (citations omitted); *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses."); *Schwartz v. TXU Corp.*, No. 02-2243, 2005 WL 3148350, at \*17 (N.D. Tex. 2005) (recognizing the "public interest in favor of settlement of class action lawsuits") (citations omitted).

This policy applies with particular force in the context of securities class actions "because of the notable unpredictability of result and the potential for litigation spanning up to a decade or more." 7 Conte & Newberg, *Newberg on Class Actions* §22.91 at 386-387 (4th ed. 2002) (citations omitted); *In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2007 WL 2743675, at \*10 (E.D.N.Y. Sept. 18, 2007) (same); *In re AOL Time Warner, Inc. Sec.* & *ERISA Litig.,* No. 02-5575, 2006 WL 903236, at \*8 (S.D.N.Y. Apr. 6, 2006) (due to their "notorious complexity," securities class actions are often settled to "circumvent[] the difficulty and uncertainty inherent in long, costly trials"); *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993) ("Securities class action litigation is 'notably difficult and notoriously uncertain'[.]") (citations omitted). Here, the proposed Settlement amply satisfies the standards for final approval.

## II.   CONSIDERATION OF THE FIFTH CIRCUIT'S SIX-FACTOR *REED* TEST FAVORS APPROVAL OF THE SETTLEMENT

### A.   Factors (a) and (f): The Settlement Was the Result of Arm's-Length Negotiations by Counsel Experienced in Securities Litigation and Not Obtained by Fraud or Collusion

A proposed class action settlement will enjoy a "presumption of correctness" where the settlement is the product of "arms' length negotiations between experienced, capable counsel after meaningful discovery." *San Antonio Hispanic Police Officers' Org., Inc.,* 188 F.R.D. at 461; *see also In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) (affording "significant weight" to counsel's recommendation); *Petruzzi's, Inc. v. Darling-Delaware Co., Inc.,* 880 F. Supp. 292, 301 (M.D. Pa. 1995) (finding that "[t]he opinions and recommendation of such experienced counsel are indeed entitled to considerable weight"). Inescapably, "[t]he endorsement of class counsel is **entitled to deference**, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims." *DeHoyos*, 240 F.R.D. at 292 (emphasis added) (citations omitted); *Quintanilla*, 2007 WL 5166849, at *5; *Lelsz v. Kavanagh,* 783 F. Supp. 286, 297 (N.D. Tex. 1991) ("the Court is to bear in mind that counsel for each side possess the unique ability to 'assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery.'"). Lead Counsel endorses the instant settlement and contends that the instant settlement – at this stage of the litigation and in its current posture, as further discussed herein – is fair, adequate, and reasonable.

Where counsel has adequately represented the interests of the class, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330. Furthermore, "[t]here is also a presumption of no fraud or collusion occur[ing] between counsel, in the absence of any evidence to the contrary." *DeHoyos*, 240 F.R.D. at 287; *Camp v. Progressive Corp.*, No. 01-2680 and No. 03-2507, 2004 WL 2149079, at *7 (E.D. La. Sept. 23, 2004).

There is no doubt that settlement negotiations here took place at arm's length. The parties engaged the services of an impartial mediator (John Young, Esq.) in the early stages of the case to provide an objective assessment to the parties of the strengths and weaknesses of their respective positions. During the formal mediation, the parties could not come to terms on a reasonable compromise at that early juncture, in part because the parties had yet to undertake extensive discovery. As Judge Hayden concluded in *In re Schering-Plough Corp. Sec. Litig.*, No. 08-0829, 2009 WL 5218066, at *3 (D.N.J. Dec. 31, 2009), "[i]n choosing mediation rather than a jury trial, the parties showed their respect for the difficulty of predicting a trial outcome given the matters in contention[.]"

Once full-blown discovery had taken place, and the parties had a far better understanding of the strengths and weaknesses of their case, the parties engaged in an informal and brief – albeit unsuccessful – attempts at settlement. Not until after the Court's opinion on class certification (a point at which fact discovery had already concluded and first-round expert reports had been exchanged) did the parties again re-engage and discuss settlement, having an even greater appreciation of the strength and

weakness of the case in light of the Court's Order.[11]

Lead Counsel and counsel for Defendants negotiated over the ensuing weeks to eventually arrive at an agreement. There is absolutely nothing to suggest that the settlement reached is the product of fraud, collusion, or overreaching.

### B.    Factors (c) and (d): The Stage of the Proceedings and Probability of Success on the Merits Favor Approval of the Settlement

The stage of the proceedings factor considers whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369; *In re Dell, Inc. Sec. Litig.*, No. 06-726, 2010 WL 2371834, at *7 (W.D. Tex. June 11, 2010).

Here, even prior to the filing of the Complaint, Lead Counsel conducted an independent factual investigation through more than 20 interviews and conversations with third parties with knowledge of Superior's practices, operations, and condition. And there is no question that Lead Counsel had an in-depth and detailed understanding of the case because "[a]t the time settlement was achieved, the parties completed discovery, which included depositions, interrogatories, and requests for production." *Henderson v. Eaton,* No. 01-0138, 2002 WL 31415728, at *3 (E.D. La. Oct. 25, 2002); *In re Schering-Plough/Merck Merger Litigation,* No. 09-1099, 2010 WL 1257722, at *10 (D.N.J. Mar. 26, 2010) (considering discovery from "formal" and "informal" sources, and discovery from third-parties, experts, witnesses, depositions, and documents obtained in litigation).

Lead Plaintiff also served on Defendants a combined total of over 570 specific

---

[11]    *See* Withdrawal of Order, Rec. Doc. No. 197.

requests for production of documents and issued 12 third-party document subpoenas. This resulted in the production of more than 108,000 documents totaling more than 1.5 million pages that Lead Counsel carefully reviewed and analyzed. Defendants culled responsive documents from 53 custodians (which included numerous vice-presidents, senior vice-presidents, controllers, and operations general managers). Defendants also culled and produced hard-copy documents from boxes stored in warehouses in Lafayette, Louisiana and Houston, Texas. These document repositories contained files obtained from Superior upon its bankruptcy.

Lead Counsel served nearly their full allotment of 25 interrogatories upon each of the Defendants, as well as a comprehensive set of 118 specific requests for admissions on all Defendants combined. Additionally, the parties took and/or defended 26 depositions not only in Texas, but also North Carolina, Illinois, and Louisiana. Lead Plaintiff and the four Individual Defendants were deposed, as well as a total of three of the Underwriter Defendants' employees who worked on the Superior IPO.

Lead Plaintiff had several consultants to advise on various matters, including accounting and financial issues, damages, vessel and general construction standards, and due diligence. Lead Plaintiff also engaged bankruptcy counsel to advise on matters related to the bankruptcy of Superior.

On May 20, 2010, the parties served the first-round reports of their testifying experts.  Lead Plaintiff tendered to defendants reports of experts in the following areas: damages and accounting. Defendants submitted to Lead Plaintiff due diligence reports and a damages and loss causation report.

This case was also marked by extensive motion practice, including the motions to dismiss, various discovery-related letters to the Court, briefings for the mediation, and the motion for class certification. *See In re Remoron Direct Purchase Antitrust Litig.*, No. 03-0085, 2005 WL 3008808, at *6 (D.N.J. Nov. 9, 2005) (considering extent of motion practice that allowed plaintiffs "to preview some of the defenses that Defendants would advance"). The Court's Orders on the motions to dismiss, during the parties' discovery hearings, and on the motion for class certification further enlightened the parties about the relative strengths and weaknesses of their positions.

As a result of the foregoing, Lead Plaintiff believes that the action has reached a stage where the parties had "sufficient information about the strength and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case...." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.,* 447 F.Supp.2d 612, 620 (E.D. La. 2006); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("the parties certainly [had] a clear view of the strengths and weaknesses of their cases."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 578-79 (S.D.N.Y. 2008) (same). The Court should thus find that this factor weighs in favor of granting preliminary approval of the Settlement.

Given the level of case development, Lead Counsel had ample information from which to assess the probability of success on the merits, being mindful that it would be "imprudent to presume ultimate success at trial and thereafter." *In re Heritage Bond Litig.*, No. 02-md-1475, 2005 WL 1594403, at *7 (C.D. Cal. June 10, 2005) (collecting

21

cases where the court rejected settlement and the ultimate recovery to plaintiffs turned out to be lower than that in the proposed settlement). Therefore, in evaluating the likelihood of success, "the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *Reed*, 703 F.2d at 172; *see also In re Prohibition Against Disclosing ENE Communs. to Settlement Judges*, 494 F. Supp. 2d 1097, 1105 (N.D. Cal. 2007) ("Most judges are well aware of their own limitations. They also understand that the task of analyzing a case and trying to predict the outcome of litigation is fraught with analytical and informational perils.").

Lead Plaintiff survived the motion to dismiss for failure to state a claim, allowing for the commencement of full-blown discovery. The parties reached the end of the fact discovery period, at which time Lead Plaintiff filed the motion for class certification. Lead Plaintiff believed he had a strong case. But, in light of the Court's opinion denying the motion for class certification, the case took a markedly different trajectory. *See, for example, Dell,* 2010 WL 2371834, at *6 (considering that case's procedural posture). "Because 'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action,' this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir.2004). But, as noted in *Camp*, 2004 WL 2149079, at *11:

> All other putative class members in these cases would have to proceed with individual actions, if they chose to do so and if they could find counsel willing to accept their cases. They would face the weakness of many of

their individual claims and the expense, delays and risks of litigation. Even under the ridiculous assumption of a 100% chance of success on the merits, the total damages that could be awarded to the individual plaintiffs in any of these actions in the absence of certification would be considerably less than the multi-million dollar settlement being offered here.

Mindful of the possibility of higher court review of a district court's certification denial decision, Lead Plaintiff did have the option under Fed. R. Civ. P. 23(f) to petition the Fifth Circuit to review the Court's class certification decision. This, however, is not an absolute given the rule's discretionary grant and the stringent factors guiding whether the Fifth Circuit would accept such a request.[12] But even if the Fifth Circuit granted review of such a petition, Lead Plaintiff would be left with great uncertainty as to how the appellate court would decide the case. *See, for example, Dell,* 2010 WL 2371834, at *6 (noting that the plaintiffs there were in "dire straits" where their dismissed complaint was pending on appeal before the Fifth Circuit).

As a result of the foregoing risks, Lead Plaintiff's acceptance of a settlement given the posture of this case and in the amount agreed upon by the parties for a recover of $1.9million in cash now, is beneficial to the class.

### C.      Factor (b): The Complexity, Expense, and Likely Duration of the Litigation

---

[12]      The Fifth Circuit would look to one or more of following factors: (a) the certification order represents the death knell of the litigation for either the plaintiffs (who may not be able to proceed without certification) or defendant (who may be compelled to settle after certification); (b) the certification decision shows a substantial weakness, amounting to an abuse of discretion; and, (c) an interlocutory appeal will resolve an unsettled legal issue that is central to the case and intrinsically important to other cases but is otherwise likely to escape review. Manual for Complex Litigation § 21.28, at 283 (4th ed. 2004); *In re Delta Air Lines,* 310 F.3d 953 (6th Cir. 2002) (collecting cases).

Under Factor (b), the Court should compare the significance of immediate recovery as "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." *In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D. La. 1993) (quoting *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo. 1974)); *see Educ. Testing*, 447 F. Supp. 2d at 620 (recognizing the potential of protected litigation and delays in appeals of class certification decisions and concluding that "an early settlement that obviated these delays and the risks of having to litigate the claims makes sense.").

Defendants are represented by three of the country's top defense firms – Greenberg Traurig, LLP; Bracewell & Giuliani LLP; and, Mayer Brown LLP – whose attorneys have considerable experience with securities and commercial litigation, and who can and have marshaled substantial resources to fully defend the interests of their respective clients. The further mounting of a vigorous defense would necessarily increase the costs of litigation for Lead Plaintiff and the putative class.

Moreover, taking this case through trial would require an extraordinary commitment of time, money, and resources by Lead Counsel. The possibility of appeals could force Class Members to wait even longer to see a recovery (if any), further reducing present value compared to the immediate settlement (which eliminates the risk of no recovery). *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 260-61 (S.D.N.Y. 2003) ("Even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation and trial, the passage of time would introduce yet more risks in terms of appeals and possible changes in the law and would in light of the time value of money, make future recoveries less valuable than this current recovery.");

24

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985) ("much of the value of a settlement lies in the ability to make funds available promptly."). In addition, at trial, Lead Plaintiff would likely have to resist motions *in limine* by Defendants seeking to preclude these experts, their testimony, and their valuation models. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156 (1999); *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Defendants' experts would also likely contend that all losses experienced by Class Members were due to factors completely unrelated to any actionable conduct, potentially eliminating any recovery. In this context, it is also impossible to predict with any certainty which arguments would find favor with the jury.

Lead Plaintiffs would also have to obtain and maintain class certification because without a certified class, this case would not be economically feasible for virtually all class members, including the Lead Plaintiff, whose damages in the case are similar in size to the costs incurred to date in the litigation, which is far from over if the litigation were to continue. The parties have also yet to file dispositive motions and other pre-trial motions, including *Daubert/Kumho* motions and anticipated cross-motions for summary judgment; oppositions and replies would necessarily follow. Any trial on this matter would last for weeks, if not longer. Prior to trial, Lead Counsel would have to draft and prepare motions *in limine* (and oppositions and replies thereto) related to exclusions of exhibits, evidence, or testimony. Lead Counsel would also have to prepare deposition designations (and objections), draft the pre-trial order and trial memorandum, create jury charges and jury interrogatories, prepare for *voir dire*, prepare witnesses (facing the

inherent difficulties of securing witnesses for trial), and undertake overall trial preparation. Jury instructions would also need to be prepared and drafted, and Lead Plaintiff would likely have engaged the services of a jury consultant and technological consultants to assist with courtroom audio-visual presentations.

Lead Plaintiff has detailed only some of the major milestones for this case, but the aforementioned discussion in no way encompasses the entirety of what would be required to take this case through to trial and through eventual appeals.

**D.      Factor (e): The Range of Possible Recovery and Certainty of Damages**

"[A]fter determining if any legal or factual obstacles exist, a district court must make an inquiry into whether the settlement's terms fall within *a reasonable range of recovery,* given the likelihood of the plaintiffs' success on the merits." *Turner,* 472 F. Supp. 2d at 849-50 (emphasis added). In assessing this factor, the Court "can take into account the challenges to recovery at trial that could preclude the class from collecting altogether, or from only obtaining a small amount." *Klein*, 705 F. Supp. 2d at 656.

Lead Plaintiff's damages expert estimated aggregate recoverable damages at over $100 million for shares purchased between April 19, 2007 (the IPO) and October 24, 2007; these are class-wide damages, of course, and no class was certified until the settlement phase of the litigation, in connection with the preliminary approval of the settlement. Lead Plaintiff's personal estimated damages are approximately $766,344.54; it is clear that on an individual basis the case is already economically unsustainable at this juncture. Defendants' damages expert estimated total recoverable damages for the putative class at just over $600,000. "It is well-settled law that a cash settlement

26

amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982); *Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338, 369 (S.D. Miss. 2003) (same); *see also Grinnell Corp.*, 495 F.2d at 455 n.2  ("In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

The settlement of $1.9 million obviously falls within the range of recoverable damages. Given the prime obstacle noted above regarding class certification and the future likelihood of ultimate success through to trial – and the discount Lead Plaintiff must attribute thereto as a result – the settlement achieved is fair, adequate, and reasonable.

## THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

The approval of a plan of allocation of a settlement fund in a class action is "governed by the same standard of fairness, reasonableness and adequacy applicable to approval of the settlement as a whole." *Schwartz*, 2005 WL 3148350, at *23; *accord, Dell,* 2010 WL 2371834, at *10; *OCA*, 2009 WL 512081, at *11 (noting the plan of allocation had a "fair and reasonable basis for apportionment of recovery"). The Plan of Allocation, fully described in the Notice, was formulated by Lead Counsel in consultation with an expert damages consultant, ensuring its fairness and adequacy. *See* Miller Decl. at ¶¶59-62. The Plan was formulated in accordance with the statutory damages provisions of Section 11 of the Securities Act. 15 U.S.C. § 77k(e).

Here, the $1.9 million cash settlement amount and the interest earned thereon, less all taxes, approved costs, fees, and expenses (the "Net Settlement Fund") shall be distributed to Class Members who submit acceptable Claim Forms. Each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund with that share to be determined by the ratio that the Authorized Claimant's Recognized Claim bears to the total Recognized Claims of all Authorized Claimants. *See Dell*, 2010 WL 2371834, at *11 ("Each class member will receive his or her *pro rata* share of the total funds based on the calculation of his or her recognized losses."); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 127 (D.N.J. 2002) ("Each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Securities based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants.").

The Plan of Allocation here is a weighted calculation, taking into account the differing losses attributable to each share based on relative inflations at time of purchase and sale. *OCA*, 2009 WL 512081, at *11 (approving a plan that "compensates class members in relation to the timing of their actual purchases and sales as well as the amount of their actual losses."); *Schwartz*, 2005 WL 3148350, at *24 (approving a plan that "ensures that Class Members' recovery will be based on not only their legal damages, but also on their actual losses recognizing the facts and circumstances of this case, based on an objective analysis of the magnitude of loss based on the timing of purchases and sales.").

Plaintiffs submit that the proposed Plan of Allocation, which is based on the statutory damages requirements and consultation with an expert consultant, is designed to

28

fairly and rationally allocate the proceeds of the Settlement among Class Members. Accordingly, Co-Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate, and should be approved.

<u>**AWARD OF ATTORNEY'S FEES, LEAD PLAINTIFF AWARD, AND REIMBURSEMENT OF EXPENSES**</u>

Lead Plaintiff believes the percentage method to be reasonable. Lead Plaintiff seeks an award of 8% of the $1.9 million settlement ($152,000), which is considerably less than Lead and Liaison Counsel's lodestar of $2,827,474.50. This request represents a mere 5.5% of the lodestar, or a negative multiplier of just over .05. Moreover, the reimbursement is reasonable in light of this three-year long litigation that involved full merits discovery and the initial exchange of expert reports. There have been no objections lodged either to the fee request or the request for reimbursement of expenses.

**I.     THE COURT SHOULD UTILIZE THE PERCENTAGE-OF-THE-FUND METHOD IN AWARDING ATTORNEYS' FEES**

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co.* v. *Van Gemert,* 444 U.S. 472, 478 (1980); *see also Klein*, 705 F. Supp. 2d at 673 (noting in a case involving a contingent fee-arrangement that did not involve a fee-shifting statute, and concluding "any award of attorney's fees and costs will come from the common fund obtained for the class plaintiffs through the settlement."). For decades, the Supreme Court has approved of attorneys' fees being awarded in common fund cases based upon a percentage of the fund created. *Boeing*, 444 U.S. at 478-79; *Sprague v. Ticonic Nat'l*

*Bank*, 307 U.S. 161, 165-67 (1939). This point was so well established by 1984 that the Supreme Court's statement of it was relegated to a footnote a half-century later. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (noting that "under the 'common fund doctrine,'…a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also* MANUAL FOR COMPLEX LITIGATION (THIRD) § 24.121 at 210 (2003).

Implicitly acknowledging this long-standing method of remuneration, the governing statute in this securities case, the PSLRA, expresses a preference for the percentage-of-the-fund method, stating, "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the class. 15 U.S.C. § 77z-4(a)(6) (emphasis added). Indeed, "[t]he percentage method of calculating fees is particularly appropriate in the PSLRA context." *In re OCA, Inc. Sec. and Deriv. Litig.*, No. 05-2165, 2009 WL 512081, at *19 (E.D. La. Mar. 2, 2009).

And, although the Fifth Circuit has not explicitly adopted the percentage method, it has acknowledged its use in district courts within the Circuit.[13] *Longden v. Sunderman*, 979 F.2d 1095, 1100 n. 11 (5th Cir. 1992) (affirming district court's percentage fee award

---

[13]     Other Courts of Appeals have endorsed the percentage-of-recovery method as an appropriate method for determining attorney's fees in common fund cases. *See Goldberger* v. *Integrated Res., Inc.,* 209 F.3d 43, 49 (2d Cir. 2000) (comparing lodestar analysis to "resurrect[ing] the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits"); *see also In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268-70 (D.C. Cir. 1993).

in securities class action noting that the district court stated its preference for the percentage of recovery approach "as a matter of policy"); *see also In re OCA, Inc. Sec. and Deriv. Litig.*, No. 05-2165, 2009 WL 512081, at *18 (E.D. La. Mar. 2, 2009) ("The Fifth Circuit has never explicitly disapproved of the percentage method of calculating fees in common fund cases."); *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F. Supp. 2d 942, 967 n.15 (E.D. Tex. 2000) ("[T]he Fifth Circuit has never...reversed a district court judge's decision to award a fee as a percentage.").

District courts within the Fifth Circuit have also endorsed the percentage method. *See, for example, Dell,* 2010 WL 2371834, at *12 (noting further that the "rationale behind this widespread (and increasing) use of the percentage method to calculate attorneys' fees in securities class action cases is because the method is considered 'particularly appropriate' to the PSLRA."); *OCA*, 2009 WL 512081, at *18 (citing cases); *Enron,* 586 F. Supp. 2d at 748 (noting as well that "[m]ost federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes.") (citing cases); *Schwartz*, 2005 WL 3148350, at *26 (recognizing the "strong consensus" in utilizing the percentage method); *Batchelder v. Kerr-McGee Corp.,* 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003) ("A percentage fee approach, as opposed to a lodestar computation, is the preferred method for determining awards of attorneys' fees in common fund, or class action, cases."); *Faircloth v. Certified Finance, Inc.,* No. Civ. A. 99-3097, 2001 WL 527489, *8-9 (E.D. La. 2001); *In re Lease Oil Antitrust Litig. (No. II),* 186 F.R.D. 403, 444 (S.D. Tex. 1999); *In re Harrah's Entm't, Inc. Sec. Litig.,* No. 95-3925, 1998 WL 832574, at *4 (E.D. La. Nov. 25, 1998) (Clement, J.).

In stark contrast, the lodestar method, which focuses a court's inquiry into the amount of time spent by counsel prosecuting the claims, is unwieldy and has come under steady attack. *E.g.,* Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 Tex. L. Rev. 865, 867 (1992) (suggesting that the lodestar method "is a source of many problems and has been widely condemned"). Consequently, the leading scholars in the economics of litigation condemn the lodestar approach. Silver, *supra*, 70 Tex. L. Rev, at 868.

Therefore, there is a strong consensus that attorney's fees in common fund cases should be awarded on a percentage-of-the-fund basis. Accordingly, Lead Counsel respectfully requests that the Court employ that method.

## II.    OTHER RELEVANT FACTORS CONFIRM THAT THE REQUESTED FEES ARE FAIR AND REASONABLE

The Fifth Circuit has set forth the following criteria that courts should consider when testing the reasonableness of a request for attorney's fees in a common fund case:

> (1) required time and labor; (2) issues' novelty and complexity; (3) the skill required to properly litigate them; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable;" (11) the type of attorney-client relationship and whether it was long-standing; and (12) awards made in similar cases.

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-719 (5th Cir. 1974); *OCA,* 2009 WL 512081, at *17 (citing *Johnson*). "The relevance of each of the *Johnson* factors will vary in any particular case, and, rather than requiring a rigid application of each factor, the Fifth Circuit has left it to the lower court's discretion to apply those factors in

32

view of the circumstances of a particular case." *Schwartz*, 2005 WL 3148350, at *28

(citing *Brantley v. Surles*, 804 F.2d 321, 325-26 (5th Cir. 1986); *In re Catfish Antitrust

Litig.*, 939 F. Supp. 493, 502 (N.D. Miss. 1996) ("not every [*Johnson*] factor need be

necessarily considered")). An analysis of the *Johnson* factors further demonstrates that

the fee requested by Lead Counsel is reasonable.

### A. Factors (1), (2), (4), and (7): Time and Labor Expended by Lead Counsel; Magnitude and Complexities of the Litigation; Preclusion of Other Employment; Time Constraints

A securities case, "by its very nature, is a complex animal." *Maley v. Del Global

Techs. Corp.*, 186 F. Supp. 2d 358, 372 (S.D.N.Y. 2002) (citing *Clark v. Lomas &

Nettleton Fin. Corp.*, 79 F.R.D. 641, 654 (N.D. Tex. 1978), *vacated on other grounds,*

625 F.2d 49 (5th Cir. 1980), *cert. denied,* 450 U.S. 1029 (1981)); *see also DiGiacomo v.

Plains All American Pipeline*, No. 99-4137, 2001 WL 34633373, at *11 (S.D. Tex. Dec.

19, 2001) (recognizing that Section 11 claims have "significant damages and causation

issues.").

Lead Counsel expended over 5,000 hours prosecuting this litigation, which

precluded employment on other cases given the overall time needed to devote to this

case. *See Enron*, 586 F. Supp. 2d at 789 (accepting the conclusion that "[w]ith the time

commitment involved, it would have been virtually impossible not to forego other work

in order to prosecute this case with the vigor that is evidenced in the pleadings and

declarations[.]").

These four *Johnson* factors are fairly encompassed within the discussion of *Reed*

factors (b) and (c) – the complexity, expense, and likely duration of the litigation; the

stage of the litigation and discovery. In brief:

- Lead Counsel investigated the Class's claims and consulted with consultants in the following fields: economic damages, forensic accounting, construction, and due diligence;

- Lead Counsel drafted an amended complaint that survive Defendants' motions to dismiss;

- Lead Counsel researched and briefed the opposition to the motions to dismiss;

- Lead Counsel attended Court hearings on scheduling and discovery issues on the following dates:

    (a) January 30, 2009 (initial case conference);

    (b) April 9, 2009 (discovery dispute relating to cost sharing on electronically stored information and production of hard copy documents); and,

    (c) November 23, 2009 (discovery dispute relating to Defendants' assertion of the common interest privilege, production of a privilege log, incomplete Interrogatory responses with respect to negative causation).

- Lead Counsel conducted extensive document discovery, and reviewed and analyzed over 1.5 million pages of produced documents;

- Lead Counsel deposed or defended the depositions of 26 individuals;

- Lead Counsel researched and briefed the motion for class certification, as well as researched Fifth Circuit law with respect to filing a Fed. R. Civ. 23(f) petition for appeal;

- Lead Counsel monitored the related bankruptcy proceedings of Superior Offshore Int'l., Inc.;

- Lead Counsel had extensive back-and-forth communications with

Defendants' counsel and with Lead Plaintiff, through electronic mail and telephone conferences;

- Lead Counsel maintained open communications with the parties' selected mediator, and briefed for and attended a mediation in New York, New York; and,

- Lead Counsel negotiated a resolution to this litigation.

All of these steps were taken with the extensive involvement of and oversight by Lead Plaintiff Ognar.

The precarious procedural posture of the denial of Lead Plaintiff's motion for class certification was of palpable concern. Regardless, even assuming that Lead Plaintiff were able to ultimately obtain class certification, the parties would then be thrust into the dispositive motions stage and the law in this area is ever-changing. And, against this backdrop, it bears worth mentioning that "[t]he Fifth Circuit is wary of the power of class actions and requires a plaintiff to prove more at pretrial stages of the litigation[.]" *Enron*, 586 F. Supp. 2d at 795.

Should the case have survived summary judgment, prior to trial, Lead Counsel would then have to draft and oppose motions *in limine*, designate transcripts, draft the pre-trial order and trial memorandum, create jury charges and interrogatories, prepare for *voir dire*, and prepare witnesses (after facing potential difficulty securing them for trial), examinations and exhibits. At trial, Plaintiffs would have had to convince a jury that Defendants had made material misstatements of fact in the Prospectus that caused damage to Class Members. Any jury verdict in favor of the Class would have then been subjected to post-trial motions and/or appeal.

Should Lead Plaintiff have cleared every hurdle to recovery, the case would have been prosecuted for several more years. Avoidance of such protracted litigation militates in favor of granting the requested fees.

## B. Factors (3) and (9): Skill Required to Litigate the Case; and Experience, Reputation, and Ability of the Attorneys

The quality of the representation by Lead Counsel is also an important factor that supports the reasonableness of the requested fee. Given the complexity of the causes of action and the presence of numerous contested issues (including materiality, knowledge, negative causation, due diligence, and damages), nothing less than highly-skilled counsel could have successfully represented the Class and achieved this settlement without the considerable risk, expense, and delay of trial.

Lead Counsel has extensive experience in complex litigation and securities class actions. Miller Decl. at ¶73. This Settlement represents a favorable result for the Class, one that is attributable to the diligence, determination, hard work, and reputation of Lead Counsel. The fees requested by Lead Counsel are within the range of hourly rates received by attorneys at similar firms and reflect work appropriate for attorneys of their levels of experience.

The quality of opposing counsel is also important in evaluating the quality of the services rendered by Lead Counsel. *See In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008); *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-525, 2007 WL 4225828, at *7 (D.N.J. Nov. 28, 2007) (citing *In re Warner Communs. Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985). Defendants were vigorously represented

by Greenberg Traurig, LLP; Bracewell & Giuliani LLP; and, Mayer Brown LLP, preeminent firms representing companies, officers, and directors in complex and securities litigation. The ability of Lead Counsel to obtain this settlement for the Class at this juncture and in the instant procedural posture, in the face of formidable legal opposition, favors granting the requested percentage.

### C. Factors (5), (6), and (11): Customary Fee; Contingent Nature of the Case; and Type of Attorney-Client Relationship and Whether it was Long-Standing

The Supreme Court has recognized that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace. *Missouri v. Jenkins,* 491 U.S. 274, 285 (1989). If this were a non-representative action, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery. *Blum,* 465 U.S. at 904 ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery."). "The vast majority of Texas federal courts and courts in this District have awarded fees of 25%-33% in securities class actions." *Schwartz*, 2005 WL 3148350, at *31.

Lead Counsel undertook this case on an entirely contingent basis with Lead Plaintiff Ognar, wherein attorney's fees would be no greater than one-third of the total recovery.[14] Lead Plaintiff's requested percentage award here -- 8% -- is considerably less

---

[14]     Lead Plaintiff Ognar is a sophisticated individual, having "worked as a retail stockbroker and municipal bond salesman registered with the major stock exchanges until his retirement in the 1980's." Rec. Doc. 194 (Memorandum and Order at 8). Moreover, as to the attorney-client relationship (*Johnson* Factor (11)), the Court concluded:

than the negotiated amount, and should thus be entitled to a "presumption of reasonableness" and "deference." *Dell*, 2010 WL 2371834, at *14 ("In the present case, the Court agrees the Retainer Agreement, setting a fee range of 18% to 25%, was entered into by a properly-selected, sophisticated Lead Plaintiff and properly-selected Lead Counsel, and the terms of the Agreement are therefore entitled to a ***presumption of reasonableness***."); *OCA*, 2009 WL 512081, at *19 ("Such an agreement would be ***entitled to deference*** given the lead plaintiff's role in selecting counsel under the PSLRA."). The risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit* v. *Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted); *see also Schwartz*, 2005 WL 3148350, at *31 (noting that "[c]ounsel's contingent fee risk is an important factor in determining the fee award.") (citation omitted); *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (concluding it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award").

---

> He questioned counsel about their qualifications and experience in class action litigation before he retained them…. He chose competent counsel, on whom he reasonably relies for their legal expertise and advice.

Rec. Doc. 194 (Memorandum and Order at 8-9).

The risk of no recovery in complex cases of this type is significant. There have been many class actions in which lead counsel expended thousands of hours and yet received no remuneration despite their diligence and expertise. *See, e.g., Winkler* v. *NRD Mining, Ltd.,* 198 F.R.D. 355 (E.D.N.Y. 2000) (granting judgment as a matter of law for defendants after a jury returned a verdict for plaintiffs); *In re Health Mgmt., Inc. Sec. Litig.,* 184 F.R.D. 40 (E.D.N.Y. 1999) (jury verdict for auditor in securities class action); *Robbins v. Koger Props.,* 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million against an accounting firm reversed on appeal and judgment entered for defendant); *Anixter v. Home-State Prod. Co.,* 77 F.3d 1215 (10th Cir. 1996) (appellate court overturned securities fraud jury verdict for plaintiffs in case filed in 1973 and tried in 1988, on the basis of 1994 Supreme Court opinion); *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir. 1990) (judgment reversed on appeal and case dismissed after 11 years).

Unlike counsel for Defendants, who are paid hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses in their prosecution of this case, which has been pending since 2008. Lead Counsel undertook a substantial risk that their considerable investment of time and out-of-pocket expenses would never be recouped.

### D.  Factor (8): The Amount Involved and Results Obtained

This *Johnson* factor is fairly encompassed within the discussion of *Reed* factors (b), (c), and (e) – the complexity, expense, and likely duration of the litigation; the stage of the litigation and discovery; and the range of possible recovery and certainty of damages. Lead Counsel, in consultation with an economics and damages expert,

estimates that had liability been fully established on a class-wide basis, the Class could have recovered aggregate damages in excess of $100 million. This figure, Lead Plaintiff believes to be now unrealistic in light of the Court's decision to deny class certification on the knowledge affirmative defense.[15]

Defendants' damages expert estimated total recoverable damages at just over $600,000 – if a class were certified, which has not occurred and is unlikely, except the certification approved in connection with this settlement. The amount obtained – $1.9 million – greatly exceeds Defendants' estimate, in spite of clear and present obstacles to full class-wide recovery, and this factor favors approval of the requested percentage award.

### E.  Factor (10): Undesirability of the Case

Moreover, Lead Counsel accepted this case and prosecuted it to the full extent possible despite its undesirability. Indeed, unlike the discussion in *Dell* noting that "claims about the supposed undesirability of this case ring somewhat hollow" because of the many lead plaintiff movants in that case, 2010 WL 2371834, at *19, here, as the Court noted in the Order naming Mr. Ognar lead plaintiff, "Ognar is the only remaining movant for appointment as lead plaintiff[.]" Rec. Doc. No. 64 (Memorandum and Order at 1).

"Class Action cases that carry with them elevated risks, such as the present litigation and that also require lengthy investigation through informal discovery, not to

---

[15]     *See* Withdrawal of Order, Rec. Doc. No. 197.

mention a possibility of no recovery, certainly speaks to the undesirability of a case."
*Schwartz*, 2005 WL 3148350, at *33. Moreover, this case involved a bankrupt company
against which all proceedings have been stayed pursuant to the Bankruptcy Code. *See
OCA,* 2009 WL 512081, at *22 and *23 (noting that "because of OCA's bankruptcy,
there was a chance that plaintiffs' claims would be completely wiped out in the
reorganization of the company…. That counsel pursued this case against a bankrupt
corporation was a substantial risk in itself."); *Enron,* 586 F. Supp. 2d at 791 (noting the
risk of no recovery because of Enron's bankruptcy and the "wasting" director's and
officer's liability insurance policies). This also presented another problem for Lead
Plaintiff. In a Section 11 case, liability is "'virtually absolute' [] for corporate issuers for
even innocent material misstatements." *Krim v. PCOrder.com*, 402 F.3d 489, 495 (5th
Cir. 2005) (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 (1983)). The
Company's bankruptcy effectively foreclosed a simpler avenue of imposing liability on
Defendants. The undesirability of the case thus favors granting the requested percentage.

### F.  Factor (12): Awards in Similar Cases

Lead Counsel seeks an award of only 8% of the $1.9 million settlement. "The vast
majority of Texas federal courts and courts in this District have awarded fees of 25%-
33% in securities class actions." *Schwartz*, 2005 WL 3148350, at *31; *OCA*, 2009 WL
512081, at *19 (citing cases and concluding that in "reported securities cases involving
funds in the $5 million to $10 million range, attorneys' fee awards are generally within
the 25 to 33 1/3 per cent range.").

The amount requested here is considerably below the norm requested by counsel

in other securities cases. In *Enron*, for instance, the court approved a 9.52% fee in a

megafund case. *Enron*, 586 F. Supp. 2d at 803; *see also id.*, at 799 (observing that in

*Waste Management, Inc. Sec. Litig.*, No. 99-2183, the court awarded 7.9% of the

settlement fund, an amount "substantially lower than fees regularly awarded in the Fifth

Circuit"); *see also id.*, at 799-802 (citing cases and studies on percentages awarded in

other cases). Moreover, courts around the country have routinely granted fees of as much

as one-third of settlement funds in securities cases of all sizes:

- *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254 (S.D.N.Y. 2003) (awarding one-third of $1.5 settlement and citing cases awarding one-third in securities cases)

- *In re Blech Sec. Litig*, No. 94-7696, 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002) (awarding one-third of $2.795 million and noting that this percentage is consistent with awards made in similar cases)

- *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310 (S.D.N.Y. 1997) (awarding one-third of $8.25 million settlement)

- *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) (awarding one-third of $11.5 million settlement)

- *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97-9145 (S.D.N.Y. Dec. 11, 2001) (docket entry, Rec. Doc. No. 58, noting that "Counsel for pltffs and the Class are awarded 33 1/3% of the Settlement Fund plus $323,729.68 in reimbursement of expenses, which shall be paid to pltffs' Lead Counsel from the Settlement Fund) (awarding one-third of $21 million)

- *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (awarding one-third of $42 million settlement)

- *In re Marconi, PLC, Sec. Litig.,* No. 01-1259 (W.D. Pa. Jan. 1, 2004) (minute entry, Rec. Doc. No. 44) (awarding one-third of $4.66 million settlement)

- *In re Corel Corp., Inc. Sec. Litig.*, 293 F. Supp. 484, 497 (E.D. Pa. 2003) (awarding one-third of $7 million settlement and finding that "the [one-third] fee request in this complex case is within the reasonable range.")

- *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005) (awarding one-third of $7 million settlement)

- *In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 76 (D.N.J. 2001) (awarding one-third of $4.5 million settlement and citing to ten cases holding the same)

- *In re Eng'g Animation Sec. Litig.*, 203 F.R.D. 417 (S.D. Iowa 2001) (awarding one-third of $7.5 million settlement)

- *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97-7694, 2001 WL 1568856 (N.D. Ill. Dec 10, 2001) (awarding one-third of $14 million settlement)

- *In re Heritage Bond Litig.*, No. 02-ml-1475, 2005 WL 1594389 (C.D. Cal. June 10, 2005) (awarding one-third of $27.8 million settlement)

- *In Mego Fin.,* 213 F.3d 454 (9th Cir. 2000) (affirming district court's award of one-third of $1.725 million settlement)

- *In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) (affirming district court's award of one-third of $12 million settlement)

In light of the foregoing, there is little doubt that the requested fee percentage here lies within the bounds of reasonableness.

## III.   CLASS REACTION TO THE FEE AND EXPENSE REQUEST

To date, the Claims Administrator mailed 39,165 copies of the Notice to Class Members informing them, *inter alia,* that Lead Counsel intended to apply to the Court for an award of attorney's fees of up to 8% of the Gross Settlement Fund and no more than

43

$698,500 in expenses. *See* Mulholland Decl. ¶5. An additional 37,028 Notice and Claim Forms were requested by, and provided to, the Nominee Account Holders and Institutional Groups and other individuals. *Id.* The time for Class Members to exclude themselves from the Class or object to the fee request by lodging a written objection expires on April 26, 2011, and to this date, not a single member of the Class has objected to the settlement or the fee request; indeed, only one Class Members requested an exclusion from the Class, and that request was invalid. Mulholland Decl. at ¶10. "[S]uch a low level of objection is a 'rare phenomenon.'" *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 305 (3d Cir. 2005) (citation omitted); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853 (E.D. La. 2007) ("The absence or small number of objections may provide a helpful indication that the settlement is fair, reasonable, and adequate."). The absence of any objections from the Class strongly supports the fee request.

## IV.   A LODESTAR CROSS-CHECK CONFIRMS THAT THE REQUESTED FEES ARE REASONABLE AND PROPER

A cross-check of the proposed award against Lead Counsel's lodestar further confirms that the requested percentage fee award is reasonable. *See OCA,* 2009 WL 512081, at *25 (using a lodestar cross-check); *Klein*, 705 F. Supp. 2d at 679-681. Using the lodestar as a cross-check ensures that the percentage awarded does not create an unreasonably high fee. *DiGiacomo*, 2001 WL 34633373, at *7. Under the lodestar method, the Court multiplies the number of reasonable hours expended by a reasonable hourly rate and than applies a lodestar multiplier. *Dell*, 2010 WL 2371834, at *12 (citing *OCA,* 2009 WL 512081, at *17 and *Enron*, 586 F. Supp. 2d at 745-746). However, "the

Court is not required to perform a detailed review of the time records for a percentage award or for a lodestar cross check." *Enron*, 586 F. Supp. 2d at 825. Indeed, the lodestar cross-check calculation need not entail "mathematical precision" or "bean-counting," *Rite Aid,* 396 F.3d 294, 306 (3d Cir. 2005), and is "not a full-blown lodestar inquiry," *id.*, at 307 n.16 (quoting Report of the Third Circuit Task Force, *Selection of Class Counsel*, 208 F.R.D. 340, 423 (2002)).

As shown in the accompanying Miller and Sadin Declarations, Lead Counsel expended more than 5,000 hours in the prosecution of this case. Applying the hourly rates of Lead and Liaison Counsel's attorneys to the hours they expended in this action yields a lodestar amount of approximately $2,827,474.50. *See* Miller Decl. at ¶ 69 (Lead Counsel lodestar of $2,788,164.50); Sadin Decl. at ¶7 (Liaison Counsel lodestar of $39,310.00). Thus, the 8% fee requested by Lead Counsel results in a negative multiplier of .05; that is to say, the requested fee is less than the value of Lead Counsel's actual lodestar in this case. This demonstrates the reasonableness of the fee request.[16]

## V.    LEAD COUNSEL'S EXPENSES ARE FAIR AND REASONABLE

Lead Counsel's fee application includes a request for reimbursement of expenses in the amount of $698,500, which were reasonably incurred and necessary to the

---

[16]    Indeed, lodestar multipliers are generally awarded. *DiGiacomo,* 2001 WL 34633373, at *11 (approving a 5.3 multiplier and noting that "courts typically apply multipliers ranging from one to four"); *Klein,* 705 F. Supp. 2d at 680 (finding that a multiplier of 2.5 is "not uncommon in class action settlements"); *see also In re Prudential Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir.1998) ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied") (citation and quotation marks omitted); *In re Interpublic Sec. Litig.,* No. 02-6527, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 27, 2004) (awarding multiplier amounting to 3.96; noting multiplier between 3 and 4.5 common in securities cases) (citation omitted).

prosecution of this case.  The actual expenses incurred by Lead Counsel and Liaison Counsel in this litigation amount to $712,247.79 but Lead Counsel limit their expense reimbursement request to the amount of $698,500, which amount was set forth in the notice to Class Members.  No objections to this request were made. "Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement." *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996).  To decide which expenses are compensable in a common fund case, the Court should look to whether the particular costs are of the type typically billed by attorneys to paying clients in the marketplace. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that 'would normally be charged to a fee paying client.'") (citation omitted).

The categories of expenses for which counsel seek reimbursement are the type of expenses routinely charged to hourly paying clients and, therefore, should be reimbursed out of the common fund. *See Schwartz,* 2005 WL 3148350, at *34 (awarding expenses for consulting expert fees, "transportation, meals and lodging, in-house and outsourced photocopying, computerized and on-line research, court reporting fees and deposition transcripts; telephone and facsimile; overnight courier service; statutory notice publication; purchase of special materials; postage; messengers; and other services."); *In re Remoron Direct Purchaser Antitrust Litig.*, No. 03-0085, 2005 WL 3008808, at *17 (D.N.J. Nov. 9, 2005) (citing *Oh v. AT&T Corp.,* 225 F.R.D. 142, 154 (D.N.J.2004) (approving reimbursement for "(1) travel and lodging, (2) local meetings and

transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund-pro hac vice.")); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation* (hereafter, "*Enron* Expense Order"), No. 01-3624, 2004 WL 1900294, at *1 (S.D. Tex. Aug 5, 2004) (allowing for costs and expenses related, *inter alia,* to financial consultants, computer consultants, investigators, accounting consultants, consultants that aided in developing allegations about defendant law firms' duties and obligations, energy consultants, mediation costs, class action notices, filing and witness fees, computerized legal research, overnight delivery, photocopying, telephone and fax expenses, and court reporter services).

A significant component of these expenses is the reasonable cost of Lead Plaintiff's experts, consultants, and investigators. *See Enron* Expense Order, 2004 WL 1900294, at *1 (allowing costs and expenses for investigators and accounting, energy, financial, and law firm standards consultants). Lead Counsel secured assistance from due diligence, construction (vis-à-vis industry standards, including as to vessel construction), damages and economics, and forensic accounting consultants. The economic and damages consultants, for instance, provided advice related to knowledge and negative causation, both elements of Defendants' affirmative defense, which early on Defendants indicated they would advance. In addition, they provided invaluable assistance in devising an event study for Lead Counsel's use in assessing damages. The experts, consultants, and investigators retained by Lead Counsel were indispensable because

without their involvement, Lead Plaintiff could not have properly prosecuted this case. *See, for example, Schwartz,* 2005 WL 3148350, at *34 (awarding expenses for consultants); *In re Media Vision Technology Sec. Litig.,* 913 F. Supp. 1362, 1366 (N.D. Cal.1995) (awarding consulting and expert expenses where the testimony is "crucial or indispensable" to the litigation at hand); *In re Immune Response Secs. Litig.,* 497 F. Supp. 2d 1166, 1178 (S.D. Cal. 2007) (awarding reimbursement for experts and consultants as "reasonable" given the "complex factual nature" of the case in which experts opined on materiality, loss causation, and damages, which was "crucial or indispensable" to the litigation) (internal quotation omitted); *Hicks v. Stanley,* No. 01-10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005) (awarding expenses incurred by co-lead counsel including expert witness fees and other expenses "necessary to the litigation and settlement of [the] action"); *Uniroyal Goodrich Tire Company v. Mutual Trading Corp.,* 63 F.3d 516, 526 (7th Cir. 1995) (reimbursing counsel for expert expenses where the expert testimony was "reasonably necessary" for plaintiff to prove its case); *In re Greenwich Pharm. Secs. Litig.,* No. 92-3071, 1995 WL 251293, at *7 (E.D. Pa. Aug.26, 1995) (awarding expert witness fees, which was "a reimbursable expense since expert testimony would have been crucial at trial").

Lead Counsel also incurred costs in retaining an e-discovery vendor. *See, for example, Enron* Expense Order, 2004 WL 1900294, at *1 (S.D. Tex. Aug 5, 2004) (allowing costs and expenses for computer consultants); *Yarrington v. Solvay Pharms., Inc.*, 697 F. Supp. 2d 1057, 1067 (D. Minn. 2010) (approving "hard" costs paid to third-party vendors). Lead Counsel worked closely with e-discovery consultants on discovery

database preparation, management, and review, including such issues as: file formats and method of delivery; storage and organization of produced files; customization of discovery software; maintenance of discovery databases and software; user support for document review and tagging; report generation; and, document collation for analysis. They assisted greatly in this litigation, among other things, in locating witnesses, many of whom were interviewed and provided valuable information relating to key issues in the case.

Expenses also include the actual costs charged for computerized legal research through Lexis and Westlaw. It is standard practice for attorneys to use these services to assist them in researching legal and factual issues, and reimbursement is proper. *Schwartz,* 2005 WL 3148350, at *34 (allowing costs and expenses for computerized and on-line research); *Remoron*, 2005 WL 3008808, at *17; *Ricoh Corp. v. Pitney Bowes Inc.,* Civ. No. 02-5639, 2007 WL 1852553, at *4 (D.N.J. June 26, 2007) (allowing computer research expenses to be recovered). Courts recognize that these tools create efficiencies in litigation and, ultimately, save clients and the class money. *See Cont'l Ill.*, 962 F.2d at 570. In approving expenses for computerized research, the court in *Gottlieb v. Wiles*, 150 F.R.D. 174, 186 (D. Colo. 1993), underscored the time-saving attributes of computerized research as a reason reimbursement should be encouraged. The court also noted that fee-paying clients reimburse counsel for computerized legal and factual research. *Id*.

In addition, Lead Counsel were required to travel in connection with this action and thus incurred the related costs of transportation, lodging, and meals. *Schwartz,* 2005

WL 3148350, at *34 (awarding costs and expenses for transportation, meals, and lodging). The expenses in this category are reasonable, and are properly charged against the fund created. *See Thornberry v. Delta Air Lines*, 676 F.2d 1240, 1244 (9th Cir. 1982); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733, 746 (S.D.N.Y. 1994).

The costs and expenses incurred in this litigation were necessary for the result obtained. It is notable that not a single objection to the expense request has been received. Reimbursement of these expenses is fair and reasonable and Lead Plaintiffs respectfully request that the Court grant Lead Counsel $698,500 for their unreimbursed outlays on behalf of the class.

## VI.   LEAD PLAINTIFF OGNAR SHOULD BE REIMBURSED FOR REASONABLE TIME, COSTS, AND EXPENSES

The Notice of Pendency expressly stated that Lead Counsel would request reimbursement for "reasonable time, costs, and expenses incurred directly related to representation of the Class, in an amount up to $7,000." Congress acknowledged the authority of district courts to approve a PSLRA reimbursement to the class representatives by noting: "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 77z-1(a)(4). In considering PSLRA awards, courts "consider the relationship between the requested incentive award and the amounts recovered by absent class members under the settlement" and "the time and effort expended by that plaintiff in

50

prosecuting the litigation, any other burdens sustained by the plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery." *Denney v. Jenkins & Gilchrist,* 230 F.R.D. 317, 355 (S.D.N.Y. 2005) (citation omitted).

Courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, ***as well as to provide an incentive for such plaintiffs to remain involved in the litigation*** and to incur such expenses in the first place." *In re Gilat Satellite Networks, Ltd.,* No. No. 02-1510, 2007 WL 2743675, at \*19 (E.D.N.Y. Sept. 18, 2007); *see also In re Heritage Bond Litig.,* Nos. 02-1475, 01-5752, 02-382, 02-993, 02-2745, 02-6484, 02-6841, 02-9221, 02-6512, 2005 WL 1594403, at \*4 and \*18 (C.D. Cal. June 10, 2005) (concluding that the lead plaintiffs were entitled to compensation for their efforts during the litigation); *In re Xcel Energy, Inc.,* 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 total to eight lead plaintiffs); *In re Infospace, Inc.,* 330 F. Supp. 2d 1203, 1216 (W.D. Wash. 2004) (approving lead plaintiff awards)*; Corel*, 293 F. Supp. 2d 484 (E.D. Pa. 2003) (awarding lead plaintiff awards because "[d]uring the course of this litigation, the lead plaintiffs each responded to the defendant's written discovery requests and were deposed.").

Lead Plaintiff Ognar testified in an all-day deposition on March 22, 2010. The Court has read the transcript and reviewed the video of the deposition, Rec. Doc. No. 194 (Memorandum and Order at 7), and concluded about Mr. Ognar:

> He questioned counsel about their qualifications and experience in class action litigation before he retained them. ***He has spent at least 400 hours communicating with counsel (mostly over the telephone and via email)***

*and overseeing their work in this case.* He has read the relevant pleadings in the case, has discussed the case often with his attorneys, and understands the fundamental basis for and the core allegations in the lawsuit....

He chose competent counsel, on whom he reasonably relies for their legal expertise and advice. ***He has been an active participant and has demonstrated that he is willing and able to represent a class if one were certified***.

Rec. Doc. 194 (Memorandum and Order at 8-9) (emphasis added). Lead Plaintiff Ognar has undertaken the kind of responsibilities that other courts have acknowledged in awarding compensation to lead plaintiffs. In *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04-8144, 2009 WL 5178546, at *12 (S.D.N.Y. Dec. 23, 2009), for example, in approving a lead plaintiff award the court indicated that the following constituted "precisely the types of activities that support awarding reimbursement of expenses to class representatives." There, the lead plaintiffs "(1) reviewed and approved the complaints and other pleadings filed in this action; (2) had extensive and regular telephonic, email, and in-person communications with Lead Counsel regarding strategy and developments in the case; (3) reviewed and commented on Lead Counsel's submissions to the Court, the Special Master and the Mediator; (4) oversaw and assisted their own personnel in responding to discovery requests, including requests for production of documents and interrogatories; (5) reviewed and approved responses and objections to discovery requests drafted by Lead Counsel; (6) proffered several representatives to give deposition testimony; (7) reviewed and approved the retention of experts and consultants; and (8) fully participated in all mediation sessions and settlement discussions on behalf of the Class." *See also In re Top Tankers, Inc. Sec. Litig.,* No. 06-

13761, 2008 WL 2944620 (S.D.N.Y. July 31, 2008) (awarding $3,000 to lead plaintiff out of a $1.2 million settlement); *Hicks v. Morgan Stanley,* No. 01-10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005) (awarding $7,500 to lead plaintiff out of a $10 million settlement); *In re WorldCom, Inc. ERISA Litig.,* No. 02-4816, 2004 WL 2338151, at *11 (S.D.N.Y. Oct. 18, 2001) (approving lead plaintiff award because "the three plaintiffs have been intimately involved in every step of the litigation. The named plaintiffs have performed an important service to the class and the burden of this commitment deserves to be recognized through an award from the common fund.").

Notably, no objections have been lodged to Lead Plaintiff's modest request, when juxtaposed against the $1.9 million settlement fund created by Lead Plaintiff Ognar's active supervision of Lead Counsel over the past few years and his vigorous involvement in this litigation. Lead Plaintiff Ognar thus requests reimbursement for time, costs, and expenses in his efforts to achieve a substantial benefit to the Class of a $1.9 million settlement fund.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant final approval to the settlement, award attorney's fees of $152,000 (8% of the settlement), award Lead Plaintiff Ognar $7,000 for his time and diligence in prosecuting this action on behalf of the Class, and approve reimbursement of $698,500 in expenses incurred.

Dated: April 12, 2011                           Respectfully submitted,

                                               _____/s/ Kim E. Miller_____

                                               Kim E. Miller, *pro hac vice*

Melissa Ryan Clark, *pro hac vice*
KAHN SWICK & FOTI, LLC
500 5th Avenue, Suite 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn, *pro hac vice*
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff*
*and the Class*

Art Sadin (Texas Bar No. 17508450)
THE SADIN FIRM
121 Magnolia, Suite 102
Friendswood, Texas 77546
Telephone: (281) 648-7711
Facsimile: (281) 648-7799
asadin@sadinlawfirm.com

*Liaison Counsel for Lead Plaintiff*
*and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Memorandum of Law was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent via U.S. Mail to those indicated as non-registered participants on April 12, 2011.

/s/ Kim E. Miller

Kim E. Miller